**IN UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re:<br><br>Earth Pride Organics, LLC, and<br>Lancaster Fine Foods, Inc.,<br><br>               Debtor. | Chapter 11<br><br>Case No.  17-13816 (ELF)<br><br>(Jointly Administered) |

**DALMATIA IMPORT GROUP, INC.'S POST-TRIAL BRIEF IN SUPPORT OF
ITS OBJECTION TO CONFIRMATION OF THE DEBTORS AND THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS' FOURTH AMENDED PLAN OF
REORGANIZATION AND OBJECTION TO THE DISCLOSURE STATEMENT**

Dalmatia Import Group, Inc. ("Dalmatia"), hereby files this Post-Trial Brief in support of

its Objection to the Debtors' Fourth Amended Plan of Reorganization (the "Plan") Proposed by

Debtors In Possession and the Official Committee of Unsecured Creditors and Objection to

Disclosure Statement (the "Objection").

## BACKGROUND

*1.  History Between the Parties and District Court Litigation.*

Dalmatia, Earth Pride Organics, LLC and Lancaster Fine Foods, Inc. (collectively, the

"Debtors") have a long and tortured history. Up until late 2015, Lancaster Fine Foods

manufactured Dalmatia's proprietary fig spread.  Contrary to the Debtors' account set forth in

the Disclosure Statement, Dalmatia did not "cease[] placing orders with the Debtors, leaving the

Debtors with a large supply of inventory." (Disclosure Statement at 5). Rather, Dalmatia rejected

multiple lots of fig spread because they failed to meet Dalmatia's quality requirements, and

Dalmatia directed Lancaster Fine Foods to stop further production. The Disclosure states that Debtors "liquidated this inventory on the open market in a commercially reasonable manner." This is a lie.  The Debtors did not sell the fig spread on the "open market," but rather they sold it *in secret* through Dalmatia's established distribution channels:  To Dalmatia's then exclusive master distributor, FoodMatch, Inc.  They also continued to illegally manufacture counterfeit Dalmatia Fig Spread using Dalmatia's proprietary fig spread recipe, illegally using Dalmatia's trademarked name and trade dress, all without Dalmatia's knowledge or consent, and the Debtors coordinated with Foodmatch to distribute the counterfeit Dalmatia Fig Spread across America misrepresenting to the American consumer public their product was authentic Dalmatia Fig Spread.  Simultaneously, Lancaster created and sold a competing Fig Spread for Foodmatch, under Foodmatch's Divina label, put Dalmatia's recipe inside those jars, and sold those to Americans as well, all without Dalmatia's knowledge or consent. They tried to put Dalmatia out of business almost overnight using Dalmatia's own recipe to do it.

Due to the Debtor's conduct, Dalmatia was forced to preserve its rights by filing a lawsuit in New York which the Debtors then requested be moved to the Eastern District of Pennsylvania titled *Dalmatia Import Group, Inc. and Maia Magee v. Foodmatch, Inc., Lancaster Fine Foods, Inc. and Earth Pride Organics, LLC, C.O.  Nolt, Inc. and Michael Thompson*, Civil Action No. 16-2767 ("Eastern District Action"). After one year of litigation, a jury found Defendants liable for misappropriating Dalmatia's trade secret fig spread recipe in creating a competing fig spread for FoodMatch, counterfeiting, and trademark infringement.  Although the Disclosure Statement conflates Dalmatia's trade secret claim with the trademark infringement, the Debtors' theft of

trade secrets was a separate tort.  Debtors also were found liable for theft of Dalmatia's property and for breach of a nondisclosure agreement.[1]

On May 3, 2017, the trial court entered judgment against the Debtors in an amount in excess of $2,100,000 plus interest (the "Judgment"). After the jury verdict was entered, the court in the Eastern District Action was going to rule on, *inter alia*, Dalmatia's request for a permanent injunction to stop the defendants in the case from continuing to violate Dalmatia's trade secret rights.

### 2. *Bankruptcy Filing*.

At that point, in May 31, 2017, the Debtors instead filed the instant Chapter 11 cases. Dalmatia obtained stay relief on July 31, 2017, so it could proceed with obtaining injunctive relief against the Debtors and reducing its jury verdict to a monetary claim in the Eastern District Action [Docket Entry 134].

On October 11, 2017, Judge Smith was set to rule on the remaining issues in the Eastern District Action. However, instead of ruling on the issues, the Judge decided to have the parties engage in an impromptu settlement. The terms of the settlement were documented in a handwritten agreement written by Judge Smith, which was executed by all parties late that night. Thereafter, the Parties entered into the typed settlement agreement. A copy of both the handwritten settlement agreement and formal typed agreement is attached hereto as Exhibit "A"[2] for reference and is also on the docket, entry number 306.

---

[1] The jury tried to award Dalmatia an additional $1.5 million for Lancaster's breach of the non-disclosure agreement, however, they unknowingly wrote those awards in the wrong places, so Dalmatia did not receive this intended amount.

[2] Counsel for the Debtors and Dalmatia have agreed to submit joint exhibits "A" and "B," which are submitted by Dalmatia, herewith.

A summary of the terms of the settlement agreement for the instant dispute are as follows: (a) Lancaster was to pay Dalmatia the sum of $700k;  (b) for one year, until October 13, 2018, Debtors were enjoined from making fig spread, but was allowed a carve-out to produce a fig item for one customer who Lancaster claimed did not compete with Dalmatia  (this 1 year injunction was a compromise on Dalmatia's side as Lancaster had previously contractually promised Dalmatia a 2-year non-compete in order to get Dalmatia's business) and Dalmatia would further have the right to inspect Lancaster's facility for a period of five (5) years to ensure Dalmatia's trade secrets were not being illegally used by Lancaster[3]; (c) Dalmatia agreed to fix its claim against the Debtors in the amount of $1,758,871 (a reduction of approximately $350,000 from the Eastern District judgment) (the "Dalmatia Claim"); (d) the Reduced Claim would be a "fixed, valid and allowed unsecured claims in the bankruptcy cases, which will not be challenged by Lancaster, Earth Pride, Michael S. Thompson or C.O. Nolt"; (e) Dalmatia agreed to support the Debtors' plan of reorganization as long as the plan paid "at least 10%." Additional details surrounding settlement conference and settlement agreement will be discussed in greater detail, below. *See* Exhibit "A."

The Debtors filed a motion to approve the settlement agreement and 9019 notice thereafter and the settlement was approved by this Court on March 2, 2018. [Docket Entry No. 339].

---

[3] While it is self-evident that the Debtors could never use Dalmatia's trade secrets, this provision added an inspection right for Dalmatia to help ensure that the Debtors did not continue to misappropriate Dalmatia's intellectual property. Thus, the 5 year provision, was simply a policing mechanism to help guard against future illegal conduct.

### a. *Debtors' Proposed Chapter 11 Plans*

On November 20, 2017, the Debtors filed their disclosure statement and plan of reorganization. [Docket Entry No. 239, 240].  In the Chapter 11 plan, the Debtor proposed to pay all unsecured creditors, including Dalmatia, 15% of their claims over a period of approximately 5 years. [Docket Entry No. 240].  On March 13, 2018, the Debtors filed their amended disclosure statement and amended plan of reorganization. [Docket Entry No. 350, 351].  In the amended Chapter 11 plan, the Debtor proposed to pay all unsecured creditors 15% of their claims over a period of approximately 5 years. [Docket Entry No. 351].  On April 27, 2018, the Debtors filed their second amended disclosure statement and second amended plan of reorganization. [Docket Entry No. 390, 391].  In the second amended Chapter 11 plan, the Debtor proposed to pay all unsecured creditors 15% of their claims over a period of approximately 5 years. [Docket Entry No. 391].  On June 1, 2018, the Debtors filed their third amended disclosure statement and third amended plan of reorganization. [Docket Entry No. 419-422].  In the third amended Chapter 11 plan, the Debtor proposed to pay all unsecured creditors 15% of their claims over a period of approximately 5 years. [Docket Entry No. 419].  The first 4 iterations of the plan, above, were devised and filed by the Debtors, only.

Shortly after the third amended plan was filed, the unsecured creditor's committee (the "Committee") began to jointly draft a fourth amended plan with the Debtors. On June 6, 2018, the Debtors and Committee filed a joint fourth amended disclosure statement and fourth amended plan of reorganization which abruptly reduced Dalmatia's rights [Docket Entry No. 428 and 429].  In the fourth amended Chapter 11 plan, the Debtor proposed to pay all unsecured creditors, except for Dalmatia, between 39% to 50% of their claims over a period of approximately 8 years. [Docket Entry No. 426].  However, now there was a new class created:

Class 5 in the fourth amended plan consisted of only one unsecured creditor, Dalmatia.

Dalmatia's proposed treatment was only 10% of its unsecured claim over a period of

approximately 8 years, significantly worse treatment than any other unsecured creditor.

Under the first four iterations of the plan Dalmatia would have received 15% of its claim,

which amounts to $263,830.65. in the fourth amended plan, Dalmatia's distribution was lowered

to 10% or, $175,887.10. Moreover, the fourth amended plan proposed to pay Dalmatia the

substantially reduced amount over a period 60% longer (8 years vs. 5 years) than proposed for

the higher amounts provided in the prior iterations of the plan. If Dalmatia was treated the same

as all other unsecured creditors, it would receive between 39% to 50% of its claims, which

comes out to a minimum of $685,959.69 and maximum of $879,435.50. On July 16, 2018, due to

this discriminatory treatment, Dalmatia objected to the fourth amended plan. [Docket Entry No.

449].

### b.  *Plan Confirmed*

On September 6, 2018, the Court confirmed the Debtors' fourth amended plan, with the

issue of Dalmatia's objection being reserved for a determination on a later date. At the

confirmation hearing, Mike Thompson, the principal of the Debtors, proffered the following in

connection with Dalmatia's treatment under the plan: "Your Honor, I'd like to make an offer of

proof that the debtor has the ability to fund the result of any hearing dealing with Dalmatia.

Obviously, if they lose, they have the ability to fund that. If they win, it would be a moot point."

[See Docket Entry 564-2, 26:4-8]. At the hearing, the Court advised that an evidentiary hearing

concerning Dalmatia's claim would be scheduled at a later date. The order confirming the

Debtors' plan was entered by the Court on September 17, 2018. [Docket Entry No. 502].

### c.    *Evidentiary Hearing*

The court scheduled the evidentiary hearing on Dalmatia's objection to the plan on December 21, 2018. A copy of the transcript from the December 21, 2018 hearing is attached hereto as Exhibit "B"[4] for reference. Paul Maschmeyer, Esq. appeared on behalf of the Debtors; Michael Vagnoni, Esq. and Edmond George, Esq. appeared on behalf of the unsecured creditor's committee; and Marshall Kizner, Esq. appeared on behalf of Dalmatia. Maia Magee, the principal of Dalmatia, testified, along with Harvey Grossman, a salesman with Dalmatia. Michael Thompson, principal of the Debtors' testified on behalf of the Debtors.

### i.  Ms. Magee's Testimony

Ms. Magee testified regarding the October 11, 2017 settlement conference. The settlement conference was unexpected since it was the return date of a motion for injunctive relief and not a scheduled as a settlement conference. [45:12-15]. The conference started in the morning and ended late that evening, around 10 at night. [45:22]. Ms. Magee discussed the fact that the language concerning the Dalmatia's unsecured claim was an afterthought that the Judge squeezed into the margin of paragraph 3 of the handwritten agreement as a result  [51:6-23]. Ms. Magee's understanding of the language concerning the handwritten clause in the margin of paragraph 3  was that "if Lancaster can only afford to pay [all] the [unsecured] creditors ten percent, [she] would not object to that." [52:10-12]. There is no reference to or creation of separate classes in the settlement agreement, handwritten or typed. Ms. Magee is sure that there was absolutely no discussion about separate classes of unsecured claims during the settlement conference. [52:21-23]. She was aware of secured claims and unsecured claims, but it was never

---

[4] Dalmatia's counsel redacted one word, a food ingredient, from the transcript due to the confidentiality provision contained in the settlement agreement and the possibility that the un-redacted word may violate that provision. The redacted word appears on pages 173 and 224.

discussed that there would be a "third" and "lesser class" of creditors, such as a separately

classified unsecured creditor. [77:14-22].

Regarding the language in the settlement agreement, "at least ten percent," Ms. Magee

testified as follows:

BY MR. KIZNER:

Q Okay. So is it fair to say you agreed to receive at
least ten percent?

A I agreed to receive what other unsecured creditors would
agree to receive. And in the worst-case scenario -- this was
written in at the end. It was like if this is all Lancaster
can pay out to you guys and to the creditors -- and that's
what I mean, "you guys," to the creditors, pay out -- that's
what "pay out" means, paying out to the -- to the creditors.
If this is all Lancaster can afford, I'm not going to cause
any trouble, I'm not going to object, I'm not going to stop a
plan if that's all he can afford. And that's what I --
that's what I did. I wasn't agreeing to only take ten
percent. Why would I do that?

*        *        *

Q And also, it doesn't say only ten percent, right? It's
a floor of ten percent, not a ceiling.

A It's worst-case scenario, it's a worst-case scenario.
It was written in at the very end. It's very vague.

[79:11-23 and 80:1-5].

 Ms. Magee never received any money from the Debtors or any third parties under the

terms of the settlement agreement or in any other way.  [56:14-16]. Ms. Magee repeatedly

testified that she does not believe she received any benefit from the injunctive relief contained in

the settlement agreement because she never received what mattered to her:  money. The Judge

wanted to put some sort of injunction in the agreement and Ms. Magee did not want to argue

with a Federal Judge, however, she maintained at the settlement conference and at the hearing

that short of a two-year injunction, whereby Lancaster would be prohibited from making fig spread at all (as in the non-compete clause Thompson agreed to in the Manufacturing Agreement he signed with Dalmatia), no injunction would protect her business, because manufacturing can work around an injunctive period which is less than two (2) years.  She testified that a one year injunction, due to the timing of it right before the holidays, was basically meaningless for the following reasons:  Lancaster could easily stock up Foodmatch (and Lancaster did so) before the injunction started, and again stock up after the injunction ended right before the following holiday season (and Lancaster did so).  She told Judge Smith this would happen which is why the $700,000 payment to Dalmatia and the bankruptcy claim were the items of value to her.  Ms. Magee felt strongly that she did not want to disrespect a federal judge's desire for peace.  The monetary payout is what Dalmatia was looking forward to, expecting, what all parties believed and understood would be paid to Dalmatia, and what Dalmatia needed to recover some of its damages from the theft and counterfeiting of its property by the Debtors.

Everyone, including Judge Smith believed that Lancaster was to pay Dalmatia $700,000, and everyone understood that this payment was the motivation for Dalmatia settling at all.  Ms. Magee maintained that fact at the hearing. It was understood to the Judge and all parties that Lancaster agreed, in good faith, to pay Dalmatia $700,000. To that end, the Judge included language in the settlement agreement, assuming that payment would have already happened: "Upon payment of the sum of $700,000…."

The Debtors, with the Committee, are trying to twist and manipulate the Settlement Agreement, made in good faith, and are trying to rewrite the meaning of the Agreement so they can further reduce Dalmatia's rights to an extent greater than the sizeable monetary concession made by Dalmatia during the settlement conference.

Dalmatia won the trial fair and square, was awarded damages, and agreed to settle in good faith because Judge Smith wanted that. And now, after not receiving the settlement it agreed to in exchange for dropping its claims against Lancaster, Dalmatia is here in court again, having to defend its rights again, from Lancaster who is trying to trample it again.

ii.    **Mr. Thompson's Testimony**

Mr. Thompson's direct examination by his counsel and the unsecured creditor's committee focused on alleged detriments incurred by the Debtors by entering into the settlement agreement and alleged benefits Dalmatia received through the injunctive relief  provisions set forth in the settlement agreement. Notably, there was no documentary data produced by Mr. Thompson to support the alleged detriment the Debtors incurred. There were no hard numbers produced by Mr. Thompson, he estimated that the Debtors lost $500,000 to $700,000 in sales, without any data to support the estimate. Notably, counsel for the Committee, stated earlier in the hearing that alleged benefits to Dalmatia and detriments to the Debtors could have been determined by an economist, yet the Debtor, nor the Committee, presented an economist or other expert testimony. [22:16].

The Court questioned Mr. Thompson directly on how Dalmatia received any benefit from the injunctive relief:

> THE COURT: You've quantified in your testimony the effect of the injunction. At one point, I think you said it cost you 500,000 in sales, and later you said as much as seven hundred.
> THE WITNESS: No, in -- not in sales. In sales, it was --
> THE COURT: In -- I'm sorry. Not in sales. In basic profit.
> THE WITNESS: Profit and --
> THE COURT: Net cash flow, net cash flow --

THE WITNESS: Net cash flow.
THE COURT: -- was the word you used.
Okay. I don't -- you have to help me with this.
How does that translate into a benefit to Dalmatia, that you
lose money? Why does that mean there's a benefit to
Dalmatia? And if there is one, how do you quantify that and
why are you assuming it's dollar-for-dollar?
THE WITNESS: What -- what that did, as far as
increasing the purchase price for FOODMatch and, by
disrupting their business, it allowed her sales to increase,
and that -- and not be –

[213:4-34].

Contrary to Mr. Thompson's words, Foodmatch's supply during the slower months was
not disrupted by the one-year injection.  Foodmatch was pre-stocked for the large holiday selling
season before the injunction took effect, and during the slower months (25-30% of the business)
it ordered fill in product from its Greek manufacturer.[5]

Mr. Thompson was also questioned about his recollection of the September 6, 2018
confirmation hearing and proffer that he offered in support of his plan confirmation. Although he
generally recalled being in court, he could not remember the specifics of the confirmation
hearing in connection with Dalmatia's claim. [198:5-18]. Mr. Thompson was questioned about
the details of the settlement conference that took place on October 12, 2017 as well. When asked
who wrote the handwritten settlement agreement, he could not answer with complete accuracy
[200:10-16].

Regarding the inclusion of the late handwritten addition to the settlement agreement
concerning Dalmatia's possible support of the Chapter 11 plan, Mr. Thompson recalled, in detail
that Dalmatia agreed to accept ten percent and claimed there were in-depth discussions about the
10%. [202:13-25 and 205:18-25]. Mr. Thompson did not refute that the bankruptcy language was

---

[5] The Greek manufacturer also now knows Dalmatia's recipe as a result of the trade secret theft.

added to the settlement agreement at the very end of the conference, but claimed to believe that

the "at least 10% language" was clear and meant only 10%. [206:6-7].

## **LEGAL ARGUMENT**

Section 1129(b)(1) of the Bankruptcy Code provides: [n]otwithstanding section 510(a) of

this title, if all of the applicable requirements of subsection (a) of this section other than

paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan,

shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not

*discriminate unfairly*, and is *fair and equitable*, with respect to each class of claims or interests

that is impaired under, and has not accepted, the plan. *Id.* (emphasis added). Section 1129(b)(1)

provided two independent tests that a plan proponent must satisfy to confirm a plan over

dissenting creditors. First, the plan must not "discriminate unfairly" and, second, the plan must

be "fair and equitable." 11 U.S.C. § 1129(b)(1).

To forcibly impose a plan upon dissenting creditors, the plan proponent must specifically

request it, or it must be evident by the provisions of the plan that cramdown is the only method

by which the plan may be confirmed. *Law Debenture Tr. Co. of N.Y. v. Tribune Media Co. (In re*

*Tribune Media Co.)*, 587 B.R. 606, 617-618 (D. Del. 2018) (emphasis added).

In the Third Circuit, two tests have emerged under 11 U.S.C. § 1129(b)(1) to determine

the issues of unfair discrimination and fair and equitable treatment. One is a four factor test and

the other is a rebuttable presumption test, known as the Markell test. The hallmark of the tests

are whether there is a reasonable basis for the discrimination, and whether the debtor can confirm

and consummate a plan without the proposed discrimination. *See, e.g., In re Ambanc La Mesa*

*L.P.*, 115 F.3d 650, 656 (9th Cir. 1997). The Third Circuit has yet to determine which standard

should apply when assessing unfair discrimination. *Tribune Media Co.*, 587 B.R. 606 at 618.

Since the Court may be inclined to consider one or both tests, Dalmatia has analyzed its position

under both tests.

        As noted by the Court at the evidentiary hearing, the Debtors have the burden of proof as

to whether the plan provisions and treatment of Dalmatia are permissible under the Bankruptcy

Code.  [9:16-19].

### 1. *Four Factor Test*

        The Bankruptcy Code does not define unfair discrimination, nor does the statute's

legislative history provide guidance as to its interpretation. *In re Armstrong World Indus., Inc.*,

348 B.R. 111, 121 (D. Del. 2006); *In the Matter of Johns-Manville Corp.*, 68 B.R. 618, 636

(Bankr. S.D.N.Y. 1986). As a result, courts have developed several methods to determine

whether a proposed plan unfairly discriminates against a dissenting class. "The hallmarks of the

various tests have been whether there is a reasonable basis for the discrimination, and whether

the debtor can confirm and consummate a plan without the proposed discrimination." *In the*

*Matter of Lernout & Hauspie Speech Products, NV.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003).

Traditionally, courts applied a four-factor "totality of the circumstances analysis" to determine

unfair discrimination. The factors considered are:

        (1) whether the discrimination is supported by a reasonable basis;

        (2) whether the debtor could consummate the plan without the discrimination;

        (3) whether the discrimination is proposed in good faith; and

        (4) the relationship between the discrimination and its basis or rationale.

*Nat'l Enters. v. Ambanc La Mesa Ltd. Pshp. (In re Ambanc La Mesa Ltd. Pshp.)*, 115

F.3d 650, 656 (9th Cir. 1997); *In re Dow Corning Corp.*, 244 B.R. 696, 700 n. 3 (Bankr. E.D.

Mich. 1999) (listing cases applying four-factor test).

      The Debtors cannot satisfy any of the four prongs under the test.

### a. *Debtors can consummate the plan without discrimination*

      The Debtors unequivocally proffered that they can consummate the plan without

discrimination at the September 6, 2018 confirmation hearing. Accordingly, unless Mr.

Thompson was not honest with the Court at the confirmation hearing, this factor favors

Dalmatia.

### b. *Dalmatia's plan treatment was not proposed in good faith*

      Dalmatia agreed to amend its claim from approximately $2,100,000 to $1,758,871 per the

settlement agreement. The Debtors agreed that the $1,758,871 would be a "fixed, valid and

allowed unsecured claims in the bankruptcy cases, which will not be challenged by Lancaster,

Earth Pride, Michael S. Thompson or C.O. Nolt." There is no mention of the possibility of

separately classifying Dalmatia anywhere in the settlement agreement. It is clear that the parties

agreed Dalmatia may receive more than 10% of its fixed valid and unsecured claim. If not, the

agreement would have not contained the language "at least 10%" and would instead have said

"only 10%." It is clear based on the history of this case, through the Debtors' course of

performance in proposing four plans that proposed to pay Dalmatia 15% of its unsecured claim,

for *all* unsecured creditors, that the Debtors' intention was to treat Dalmatia *pari passuo* with all

other unsecured creditors.

      However, in bad faith, the Debtors, in concert with the Committee sought to conduct an

end-run-around the fact that the $1,758,871 was a fixed, valid and unsecured claim. The way the

Debtors' and the Committee did this was to improperly treat Dalmatia differently from, and

worse than, every other unsecured creditor. This effectively revised the agreed upon settlement

terms and re-challenged the claim that Dalmatia already agreed to reduce by $350,000, to an

even lower figure through bad faith conduct.

### c.   *There is no reasonable basis to discriminate against Dalmatia*

The Debtors will argue that the 1st and 4th factors of the four prong test favor them

because Dalmatia agreed to support a plan that paid it only 10% of its claim. However, it is clear

that the settlement agreement is ambiguous for two reasons (a) there was no mention of separate

classifications of unsecured creditors in the settlement agreement, nor was it discussed at any

time during the settlement conference and (b) the language "at least 10%" supports that 10% is a

floor, not a ceiling, to what Dalmatia agreed to accept. Accordingly, we ask that the Court to

review the ambiguities in the settlement agreement, in light of the testimony and history of the

case, appreciating that Judge Smith himself wrote and was committed to a settlement agreement

that day.

"Settlement agreements are contracts between the parties and contract principles are

generally applicable to their construction." *Marine Midland Realty Credit Corp. v LLMD of

Michigan, Inc*., 821 F. Supp. 370, 373 (E.D. Pa. 1993). Courts will determine as a matter of law

whether written contract terms are either clear or ambiguous.  *United Refining Co. v. Jenkins*,

410 Pa. 126, 137-38 (1963).  An ambiguous contract is one capable of being understood in more

sense than one; an agreement obscure in meaning through indefiniteness of expression, or having

a double meaning. . . . Before it can be said that no ambiguity exists, it must be concluded that

the questioned words or language are capable of [only] one interpretation." *Gerhart v. Henry

Disston & Sons*, 290 F.2d 778, 784 (3d Cir. 1961)). When a contract is capable of more than one

interpretation, extrinsic evidence should be viewed to resolve the ambiguous terms in the contract. *Gerhart v. Henry Disston & Sons, Inc.*, 290 F.2d 778, 785 (3d Cir. 1961) (concluding that in viewing documents in their entirety in the setting of the circumstances of this case the district court was correct in permitting parol evidence to resolve ambiguities surrounding the use of the word "liabilities" by the parties).

In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter *Long v. Brown*, 399 Pa. Super. 312, 321 (1990). Additionally, the Third Circuit has adopted a similar approach. In *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001 (3rd Cir. 1980), the court addressed the issue of a latent ambiguity in a contract based on external objective practices. The Third Circuit held that if a reasonable alternative interpretation is suggested, "external signs and objective indicia" may be considered in determining whether ambiguity exists. *Id.* Along these same lines, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade." *Sunbeam Corporation v. Liberty Mutual Insurance Co.,* 781 A.2d 1189 (Pa. 2001)(quoting Restatement (Second) of Contracts § 202(5)).

Restatement (Second) of Contracts § 202(5), Rules of Aid of Interpretation, provides: "[w]herever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade."  Comment G of § 202 states the following regarding course of performance. "The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning." Pennsylvania court have often followed the restatement of contracts in resolving ambiguities. *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562

F.3d 213, 220 (3d Cir. 2009) (citing *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 566 Pa. 494, 781

A.2d 1189 (Pa. 2001).

### i. **Debtors' course of performance is the strongest indicator of its intent**

In the first four versions of the plan, the Debtors agreed to pay Dalmatia 15% of their

unsecured claim instead of 10%. The difference is $87,943.55. No debtor in bankruptcy would

gratuitously pay an unsecured creditor $87,843.55 more than it had to on four separate occasions.

The Debtors' course of performance throughout the case, particularly its treatment of Dalmatia's

claim in the first four iterations of the plan, is the strongest evidence of the parties' intentions and

the meaning of the settlement agreement.

### ii. **Debtors' testimony concerning the 10% provision should be given no weight**

Mr. Thompson could not recall with certainty who drafted the handwritten settlement

agreement on October 12, 2017. He could not remember the specifics of his testimony at the

confirmation hearing nearly a year later on September 6, 2018. Mr. Thompson does not dispute

that the 10% provision was added at the 11th hour to the settlement agreement. Nonetheless, Mr.

Thompson testified on December 21, 2018, in detail, that Ms. Magee agreed to take "only" 10%.

Mr. Thompson's selective memory regarding Ms. Magee's intentions are not believable since he

could not remember what he himself said in court, under oath, only four month before the

evidentiary hearing, nor could he remember basic details concerning the October 12, 2017

settlement conference, such as who wrote the agreement. Mr. Thompson's claim to vividly

remember that Ms. Magee agreed to take 10% is not credible in view of the circumstances and

should be given no weight.

Mr. Thompson seems to change his answers to suit the day.  His bad faith, and misrepresentation of the facts around the case and settlement agreement are insulting Dalmatia and offensive to Judge Smith's efforts to peacefully resolve the Eastern District Action.  The Court should disregard Mr. Thompson's testimony all-together since it is not credible.

### iii.  Dalmatia's testimony is credible and compelling

Ms. Magee provided honest "common sense" testimony to support the meaning of the settlement agreement. There were no discussions about separate classifications of unsecured creditors prior to the last minute addition of the 10% provision into the handwritten settlement agreement. This makes sense since it was written very late in the day and inserted in the margin of the document, which is consistent with her testimony. Ms. Magee understood that there were secured creditors and unsecured creditors and she wanted to make sure that she received the same amount as other unsecured creditors. At a bare minimum, if unsecured creditors, as a collective group, received 10%, she would support the plan. However, there was no discussion about separately classifying Dalmatia into its own discriminated class to provide it only 10%, while all other unsecured creditors received 25% to 35% more than Dalmatia.

There is a pattern by Mr. Thompson of bad faith and discrimination towards Dalmatia based on the Debtors' treatment of Dalmatia throughout the Eastern District Action:  Debtors disregarded all of Dalmatia's intellectual property rights, profited from stealing Dalmatia's trade secrets and illegally selling Dalmatia's product. A jury did not believe Debtors' story and found the Debtors liable.  Now, the Debtors are trying to again hurt Dalmatia by unfairly discriminating against it in this bankruptcy case.

The court should interpret the contract to support Dalmatia's position since its position is supported by the strongest evidence of intent, the Debtors' course of performance, along with

Ms. Magee's testimony. Based on the inconsistencies in Mr. Thompson's testimony, his position

is not believable and should be given no consideration. In short, there is no reasonable basis to

argue that the classification was agreed upon and proper. Dalmatia never agreed to the

discriminatory treatment in this case.

### d.  *The relationship between the parties and the discrimination does not support the Debtors' treatment of Dalmatia.*

The Debtors will presumably argue that the injunctive relief provided to Dalmatia in the

settlement agreement supports the discriminatory treatment. This argument should be rejected

because the Debtors did not have any facts other uncorroborated testimony of Mr. Thompson to

support that the Debtors  received any detriment by agreeing to injunctive relief or that Dalmatia

received any benefit. As noted by the Committee's counsel, these proofs could have been

adduced by an economist or other expert. Instead, Mr. Thompson testified, in conclusory fashion,

that he believed the Debtors lost between $500,000 to $700,000 through the injunctions. There

were no company reports, documents or other supporting proofs to verify his testimony.

Furthermore, as Ms. Magee explained at the hearing, the one-year injunction was

supposed to be accompanied by a $700,000 cash payment to her—that combination is what she

agreed to and thought she was leaving the settlement conference with.  Without the monetary

compensation she was promised, a one-year injunction, due mainly to the timing, was useless

because the Debtors could easily work around it by stocking up Foodmatch in October (right

before the holidays) and a year later stocking up Foodmatch again (right before the holidays).

Since the holiday season comprises roughly 60-70% of the fig spread sales, Debtors did not miss

out on business during that time (contrary to what Thompson claimed).

More significantly, Mr. Thompson presented no evidence to support that Dalmatia

received any benefit for the injunctions. The Court duly noted that the Debtors losing money

does not equate to a dollar-for-dollar gain by Dalmatia. Indeed, there was no evidence introduced

by the Debtors or the Committee which shows that the injunctive relief was a *quid pro quo*

providing a benefit to Dalmatia through the Settlement Agreement. The injunctive relief was a

result of the jury's findings and were warranted as a matter of law, due to the Debtors' unlawful

conduct. No evidence was introduced to show that the injunctive relief was an additional benefit

as a justification for discriminatory treatment. For these reasons, the Debtors cannot satisfy any

of the prongs of the four prong test.


### 2.   *Markell Test*

Several courts have replaced the four prong test with a rebuttable presumption test, first

proposed in an Article by Professor Bruce A. Markell in the AMERICAN BANKRUPTCY LAW

JOURNAL. *See Dow Corning*, 244 B.R. at 701 (citing Bruce A. Markell, *A New Perspective on

Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L. J. 227 (1998)). In this analysis, a

rebuttable presumption of unfair discrimination arises when there is:

> (1) a dissenting class; (2) another class of the same priority; and (3) a *difference in the plan's treatment of the two classes* that results in either (a) a *materially lower percentage recovery* for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

> *Dow Corning*, 244 B.R. at 702.

If there is an allegation of a materially lower percentage recovery, the presumption can be

rebutted "by showing that, outside of bankruptcy, the dissenting class would similarly receive

less than the class receiving a greater recovery, or that the alleged preferred class had infused

new value into the reorganization which offset its gain." *Id.* A demonstration that the risk

allocation was similar to the risk assumed by the parties prior to bankruptcy can rebut the

presumption that a discriminatory risk allocation was unfair. *Id.* The bankruptcy court in *Dow Corning* found Professor Markell's test to more effectively target unfair discrimination than did the four-factor test,  and therefore adopted and applied the rebuttable presumption standard. *Id.; see In the Matter of Greate Bay Hotel & Casino. Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000).

Dalmatia is receiving a materially lower percentage recovery under the Debtors' proposed plan treatment. Dalmatia is being treated 25% to 35% lower than the rest of unsecured creditors. This is the single most important consideration under the Markell test. *See Law Debenture Tr. Co. of N.Y. v. Tribune Media Co. (In re Tribune Media Co.)*, 587 B.R. 606, 616-18 (D. Del. 2018); *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 231 (Bankr. D.N.J. 2000). The Debtors cannot rebut the presumption that Dalmatia is not being treated fairly since it cannot show that Dalmatia, outside of bankruptcy would similarly receive less than other unsecured creditors. Likewise, the Debtors presented no evidence to support that other unsecured creditors infused new value into the reorganized debtors to offset their gains. In short, the Debtors cannot satisfy their burden under the Markell test.

While Dalmatia's objection is ultimately about money and the distribution for which Dalmatia is entitled. Dalmatia understands that no matter what the Debtors propose or are directed to do, they will ultimately not pay anything.  Accordingly, the instant objection is about unfair discrimination against Dalmatia, which should not be allowed.

      **WHEREFORE**, for the foregoing reasons, the Debtors have not met their burden

and Dalmatia requests the relief set forth in the Objection, and for such other and further relief

as this Court deems just and proper.

      Respectfully submitted,

      */s/ Marshall T. Kizner*
      Marshall T. Kizner
      Stark & Stark
      A Professional Corporation
      777 Township Line Road
      Suite 120
      Yardley, PA 19067
      (609) 896-9060

      Joseph Lemkin (admitted *pro hac vice*)
      STARK & STARK
      A Professional Corporation
      993 Lenox Drive, Bldg. 2
      P.O. Box 5315
      Princeton, New Jersey 08543-5315
      (609) 896-9060

Dated:  May 31, 2019