# EXHIBIT B

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

IN RE:

EARTH PRIDE ORGANICS, LLC,

                    Debtor.

. . . . . . . . . . . . . . . . .

. Chapter 11
.
. Case No. 17-13816-elf
.
.
. Courtroom No. 1
. Philadelphia, Pennsylvania
. Friday, December 21, 2018

TRANSCRIPT OF HEARING ON OBJECTION TO AMENDED CHAPTER 11 PLAN
(PRE-CONFIRMATION)
BEFORE THE HONORABLE ERIC L. FRANK
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For the Debtor:              Paul Brinton Maschmeyer, Esq.
                             MASCHMEYER MARINAS, PC
                             350 South Main Street, Suite 105
                             Doylestown, Pennsylvania 18901

For the Official Committee
of Unsecured Creditors:      Michael D. Vagnoni, Esq.
                             Edmond M. George, Esq.
                             OBERMEYER, REBMANN, MAXWELL
                              & HIPPEL, LLP
                             Centre Square West
                             1500 Market Street, Suite 34
                             Philadelphia, Pennsylvania 19102

For Dalmatia Import
Group, Inc.:                 Marshall T. Kizner, Esq.
                             STARK & STARK
                             P.O. Box 5315
                             Princeton, New Jersey 08543

Audio Operator:              Electronically Recorded
                             by Court Personnel

Transcription Company:       Reliable
                             1007 N. Orange Street
                             Wilmington, Delaware 19801
                             (302)654-8080
                             Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

INDEX

PAGE

DISCOVERY MOTION BY DALMATIA                                    3

MOTION TO DISQUALIFY COMMITTEE COUNSEL BY DALMATIA            10

OPENING STATEMENT BY MR. KIZNER                               10

OPENING STATEMENT BY MR. GEORGE                               14

OPENING STATEMENT BY MR. MASCHMEYER                          23

MOTION TO SEAL BY DALMATIA                                    25

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE MOVANT | | | | |
| MAIA MAGEE | 31 | 84 | 149 | 156 |
| By The Court | 148 | | | |
| FOR THE RESPONDENT/DEBTOR | | | | |
| MICHAEL THOMPSON | 165 | 183 | 229 | 230 |
| By The Court | 222 | | | |
| REBUTTAL FOR THE MOVANT | | | | |
| HARVEY GROSSMAN | 233 | 242 | | |
| MAIA MAGEE | 246 | 247 | | |

| EXHIBIT | | IDENT. | EVID. |
|---|---|---|---|
| D-1 | Settlement Agreement | 47 | 159 |

1          (Proceedings commence at 9:36 a.m.)

2          (Call to order of the Court)

3               THE COURT:  Good morning.

4               COUNSEL:  Good morning.  Good morning, Your Honor.

5               THE COURT:  We're here in the case of Earth Pride

6     Organics.  Let me begin by taking counsel's appearances.

7               MR. GEORGE:  Good morning, Your Honor.  Edmond

8     George and Michael Vagnoni from the Obermeyer firm, on behalf

9     of the committee.

10              MR. MASCHMEYER:  Your Honor, Paul Maschmeyer on

11    behalf of the debtor

12              MR. KIZNER:  Marshall Kizner from Stark & Stark on

13    behalf of Dalmatia Import Group.  Your Honor, these are my

14    clients Harvey Grossman for Dalmatia and Maia Magee from

15    Dalmatia, Your Honor.

16              MS. MAGEE:  Hello.

17              THE COURT:  Okay.  I take it, Mr. Kizner, you would

18    like to pick up the discussion that we had in a conference

19    call yesterday.  Is that where you want to begin?

20              MR. KIZNER:  Yes, Your Honor.  Just regarding the

21    discovery motion, I mean, we served the discovery --

22              THE COURT:  What motion?

23              MR. KIZNER:  The objection.  Sorry.

24              THE COURT:  What motion?

25              MR. KIZNER:  The objection that was --

1    THE COURT:  You just used phrase "discovery

2    motion."  What motion?

3    MR. KIZNER:  The objection that was filed

4    yesterday, Your Honor.

5    THE COURT:  That was an objection that was filed by

6    the other side.

7    MR. KIZNER:  Okay.  Regarding the objection and the

8    discovery that was discussed --

9    THE COURT:  Why is that before me?

10   MR. KIZNER:  Why is it before you, Your Honor?

11   THE COURT:  Yeah.

12   MR. KIZNER:  Because we served discovery, a notice

13   to produce, to prepare for this hearing, and they decided

14   they weren't going to cooperate.

15   THE COURT:  And what are you supposed to do if you

16   think that an objection is invalid; what do the rules provide

17   for?

18   MR. KIZNER:  The rules provide that they filed an

19   objection and we can file a motion.

20   THE COURT:  That's why I asked the question.

21   MR. KIZNER:  Yeah.

22   THE COURT:  What motion?

23   MR. KIZNER:  Well, Your Honor, the discovery was

24   due yesterday, they filed the objection at the eleventh hour.

25   They told us 30 days before --

1        THE COURT:  And when did you serve the discovery?

2        MR. KIZNER:  We served it 30 days ago, Your Honor -

3    -

4        THE COURT:  Uh-huh.

5        MR. KIZNER:  -- pursuant to the rule.

6        THE COURT:  So you served it so that it was going

7    to land on -- the response date was going to land on the day

8    before the trial date, right?

9        MR. KIZNER:  Your Honor, there's -- correct, but

10   there's a truncated process here where we have to go by the

11   Federal Rules for discovery, and the hearing date was --

12       THE COURT:  You could have asked for expedited

13   discovery.

14       I also heard something yesterday -- I don't have

15   any record about it -- but that there was a suggestion in the

16   conversation yesterday that you were at least informally

17   advised some time ago that the debtor and the committee were

18   going to object.  Is that accurate?

19       MR. KIZNER:  They mentioned it, and they never

20   objected until --

21       THE COURT:  Until the --

22       MR. KIZNER:  -- yesterday.

23       THE COURT:  Until the date they had to formally

24   object.

25       MR. KIZNER:  Your --

1          THE COURT:  How long ago did they mention it?

2          MR. KIZNER:  Like 20 days ago, Your Honor.

3          THE COURT:  About 20 days ago?

4          MR. KIZNER:  Yeah, but there was no objections and

5    there was no discussion, which means they could have just

6    said they were going to comply with the discovery.

7          MR. GEORGE:  Your Honor, that --

8          MR. KIZNER:  I mean, until they have a formal

9    objection --

10         THE COURT:  All right.  Well, why don't you

11   continue?  I'll let you finish making your point.

12         MR. KIZNER:  The point, Your Honor, is that we

13   served the discovery.  You know, they basically just did a

14   blanket objection.  We believe that this information is

15   pertinent.  I don't understand why they just took the

16   position they're not going to produce anything, other than

17   they just don't want to, which is not a basis, in my opinion,

18   Your Honor, to not provide any discovery in advance of a

19   contested hearing, where the Federal Rules apply.

20         They could have filed the objection earlier.  They

21   could have filed a motion for a protective order, they didn't

22   do that.  Instead, they just waited until the eleventh hour

23   and filed a blanket objection.  And you know, they're just

24   trying to support this concept of trial by ambush, which is

25   not what the rules are meant to be, Your Honor.

1           THE COURT:  Can you -- just to fill out the record

2    a little bit, given that -- you filed your objection to

3    confirmation in July.  The plan was confirmed in September,

4    and the confirmation order set up this process -- I guess I'm

5    going to call it the "virtual objection" to confirmation,

6    since we have a confirmed plan.  That occurred in September.

7    Pursuant to the confirmation order, you followed up and filed

8    the requisite precipice to schedule the hearing on your

9    objection in October, and then you wait until November to

10   file your discovery, where the due date for the discovery is

11   the day before trial.  Does that look like --

12           MR. KIZNER:  I can --

13           THE COURT:  -- you're --

14           MR. KIZNER:  Your Honor, I -- I'm not going to --

15   your characterization is one perspective.  The other

16   perspective --

17           THE COURT:  Of the -- characterization, or are

18   those facts accurate?

19           MR. KIZNER:  There's not -- there's facts that are

20   not -- that are not in the record that you didn't just

21   mention, the fact that we --

22           THE COURT:  The facts on --

23           MR. KIZNER:  -- we filed --

24           THE COURT:  They're in the record, they're on the

25   court docket.

1          MR. KIZNER:  They're on the court docket, but they

2     weren't just provided for the Court, Your Honor, in terms of

3     the fact that we tried to file a limited withdrawal of the

4     reference and we sought a stay and we promptly filed the

5     discovery after the stay was reject -- was denied and we

6     filed within a few days of the -- of Your Honor entering that

7     order.  So I mean, it's a truncated process, and we're

8     dealing with rules and --

9          THE COURT:  There's also a process to get expedited

10    discovery, is there not?

11          All right.  If you're making an oral motion under

12    Rule 37, if that's what this is, that motion is denied, for

13    lack of diligence.  You can't wait until the day of trial and

14    say, I didn't get my discovery.  It just doesn't work that

15    way.

16          MR. KIZNER:  Your Honor, if that's your decision,

17    we've made --

18          THE COURT:  Yeah, that's --

19          MR. KIZNER:  -- our oral motion --

20          THE COURT:  -- my decision.

21          MR. KIZNER:  -- you've denied it --

22          THE COURT:  So I'm ready to proceed.

23          MR. KIZNER:  -- the record reflects the same.

24    Okay.  Proceed.

25          THE COURT:  Now I gave a little thought to the

1      process here.  And again, things get complicated because of

2      the fact that this is not a conventional confirmation

3      hearing.  Typically, at the confirmation hearing I would

4      expect the debtor to present evidence first.

5           But I think in this particular case what's most

6      appropriate is that, since we have a confirmed plan and we

7      have this objection to confirmation by one party simply about

8      its treatment and a prior agreement among the parties that I

9      should consider that as if we were at confirmation, but that

10     the consequence of a successful objection is not denial of

11     confirmation, but rather simply a modification of plan

12     treatment for the creditor.

13          Given that that's the posture that we're in, I

14     think the appropriate way to go here is to have the objector

15     go first.  The objector should have the burden of production.

16     The burden of proof is going or remain with the debtor as to

17     whether or not plan provisions that -- and the treatment of

18     this creditor that the creditor finds objectionable pass

19     muster under the Bankruptcy Code.  So that's how I see it.

20     Anybody want to suggest a different approach?

21          MR. KIZNER:  Your Honor, I have no objection to the

22     debtor proceeding.  I do have one oral -- one --

23          THE COURT:  No, no.  What I'm saying is that you

24     would proceed first.

25           MS. MAGEE:  We would go first.

1        MR. KIZNER:  Yeah, I'm sorry.  We would go first.

2        I do have one more oral motion I'd like to make.

3        THE COURT:  Okay.

4        MR. KIZNER:  I'd like to move to disqualify

5   unsecured creditors' committee's counsel from this case.

6   Your Honor, they have a fiduciary duty to my client.  My

7   client is the largest unsecured creditor in the case and

8   they're actively -- they should be sitting at this table with

9   us, and they've been actively working against our interests

10  for months and months.  And there's, in my opinion, a clear

11  breach of fiduciary duty here.  And I -- and the fact that

12  we're being ganged up against the debtor with someone that's

13  supposed to represent us is a conflict of interest and it

14  shouldn't happen.

15       THE COURT:  All right.  That motion is denied.

16       MR. KIZNER:  Okay.

17       THE COURT:  So I think where we should go next is

18  I'm prepared to listen to opening statements before we get to

19  the evidence.  So, Mr. Kizner, if you'd like to make an

20  opening statement, you're free to do so.

21       MR. KIZNER:  Sure.

22       Your Honor, this issue, it really deals with the

23  Bankruptcy Court and about general fairness.  This Bankruptcy

24  Court is a Court of Equity and it's supposed to treat

25  creditors and debtors fairly.  And what you have here is you

1    have -- and the evidence is going to show at this evidentiary

2    hearing, is an effort that occurred at some point between

3    April of 2018 and June of 2018, where the unsecured

4    creditors' committee decided they wanted to take advantage of

5    an ambiguity or an incompleteness in a settlement agreement

6    and treat the largest unsecured creditor in this case

7    unfairly.

8              There was a settlement -- a handwritten settlement

9    -- the evidence is going to show there was a handwritten

10   settlement on October 11th, 2017, in the District Court.  The

11   settlement basically -- there was some language squeezed in

12   on a line that dealt with payment of ten percent.  It said

13   "at least ten percent," it created a floor.  There was no

14   discussion about separate classes and treating unsecured

15   creditors one -- every other unsecured creditor in a more

16   favorable light than the debtor.

17             It's just absent.  This wasn't discussed before

18   Judge Smith in the Eastern District, this issue just didn't

19   come up.  I don't think anyone was thinking about it, and

20   that's why it wasn't in the agreement.

21             This is consistent with the actions that occurred

22   before this Court afterwards.  On November 20th, 2017, the

23   first disclosure statement and plan were filed.  My client

24   was treated as every -- as -- fairly, with every other

25   unsecured creditor, receiving 15 percent.  If that was -- if

1    the understanding was it would be 10 percent, why didn't the

2    first plan have that in the first disclosure statement?

3              Consistent with our belief, on March 12th, 2018,

4    the second -- the first amended plan was filed, Your Honor;

5    same thing, 15 percent.  Then the second amended plan was

6    filed on April 27th, 2018, again, the same treatment.

7              On June 1st, 2018 -- so something happened between

8    April 27th and June 1st, and what happened was the unsecured

9    creditors' committee decided to become adverse to Dalmatia.

10   And they had this idea that, oh, we can try to basically make

11   an issue out of this language, make an issue out of the

12   course of performance and conduct in this case and what

13   happened at the settlement agreement and turn this into an

14   issue.  That was the point where every other creditor was to

15   receive something between 39 to 50 percent, and Dalmatia is

16   brought down to 10 percent.  It's completely inconsistent

17   with the first three plan iterations.

18             The fourth amended plan was filed, which is the one

19   that was ultimately confirmed.  Again, that same treatment is

20   there, and we objected to it.  I mean, this is just a bad

21   faith -- this whole thing is just bad faith, Your Honor.

22             And as you might recall at the confirmation

23   hearing, Mr. Thompson made a proffer before this Court that

24   he can pay Dalmatia, he -- and that's part of the

25   confirmation order, depending on what happens here today.  So

1    he has the money to pay, he just doesn't want to pay.  And

2    this is really just trickery, Your Honor.

3           My client should be treated fairly, like every

4    other unsecured creditor.  She's gone through some tough

5    times with this creditor, which culminated in this bankruptcy

6    -- this debtor, rather -- which culminated in this bankruptcy

7    being filed.  She was treated unfairly before, the test --

8    that's what the testimony is going to show.  She's been

9    treated unfairly now, after.

10           This is a Court of Equity.  The Court should do the

11    fair thing.  Every unsecured creditor should be treated the

12    same, and that's what we hope Your Honor decides.

13           THE COURT:  Can you just tell me a little bit about

14    what evidence you're going to put on?

15           MR. KIZNER:  Your Honor, Ms. Maia Magee, she is the

16    co-founder of Dalmatia, she's going to be our witness.  We're

17    also going to refer to various pleadings of record, in terms

18    of the -- basically, the settlement agreement.

19           I mean, Your Honor, in our -- our impression of

20    this is that this issue was just never discussed by anyone,

21    so, you know, there was a lack of in formation.  And she's

22    going to testify as to what happened that day.  It was a

23    twelve-hour day before Judge Smith in the Eastern District,

24    it culminated with this handwritten agreement around 11 or 12

25    p.m.  I mean, that's really what we're dealing with here.

1     So that's going to be our -- I mean, in terms of

2     the documents, well, the documents are what's already of

3     record, Your Honor, which is namely the settlement agreement,

4     which was filed by the Court, which received court approval.

5          THE COURT:  Okay.  Thank you.

6          Would any of the respondents like to -- I'm calling

7     you "respondents" because it's an objection -- but the

8     committee and the debtor, would someone like to make an

9     opening statement?

10          MR. GEORGE:  Your Honor, I think that counsel made

11     a couple of perhaps admissions that I think might be

12     important for Your Honor when you decide how much and what

13     kind of interpretation --

14          THE COURT:  Actually --

15          MR. GEORGE:  -- you have to do.

16          THE COURT:  -- I'm not sure I want to hear like a

17     closing argument type argument.

18          MR. GEORGE:  No, but -- understood, Your Honor, but

19     I think the --

20          THE COURT:  All right.  Go ahead.

21          MR. GEORGE:  -- point that I'm trying to make to

22     Your Honor is, is that there's been a concession that there

23     was -- none of these issues were really discussed, the

24     classification, the separate treatment.  And so, in our view,

25     he's not suggesting that something should have been in this

1    agreement that wasn't in this agreement.

2              And so I think we had this discussion yesterday

3    about parol and how it could be used and whether there was

4    anything ambiguous about this.  I think that's a concession,

5    that it's not ambiguous, that the parties never contemplated

6    these things and didn't talk about them.

7              With respect to where the committee is in this

8    case, Your Honor, the three versions of the plan, I don't

9    think Your Honor would not remember that the committee was

10   never in favor of ten cents; that we consistently came to the

11   Court and told the Court that we felt that creditors could be

12   paid substantially in full.  So a single creditor decided to

13   accept a dime, without waiting to see what the committee was

14   going to do.

15             That was one of the debtor's complaints, was that

16   the deal that it made with the unsecured creditor didn't come

17   until months after Dalmatia.  Well, that was a choice that

18   Dalmatia made, to make a decision to accept a dime.  They

19   could have waited and said -- and to see what the unsecured

20   creditor were going to get.

21             But more importantly, Judge, one of the things that

22   I think is important here is that there was a mechanism by

23   which, for the payment of some sum -- which was undisclosed

24   to the Court and blacked out, redacted from the agreement --

25   that Mr. Thompson would be potentially the owner of the

1   claim.  And so our concern from the committee's standpoint

2   was that the debtor and Dalmatia were, in fact, conspiring to

3   try to gerrymander to diminish the significance of the

4   unsecured creditors' votes by negotiating for the treatment

5   and acceptance of a plan, for which a disclosure statement

6   had not yet been approved.

7           THE COURT:  I'm not sure I follow.

8           MR. GEORGE:  Well, you can't solicit votes and you

9   --

10          THE COURT:  No, no.  I understand that piece of it.

11   Show me --

12          MR. GEORGE:  Because --

13          THE COURT:  Describe for me why it was some kind of

14   end run around the committee's --

15          MR. GEORGE:  Because --

16          THE COURT:  -- negotiating position.

17          MR. GEORGE:  Because they had negotiated for an

18   acceptance of the plan if they got a dime, and it was far

19   less than what we were negotiating for.  So our concern was -

20   -

21          THE COURT:  But how does --

22          MR. GEORGE:  -- that the debtor --

23          THE COURT:  How does the --

24          MR. GEORGE:  -- and Dalmatia --

25          THE COURT:  But how does the transfer of the claim

1    to the debtor's principal fit into that theory?

2              MR. GEORGE:  Well, because it could have been held

3    by an insider.

4              THE COURT:  But then I wouldn't count the vote,

5    would I?

6              MR. GEORGE:  Well, no, but then it would be

7    entitled to a distribution.  And then that raises issues

8    about whether it be subordinated or not.  And if you

9    remember, part of our settlement was the permission to allow

10   certain claims that were EPOs to be paid by LFF, and it's

11   basically a de facto consolidation of the two estates to

12   allow these monies to be paid out.

13             And so if you took all the unsecured creditors and

14   you put them in a pot -- and Dalmatia had an agreement that

15   they would vote in advance of us having negotiated our deal -

16   - then the debtor and Dalmatia would have been gerrymandering

17   for the debtor to control that class, to keep the committee

18   from getting anything else out of them.  And we think that

19   would have been a bad faith plan.

20             THE COURT:  Although that, ultimately, didn't

21   happen, right?

22             MR. GEORGE:  No, it didn't.  But we're negotiating

23   a plan, Judge, so we have to plan for the eventuality that

24   someone is making an end run of the committee, which is what

25   I think was happening here.

1          Now it ultimately happened that we negotiated --

2          THE COURT:  Well, let -- this is an interesting

3    point, so let's just stay on it for a second.  We'll come

4    back to the main case.

5          Just in the abstract, if you have a Chapter 11 case

6    with a committee, and there is a -- one very large unsecured

7    creditor that can potentially control the vote or come close

8    to controlling the vote, and in its own business judgment

9    it's satisfied if it gets X, which might be a relatively low

10   percentage from the committee's point of view, but is there,

11   per se, anything wrong with that, with the -- that creditor

12   having a discussion directly with the debtor --

13          MR. GEORGE:  No --

14          THE COURT:  -- about that?

15          MR. GEORGE:  -- I don't think.  But when that

16   unsecured creditor is potentially a controlling creditor --

17   and we'll get to that in closing argument --

18          THE COURT:  Is what makes this create some smoke

19   for you the fact that, at the time this was occurring, it had

20   that extra provision about the transfer of the claim to the

21   insider?

22          MR. GEORGE:  Correct.

23          THE COURT:  That's what raised concerns.

24          MR. GEORGE:  Absolutely.

25          THE COURT:  But absent that, would you have had

1  concerns, absent the provision regarding the transfer to the

2  principal.

3          MR. GEORGE:  Well, yes, Judge, because of the

4  nature --

5          THE COURT:  Well, that's what I'm trying to

6  understand why.

7          MR. GEORGE:  Because of the nature of what

8  Dalmatia's claims were.  They were contested, they were

9  litigation claims.  The result of this was an injunction, and

10  that injunction curtailed the debtor's ability to generate

11  revenue.  And so --

12          THE COURT:  Well, I get that from the -- well, I

13  guess those issues would unfold then in the 9019 process.

14  But if nothing came up that was untoward in the 9019 process,

15  it would just be a reality, I guess, in a case where, if you

16  have a large enough individual unsecured creditor, some sort

17  of a structural thing that that creditor, to some extent, has

18  the ability to undercut the committee because it has a big

19  vote --

20          MR. GEORGE:  Well, Judge --

21          THE COURT:  -- and it's --

22          MR. GEORGE:  -- all things being equal, if Dalmatia

23  were a vendor creditor like the majority of the other

24  creditors in the case, then I would say that's -- that could

25  be true.  But in our view, what Dalmatia had going into this

1   case is far different than what the vendors and taxing

2   authorities had coming into this case.

3          THE COURT:  But they were doing very well in that

4   litigation, weren't they?

5          MR. GEORGE:  Well, I think they were, and that's

6   maybe why they shouldn't have accepted a dime, but they did

7   it.

8          And as far as my fiduciary duty, it's owed to

9   everybody.  They have their own lawyers, they're in,

10  negotiating.  I mean, I'm sorry I got everybody 60 cents.  If

11  that's the worse thing I've done in this case, then I'll

12  accept that criticism.  But the fact of the matter is nobody

13  involved us in the negotiations.  This provision of them

14  voting if they got a dime wasn't anything the committee was

15  consulted with -- for or with.

16         And so we viewed that as an effort of the debtor

17  and Dalmatia to come up with a way that, if Mr. Thompson

18  couldn't get a deal with us, that they could confirm the plan

19  over our objection.  So we viewed it as the opposite

20  gerrymandering or the potential of gerrymandering on the

21  other side.

22         THE COURT:  Right.

23         MR. GEORGE:  So then, when we talk about

24  gerrymandering, Judge, you know, before we get into the John

25  Hancock issues -- and I will talk to you more about that on

1    closing -- you know, we had other classes voting in favor of

2    this plan, and they weren't unsecured creditors.  So we could

3    have crammed this plan down on everybody, even in the absence

4    of Dalmatia being in our class.  Even if unsecured creditors

5    didn't vote in favor of it --

6              THE COURT:  Uh-huh.

7              MR. GEORGE:  -- there was a secured creditor that

8    voted in favor of it.  So it's not like this was a deficiency

9    claim, and we stuck it in a separate class --

10             THE COURT:  Right.

11             MR. GEORGE:  -- because we couldn't confirm over

12   the objection.  There were other creditors who voted in favor

13   of the plan.  And if you look at the report of plan voting,

14   you'll see that secured creditors voted in favor.

15             THE COURT:  Although, in the end, I don't think

16   it's -- I mean, sometimes the issues merge.  I'm not sure

17   that the real dispute in this case is about classification.

18   I think it is really fair and equitable treatment, is the

19   gist of Dalmatia's --

20             MR. GEORGE:  Well, if --

21             THE COURT:  -- complaint here.

22             MR. GEORGE:  If that's so, I'm happy to hear that,

23   but I thought it was -- I thought they were arguing the other

24   part, too, Judge.

25             THE COURT:  Well, it's hard to separate the two --

1          MR. GEORGE:  Well, and I guess --

2          THE COURT:  -- because by classifying --

3          MR. GEORGE:  -- that would be my point.

4          THE COURT:  -- Dalmatia separately, the debtor

5     proposed to pay them less, so they're obviously related

6     concepts.

7          MR. GEORGE:  But Your Honor, you know, they got

8     five years worth of an injunction, and so you only get an

9     injunction if you can convince a judge that there is some

10    kind of damage that you've suffered that can't be satisfied

11    by the payment of money.  And so they may have only gotten a

12    ten-cent deal, but they got plenty of other consideration,

13    the value of which we've not been able to quantify.

14          But if you put dollars on it, or if you were able

15    to put dollars on it -- and everybody who gets an injunction,

16    Judge, I'm convinced an economist could sit down and put

17    dollars on it.  But those injunction provisions are

18    significant and they last for years, and so that's a

19    significant economic benefit that they got --

20          THE COURT:  Okay.

21          MR. GEORGE:  -- which is in excess of the ten

22    cents, and which takes them and puts them in a category of

23    people with claims and legal and equitable rights against the

24    debtor that are different than anybody else.

25          And so those are significant differences, and

1   that's, in our view, one of the most significant

2   justifications for this separate classification, on top of

3   the issue of preventing the debtor and Dalmatia from cramming

4   a plan down on the rest of the unsecured creditors.  So those

5   are our issues that we have in the case, Judge.

6                THE COURT:  Okay.

7                MR. GEORGE:  And so I just wanted to try to give

8   you a primer of --

9                THE COURT:  Okay.

10              MR. GEORGE:  -- where we're going --

11              THE COURT:  I have --

12              MR. GEORGE:  -- without making a closing argument.

13              THE COURT:  I have a sense of your perspective on

14  it.  Can you give me a little idea of what, at least at this

15  point -- it might depend on what you hear -- but what you're

16  intending to present.

17              MR. GEORGE:  I would think just cross-examination

18  of Dalmatia's witness, and potentially Mr. Thompson, if --

19              THE COURT:  If you decide that later.

20              MR. GEORGE:  -- if I feel that -- yes, Judge.

21              THE COURT:  Okay.  Thank you.

22              Mr. Maschmeyer, do you wish to be heard?

23              MR. MASCHMEYER:  Yeah, Judge.  I'm not going to

24  repeat a lot of what Mr. George said.  But I just want to

25  make it clear, Judge, when we -- the Dalmatia settlement gave

1    -- one of the comments we heard was they weren't being

2    treated fairly, like other unsecured creditors.  And the

3    reality is Dalmatia got a lot more than a lot of the other

4    unsecured creditors did under this settlement agreement; Mr.

5    George alluded to that.

6         You know, under this agreement, not only we keep

7    talking about the ten percent, which the agreement says, as

8    long as the plan plays at least ten percent, but they also

9    received a year injunction, which actually harmed my client.

10   If he has to take the stand, he can testify to the money he

11   lost with that.

12        They also got a judgment against one of the

13   collateral companies, CO Nolt.  They got the right to verify

14   compliance with the injunctions.  There was also a five-year

15   injunction that was put in place.  Ms. Magee got her -- there

16   was a judgment against her in the case; that was vacated.

17   Mr. Thompson himself, the principal, Judge, had a judgment

18   entered against him, which he agreed upon, of $1,200,000.

19        The reality is they received a lot, which is why

20   they were -- one of the reasons they were in that

21   classification of separate class because they got more than -

22   - frankly, more than the other unsecureds did get in this

23   case.  The fact that they agreed, as part of that whole

24   settlement, which is integrated into this agreement, that as

25   long as they got at least ten percent, they'd go along with

1    the plan, I think that is clearly fair and equitable

2    treatment.  That's all I have to say, Judge.

3             THE COURT:  Okay.  Thank you.

4             All right.  Mr. Kizner, if you're ready to proceed.

5             MR. KIZNER:  Your Honor, yes, I am.  One thing

6    before we begin, Your Honor, I think, because we were talking

7    about the settlement agreement and there's confidentiality

8    provisions in there -- that's why there was part of the

9    settlement agreement that was blacked out when it was filed

10   with the 9019 notice.  Could the record be sealed, in case we

11   go into areas that could -- I just don't want to have an

12   issue where, later, someone makes a claim that

13   confidentiality was breached by the public record.

14            THE COURT:  Is it -- I'm sorry.  There's a concern

15   that somebody is going to sue for a breach --

16            MR. KIZNER:  Well, there's --

17            THE COURT:  -- or is there --

18            MR. KIZNER:  -- confidentiality provisions --

19            THE COURT:  -- concern that the --

20            MR. KIZNER:  -- with the --

21            THE COURT:  -- actual --

22            MR. KIZNER:  -- with --

23            THE COURT:  -- is damaging, if it's --

24            MR. KIZNER:  No, it's --

25            THE COURT:  -- in the -- in a public record?

1          MR. KIZNER:  It's for potentially -- there's third

2     parties that are not here today that were part of that

3     settlement agreement, Your Honor.  And the concern is that I

4     don't want there to be any question that Dalmatia violated

5     the confidentiality provision; that's my concern.  And

6     frankly, it should be the concern, I think, of the debtor, as

7     well.  I mean, they were all part of the confidentiality

8     agreement.

9          THE COURT:  Let me -- Mr. Maschmeyer, any comments

10    on that?

11         MR. MASCHMEYER:  Your Honor, I'm looking at the

12    settlement agreement that's blacked out.  I don't know that

13    any of the issues that are blacked out are really relevant to

14    what we're talking about here, so I don't -- I mean, I

15    haven't -- if you're asking, Judge, do I have any objection

16    to anything being held under seal, the answer is no.

17         THE COURT:  Although you're also saying that you

18    don't necessarily see the need for it.

19         MR. MASCHMEYER:  I -- yeah, I was going to say, I

20    just don't.  I mean, I haven't spoken to my client, but I

21    don't see the need for it.  The settlement agreement that was

22    filed with the Court was already redacted.  I don't know that

23    those issues are going to be -- I guess we'll see as the case

24    goes on, but I don't know that they're even going to be

25    brought up.

1   THE COURT:  All right.  Mr. George, do you have any

2   thoughts on this?

3   (Participants confer)

4   MR. GEORGE:  One second, Your Honor.

5   THE COURT:  Sure.

6   (Participants confer)

7   MR. GEORGE:  Your Honor, I don't care if the

8   redactions remain through the hearing, if that's what Your

9   Honor --

10   THE COURT:  All right.  I'm inclined to --

11   MR. CIANCIULLI:  My apologies, Your Honor.

12   (Participants confer)

13   THE COURT:  If you want to take a moment to talk to

14   Mr. Maschmeyer, or you want to talk to me.

15   MR. CIANCIULLI:  Maybe I can make a comment that

16   can kind of cut through it.  I think the idea would be --

17   THE COURT:  Why don't you identify yourself for the

18   record.

19   MR. CIANCIULLI:  Yes, Your Honor.  Jeffrey

20   Cianciulli, appearing on behalf of no one today, but

21   potentially a witness.  I was counsel, special counsel to the

22   debtor and operated part of the negotiated settlement

23   agreement.

24   There were some aspects of the agreement that were

25   held confidential, as they related to ingredients in --

1        THE COURT:  Uh-huh.

2        MR. CIANCIULLI:  -- the recipe.  I don't see any

3   reason why, if the parties don't refer specifically to those

4   ingredients, that anything would need to be held sealed by

5   the Court.  Is that a fair statement?

6        MS. MAGEE:  I -- I actually am fine with that.

7        MR. CIANCIULLI:  Yeah.

8        MS. MAGEE:  That's fine.

9        MR. CIANCIULLI:  I mean, just to --

10        MS. MAGEE:  And it's --

11        MR. CIANCIULLI:  -- kind of help --

12        MS. MAGEE:  -- blacked out --

13        MR. CIANCIULLI:  -- the Court --

14        MR. GEORGE:  -- here, too.

15        THE COURT:  Well --

16        MR. CIANCIULLI:  -- cut through the --

17        THE COURT:  -- it sounds like what you're saying is

18   where I was headed with this, as well.  It seems to me, when

19   we get into the testify, if -- Mr. Kizner, if you think

20   you're getting into a subject that involves something that

21   was blacked out, but stopped there, and whether -- either on

22   the record or off the record, we'll talk about the problem.

23        MR. KIZNER:  Yeah.  And Your Honor, just for

24   clarification, my concern came from some of the openings

25   about what Dalmatia received, and I just didn't want it to go

1    into -- I didn't want this to snowball later, so I wanted to

2    raise the issue now.  But I can bring it up later -- I don't

3    think our testimony is going to touch on any of that --

4                THE COURT:  Do you --

5                MR. KIZNER:  -- I don't plan on it, so --]

6                THE COURT:  Is there anything anybody said that was

7    confidential --

8                MR. KIZNER:  No, but when --

9                THE COURT:  -- in the --

10                MR. KIZNER:  -- you start --

11                THE COURT:  -- opening statements?

12                MR. KIZNER:  -- talking about injunctions and stuff

13    like that, that -- my concern is going to go into those areas

14    later, potentially, on cross-examination.

15                THE COURT:  All right.  Well, let's just see if we

16    do.

17                MR. KIZNER:  Yeah, okay.

18                THE COURT:  If --

19                MR. KIZNER:  I just wanted to raise the issue, Your

20    Honor.

21                THE COURT:  If you start having concerns about

22    that, we'll stop there and we'll all address it at that

23    point.

24         (Participants confer)

25                MR. KIZNER:  I would like to call Ms. Magee.  And

1    is it all right if I stand over there, so she's more eye view

2    with me?

3              THE COURT:  It will depend on whether you can --

4    you're being picked up for the recording, so you can start --

5              MR. KIZNER:  All right if --

6              THE COURT:  -- but I may --

7              MR. KIZNER:  -- I stand --

8              THE COURT:  -- tell you --

9              MR. KIZNER:  -- over here?

10             THE COURT:  -- you can't.  Is there some reason you

11   need to stand over there, as opposed to the podium?

12             MR. KIZNER:  I don't think it means too much of a

13   difference, but it -- well, I just wanted the witness

14   comfortable with my position.

15             THE COURT:  Then I'd rather you be at the podium.

16             MR. KIZNER:  All right.

17             THE COURT OFFICER:  Please place your left hand on

18   the Bible and raise your right hand.

19   MAIA MAGEE, WITNESS FOR THE MOVANT, SWORN.

20             THE COURT OFFICER:  Please be seated.

21        (Participants confer)

22             THE COURT OFFICER:  Please state and spell your

23   name for the record.

24             THE WITNESS:  Maia Magee, M-a-i-a, M-a-g-e-e.

25             THE COURT OFFICER:  Please state your address for

Magee - Direct                                                          31

1    the record.

2                THE WITNESS:  21 Mohawk Trail, Greenfield, Mass,

3    01301.

4                THE COURT OFFICER:  Thank you.

5                THE WITNESS:  You're welcome.

6                           DIRECT EXAMINATION

7    BY MR. KIZNER:

8    Q    All right.  Ms. Magee, can you tell me where you work?

9    A    Dalmatia Import Group.

10   Q    And just so the Court is familiar, or the Judge in

11   particular, what -- explain what Dalmatia does.

12   A    So Dalmatia, we're a specialty food company.  We are

13   basically -- we're the company that brought fig spread to

14   America, it's like a big jam.  So we introduced it to the

15   marketplace here, several -- many, many years ago, taught

16   stores how to make it or how to sell it, how consumers how to

17   use it with cheese.  We basically created a new category in

18   the supermarkets.

19   Q    Okay.  And what's your position with the company?

20   A    I am pretty much everything.  We're very small, so

21   everything from high level to low level, all of it, as much

22   as I can, whenever, whatever is needed.

23                THE COURT:  Can you tell us -- could you tell us

24   your formal title?

25                THE WITNESS:  Sure.  President and Co-Founder.

Magee - Direct                                  32

1    BY MR. KIZNER:

2    Q    And when did you first start Dalmatia?

3    A    So 1995.

4    Q    And how has the company done since then?

5    A    Well, in 1995, we were -- we were an idea.  We weren't

6    anything; we were just an idea.  So I would say we -- we've

7    done okay.  You know, we've -- we've grown.  We had no stores

8    when we started, we had no products when we started.  So we

9    invented a market and we went store to store, door to door,

10   selling, trying to talk stores -- tell them how to use this

11   and tell them how great it would be.  So I think we've done

12   okay.  Now we're in like many chains and specialty food

13   stores.  We built it from nothing.  I'm -- I'm happy about

14   it.

15   Q    Okay.  And does Dalmatia -- what is its role with

16   manufacturing?

17   A    What's the question?

18   Q    What's its role with the manufacturing of your products?

19   A    What's its role?

20   Q    Yeah.

21   A    So --

22   Q    Do you manufacture specifically, or how does that work?

23   A    Well, when we were with Lancaster, we -- you know, we

24   had them co-packing.  But we oversee all manufacturing.  I'm

25   actually personally involved in a lot of the quality issues.

1    I care a lot about it because we've gotten our brand to a

2    pretty high level.  So, at that point, maintaining -- you

3    know, you need different skills to do -- to start a business,

4    and you need different skills to keep it.  And the skills now

5    are keeping it, you know, keeping people from stealing

6    recipes, but also making sure that everything is really top

7    notch.  So I actually love that part of the job.

8    Q    Okay.  And you said -- you know, you mentioned that it's

9    a small company.  How many employees do you have?

10   A    We're really small.  Me and Harvey Grossman -- actually,

11   who accompanied me today -- he's heading up sales, and then

12   my -- the co-founder, Neb.  He oversees more production, but

13   he's also involved.  So two, three.

14   Q    So, despite your growth since 1995, you're still a

15   pretty small company?

16   A    We are, we are.  And I like it that way.  I mean, it

17   would be nice to have a few more people, but yeah --

18   Q    Okay.

19   A    -- very hands-on.

20   Q    Great.

21       Let's talk a little bit about your relationship with the

22   debtors.  Are you familiar with the claims that -- if you can

23   explain your relationship, to start with, with Earth Pride

24   and Lancaster.

25   A    Like what they -- okay.  So they were our -- we hired

1    them to do co-packing for us.  We met them in -- I think I

2    found them in 2006, and we hired them to be our co-packer.

3    Q    Can you explain to the Court just what "co-packing"

4    means?

5    A    Okay.  So a co-packer is a company -- basically, we --

6    we hired them to do things the way we wanted for our recipe.

7    We showed them the recipe, we told them the ingredients, we

8    told them where to get the ingredients.  We told them how to

9    make the product, all the procedures.  We delivered jars to

10   them, we delivered labels to them.  And then, with all of

11   these components that -- that we had, we taught them how to

12   put it all together and make it based on our specifications.

13        And it took them about a year to get them up to speed,

14   teach them everything we knew.  We even brought one of their

15   people over to our plant in Europe, to teach him more.  And -

16   - yeah, and then we started business like a year after that,

17   we started doing business.

18   Q    So is it fair to say that there's a lot of trust that

19   has to go into a relationship to become a co-packer?

20   A    There's a lot --

21           MR. GEORGE:  Objection --

22   A    -- of trust that --

23           MR. GEORGE:  -- Your Honor.

24   A    Oh.

25           MR. GEORGE:  He's leading really beyond the pale.

1    I'm trying not to object, but ...

2            THE COURT:  All right.  I'll overrule that

3    objection because it's a modest point.  But try to be careful

4    about your questions.

5            THE WITNESS:  Okay.  So what was the question?

6    BY MR. KIZNER:

7    Q    You were discussing --

8    A    You said is there trust.  There's -- so there's -- there

9    is a high level of trust.  But you also have contracts, so we

10   had an NDA and -- before we gave them anything; you have to

11   cover yourself.  And then we had a contract before we started

12   doing any business.

13   Q    So did -- other than the co-packing, did they -- did --

14   what else did Dalmatia do, if anything?

15   A    With them?

16   Q    Well --

17   A    What's the question?

18   Q    Did they do anything else besides co-packing?

19   A    Lancaster?

20   Q    The debtors.  The debtors, yeah.

21   A    Lancaster and the -- when I say "Lancaster," just to be

22   clear, I -- he -- all -- I mean all of the companies, like

23   all of those sister companies he's got.  I'm not going to say

24   them every time, I don't even think I knew them all.  But

25   like the Earth Pride Organics and CO Nolt and Thompson, so

1    just so that's clear.

2          So no, that's all they did for us.

3    Q    Okay.  Who's -- can you talk a little bit about sales?

4    A    So sales --

5          MR. MASCHMEYER:  Your Honor, I'm going to --

6    A    -- we outsource --

7          MR. MASCHMEYER:  -- object -- Your Honor, I'm going

8    to object at this point.  I'm trying to think of what the

9    relevance is to this case.  Second of all, we've already

10   tried the litigation in District Court, and we're talking

11   about a settlement agreement.  It seems like they're almost

12   getting ready to try the whole case here, I -- it seems like

13   it's way off base.

14         THE COURT:  Mr. George, did you want to add

15   something?

16         MR. GEORGE:  Well, I mean, that's kind of my point,

17   Judge.  I think I'd like to try to focus on, you know, this -

18   - we're at a settlement agreement, and this is what happened.

19   I think that's the issues here.

20         THE COURT:  Do you have much more in the way of

21   background?

22         MR. KIZNER:  Your Honor, I -- we're moving into the

23   more specifics.  I think it's really hard for the Court -- at

24   least it would be for me -- to understand what happened here

25   without some context of what the relationship was and a

1   little bit about what the prior litigation is.  I mean, I

2   don't have a ton of stuff.  I mean, 20 minutes maybe.

3               THE COURT:  All right.  I'll --

4               MR. KIZNER:  But I just think the background is

5   useful.

6               THE COURT:  Twenty minutes for background, really?

7               MR. KIZNER:  No, a total of questioning, Your

8   Honor.  I mean, I don't expect this to go on for hours, but -

9   -

10              THE COURT:  All right.  All right.  I'll overrule

11  the objections.  I'll let you --

12              MR. KIZNER:  Okay.

13              THE COURT:  -- complete your foundational picture.

14  BY MR. KIZNER:

15  Q    So did -- what happened with your relationship with --

16  did anything happen to your relationship with the debtors at

17  any point?

18  A    So -- yes.  So we worked for many years, from 2007 to

19  2015.  In 2015, there were a lot of quality issues.  It was -

20  - I don't know -- six to eight months of quality problems,

21  which culminated at the end of 2015 and basically --

22              MR. MASCHMEYER:  Your Honor, I'm going to object at

23  this point.  Now we are retrying the case.

24              THE WITNESS:  It's --

25              THE COURT:  Overruled.  What I'm taking this for is

1    not the truth of the matter, but the state of mind, as you're

2    -- as the parties are entering into the settlement.

3              MR. MASCHMEYER:  Yes, Judge.

4              THE COURT:  So rest assured, it's not going to be

5    prejudicial.  So you can finish your answer.

6              THE WITNESS:  Okay.

7    BY MR. KIZNER:

8    Q    What did you mean by "quality problems"?

9    A    Just quality.  Like they weren't making it -- I don't

10   know if the machines were the problem, I don't know if the

11   people were.  We never actually figured that out.  It didn't

12   really matter.  At the end of the day, I have a brand, I have

13   to keep it at a high level.  And if it's not being

14   manufactured at a high level, that's -- that's lowering my

15   value.  So my job is to actually make sure that it stays at a

16   high value.  You know, like water -- there was liquid at the

17   top of the jar, sometimes it would soupy; various things,

18   really.

19   Q    So what ultimately happened with the debtors, once these

20   quality issues were discovered.

21   A    So -- okay.  So, basically, we stopped doing business.

22   Lancaster, at that time, got very aggressive with us.  He

23   started blackmailing me, saying, you have to take all of this

24   product.

25             MR. GEORGE:  Your Honor, I object.  Move to strike.

1           THE COURT:  Sustained.

2           THE WITNESS:  Okay.  How else can I say it?

3           THE COURT:  Just try not to use such colorful words

4      that are so conclusory.

5           THE WITNESS:  Okay.

6           THE COURT:  You want to just describe what actually

7      happened.

8           THE WITNESS:  Okay.  Lancaster would not give me

9      any good product, and insisted that I take bad product.

10          MR. KIZNER:  Okay.

11          THE WITNESS:  At that time, I did not know he was

12     already working with my distributor without my knowledge, and

13     they were -- they sort of teamed up.  Eventually, basically,

14     it became clear -- where do I go?  Maybe you just ask the

15     next question.

16     BY MR. KIZNER:

17     Q    Well, what did you mean by "teamed up" with the

18     distributor?  Because I -- we haven't talked about the

19     distributor.  So the Court understands that --

20     A    Okay.  So --

21     Q    -- that element.

22     A    -- the distribute -- the -- I'll just give you, in an

23     nutshell, what this -- the case is about, for the sake of

24     time and everyone.  So, in an nutshell, the litigated case

25     was basically about Lancaster -- Lancaster went behind my

1   back.

2              MR. MASCHMEYER:  Objection.

3              THE WITNESS:  Okay.  Hold on.  Lancaster, without

4   my knowledge, and without telling me, worked with my

5   exclusive distributor -- also, who was -- I was basically

6   exclusive with both of them.  They worked together, used my

7   recipe that I had taught Lancaster how to make, to make --

8   and they used that to make a competing brand, which they then

9   used to try to erase me from the marketplace that I had

10  created.

11  BY MR. KIZNER:

12  Q    Okay.  And what --

13  A    I think that's pretty --

14  Q    What resulted from this?

15  A    So, to survive -- well, in addition, they counterfeited.

16  They created lookalike jars that looked just like mine, with

17  my label, used my trademark and my product and flooded the

18  marketplace, so I had no business for months, very low sales.

19  Just to survive, I had to sue them.  I was afraid we were

20  actually going to go out of business.  And that's -- that's

21  what could have happened.

22  Q    Okay.  So could you just explain to the Court the

23  litigation.  You said you sued them.  What happened with

24  that?

25  A    Sure.  The claims?  Do you want to know the claims?

1    Q    Yeah, about the claims and what ultimately happened.

2    A    So there were many claims, I won't go into all of them.

3    There were -- you know, there were joint claims.  We had to

4    sue Lancaster and FOODMatch because they were working

5    together.  So we had misappropriation of trade secrets,

6    trademark infringement, counterfeiting.  One of those is

7    under the Lanham Act, I think it's -- is it trademark

8    infringement under the Lanham Act?  Theft, which is

9    conversion, technically, I think that's the word.  And then

10   there was a -- there were some contract claims.  The ones I

11   mentioned, we actually won, we won all of those.

12   Q    Just --

13   A    There were more, but ...

14   Q    Just for context, can you -- how long was this

15   litigation?

16   A    The litigation, there was months and months of

17   discovery.  I was deposed for four days straight; it was

18   exhausting.  I was the only one --

19              THE COURT:  That's not what he asked you.

20              THE WITNESS:  Sorry.  Okay.

21              THE COURT:  He asked you what was the time frame of

22   the litigation.

23              THE WITNESS:  So, actually, the litigation itself

24   went pretty fast, I think, from what I hear.  We started in

25   early 2017 -- or '16, and by early 2017, we were at trial.

1    And then we were -- we had a full month at trial, a full

2    month of trial --

3              MR. KIZNER:  And --

4              THE WITNESS:  -- in front of Judge Smith.

5    BY MR. KIZNER:

6    Q    And what was the result of the trial?

7    A    Well, the jury --

8              MR. MASCHMEYER:  Your Honor --

9    A    -- sided --

10             MR. MASCHMEYER:  -- objection.

11   A    -- with us.

12             MR. MASCHMEYER:  Your Honor, the result of the

13   trial is already -- it should be of record.  It's been -- the

14   Court has already issued findings and results.  I -- for her

15   to -- for the witness to now characterize that, I would think

16   the written documents of the trial would be the best evidence

17   of that.  So I'm going to object to her testifying --

18             THE COURT:  I'm going to --

19             MR. MASCHMEYER:  -- as to what --

20             THE COURT:  -- sustain that.

21             MR. MASCHMEYER:  -- she thinks happened.

22             THE COURT:  You can describe generally that there

23   was some success at trial, I'll let you --

24             THE WITNESS:  Uh-huh.

25             THE COURT:  -- go there.  But let's not get that

1    detailed about what the outcome was.

2                THE WITNESS:  Uh-huh.  Uh-huh.

3    BY MR. KIZNER:

4    Q    Okay.  Now was there a verdict?

5    A    Yep, there was a verdict.  It was -- it was basically in

6    our favor, for the most part.  We got most of our claims.

7                MR. MASCHMEYER:  Again, objection.

8                THE WITNESS:  I mean, we're good.  I --

9                THE COURT:  Overruled.

10   BY MR. KIZNER:

11   Q    Do you recall how much the verdict was for?

12   A    So the verdict -- okay.  So we're talking money now --

13   Q    Uh-huh.

14   A    -- with Lancaster?  So over two -- I want to say 2.16,

15   something like this, 2.1, 2.2 was what Lancaster was supposed

16   to pay me.

17   Q    Uh-huh.

18   A    That's without fees.  I think with -- I don't understand

19   how all the costs and things work, but with costs, it would

20   have been closer to one -- 2.5, something like that.

21   Q    Okay.  So let's move on to the bankruptcy proceedings

22   now.

23   A    Okay.

24   Q    What happened after you received the jury verdict?

25   A    So, after the jury verdict, I don't know.  I mean, I

1    don't know all these dates, but the papers were due in front

2    of Judge Smith.  We were seeking a new trial, which could

3    have led to punitive damages.  We were seeking for injunctive

4    relief.  We were seeking a permanent forever injunction,

5    actually.  And papers were due.  And I think the bottom line

6    of it all was, instead of filing papers, Lancaster filed this

7    case.

8    Q    Okay.  So, if you recall that you went back -- was there

9    any opportunity for you to go back to Judge Smith, if you --

10   A    We did.

11   Q    -- discussed that?

12   A    I don't know, again, exactly, but I think we actually

13   requested of this Court that we go back to Judge Smith, which

14   we eventually did.  We -- we went and prepared for a hearing,

15   and then Judge Smith really wanted a settlement, and I wanted

16   to support that.  He was very intent on a settlement.

17   Q    So let's talk about what happened when the case returned

18   to Judge Smith.

19   A    Okay.

20   Q    What -- there was a settlement conference, or how did

21   that get initiated, the settlement conference?

22   A    Well, we actually showed up -- we showed up for the

23   hearing, we -- we were all prepared, we had some witnesses,

24   and we were -- we were going for all of our things.  We were

25   going to try to get a new trial, permanent injunctive relief

1    because, you know, now he had our recipe, and from our

2    perspective, we didn't trust him to not use it.  So we were -

3    - we were trying for that.  We were thinking maybe extra

4    punitive damages we could get with a new trial.  Again, I

5    don't know all the specifics, that's really overview.

6         But we showed up, and Judge Smith really -- he really

7    loves the settlement conferences.  He wants to see peace,

8    he's a good person.  He -- I feel like he wanted peace, and I

9    wanted to support that, so we did.  We showed up, and we

10   ended up -- we ended up having a settlement conference on

11   that day, instead.

12   Q    So, before you went that day, though, you didn't know it

13   was going to be a settlement conference?

14   A    No, no.

15   Q    Okay.

16   A    Because we had already been to some, and they really

17   hadn't gone well, so we -- we went to so many settlement

18   conferences.

19   Q    So can you describe, you know, what happened that day?

20   A    It was a really long day.  It was -- I don't know.  I

21   think we got out of there at like -- I mean, it was so late;

22   it was like 10, 11 at night.  I -- it was really long.  And

23   he was just really committed to making peace and to trying to

24   get us to settle.  So, you know, we did.  I mean, I'm not

25   going to argue with a judge.  If a judge is saying he wants a

Magee - Direct                                          46

1   settlement conference and he wants us to settle, he's the

2   Judge, so that's the direction we went in.

3   Q    And how many hours were you there that day?

4   A    It was a long day.  I mean, 9 to 11 at night, something

5   like this.

6   Q    So --

7   A    Don't quite me.  I mean, really, I didn't -- I wasn't

8   looking at the clock.  I was exhausted, we all were --

9   Q    You were --

10  A    -- at the end of --

11  Q    So you were --

12  A    It was a --

13  Q    -- there well --

14  A    -- full day.

15  Q    -- after hours?

16  A    Well after.

17  Q    Okay.

18  A    He stayed late.  He stayed, and I thanked him after.  I

19  mean, it was really, yeah, above and beyond.

20  Q    Okay.  And who was there that day?

21  A    So I was there.  My -- the co-founder with me was there,

22  Neb Chupin, my lawyer, Lauren Handel, Mr. Cianciulli was

23  there on behalf of Lancaster, and then Mr. Thompson was

24  there, too.

25  Q    Okay.  And did the Judge have anyone else involved in

1    the settlement conference other than himself -- I mean, from

2    the Court's perspective, or was it just the Judge?

3    A    I don't think so.  I think it was just him.  There was -

4    - there was someone there, a clerk maybe might have been in

5    and out of the room, but he was -- he was leading it, he was

6    driving it.

7              MR. KIZNER:  Okay.  Your Honor, I'd like to

8    introduce the settlement agreement.  Can I hand a copy to the

9    witness.

10             THE COURT:  Well, wait.  Why don't you hand it to -

11   -

12             MR. KIZNER:  Sure.

13             THE COURT:  -- the court reporter, and she'll mark

14   it as D-1 for Dalmatia.  I don't know what we'll call the

15   debtor, though.  So I guess, if there are debtor exhibits,

16   we'll call them "Debtor 1," but call this D-1.

17             THE ECRO:  D-1?

18             THE COURT:  Yeah.

19        (Settlement Agreement marked D-1 for identification)

20        (Participants confer)

21             THE COURT:  I assume the other side has the

22   document.

23             MR. KIZNER:  This is docket -- this was filed with

24   the 9019 notice.  I have an extra copy --

25             THE COURT:  All right.  So --

1           MR. KIZNER:  -- but it's part of the court record.

2           THE COURT:  All right.  You've seen it before.

3    BY MR. KIZNER:

4    Q    Okay.  This is -- what's been handed to you is a

5    settlement agreement.  Are you -- it's been marked as D-1 for

6    the Court.  Are you familiar with the document?

7    A    Yes.

8    Q    Okay.  And what is this document?

9           THE COURT:  Well, let's skip that.  We all know

10   this is the settlement agreement, it's been approved by the

11   Court under a 9019 motion.  So you understand that, right?

12          THE WITNESS:  I do.  We're good.

13          THE COURT:  Okay.

14          MR. KIZNER:  Okay.

15          THE COURT:  So why don't you get to the heart of

16   what --

17          MR. KIZNER:  Okay.

18          THE COURT:  -- you want to get to about the

19   settlement agreement.

20          MR. KIZNER:  Yeah.

21   BY MR. KIZNER:

22   Q    So let's go to Page 8.  If you see the pages are on the

23   top, where it says "document," Page 8 of 15?

24   A    I do, yes.

25   Q    Okay.

1    A    Okay.

2    Q    Okay.  And on the second page, this is dated October

3    11th, 2017.

4    A    I'm on page --

5    Q    It has --

6    A    I'm on Page 8.

7    Q    I'm sorry, Page 9, the second page of the handwritten

8    document, which is Page 9.

9    A    Yes.

10   Q    Okay.  This is -- can you explain what this document is,

11   the handwritten document?

12   A    Yeah.  This is -- this is the -- the Judge, again, he

13   lead this.  He wrote it.  This is his handwritten settlement

14   agreement that we left with.

15   Q    Okay.  And so it -- this is the culmination, after 12 to

16   14 hours --

17   A    Yes.

18   Q    -- being there that day.

19   A    Yes.

20   Q    Okay.  Can you read what's in Paragraph 3?

21   A    Sure.

22   Q    Start --

23           MR. GEORGE:  Your Honor, do you mean to yourself --

24   to herself?  Because I mean, it says what it says, and I

25   don't think we need the witness to read it.

1          MR. KIZNER:  No, I'm asking her if it's even --

2          THE WITNESS:  I'll read it --

3          MR. KIZNER:  I'm asking her if it's legible.

4          MR. GEORGE:  Oh.

5          MR. KIZNER:  There's some --

6          MR. GEORGE:  You didn't ask if it was legible, you

7    asked her to read it.

8          THE WITNESS:  Do you --

9          MR. KIZNER:  I asked --

10         THE WITNESS:  -- want me to --

11         MR. KIZNER:  -- can you read it.  So I'll clarify

12   the question.

13         MR. GEORGE:  Well, you said "can you read it" --

14         MR. KIZNER:  There --

15         MR. GEORGE:  -- I thought you were asking her to

16   actually read it --

17         THE COURT:  All right.  Let's --

18         MR. GEORGE:  -- into the record.

19         THE COURT:  Let's move on.

20   BY MR. KIZNER:

21   Q    The paragraph -- the third paragraph down --

22   A    Uh-huh.  Uh-huh.

23   Q    -- "Dalmatia shall have," there's some language kind of

24   squeezed at the end there, right?

25   A    I see it.

1    Q    Like what is that language?  Can you even read it?

2    A    Okay.  So -- yeah --

3    Q    Is it --

4    A    -- it's tough --

5    Q    -- legible?

6    A    -- to read.  So I'll just read it.  Is that fine with

7    everyone?

8              "Dalmatia shall have the ability to pursue its

9              current claim in Bankruptcy Court, but will support

10             any plan not inconsistent with this agreement, as

11             long as it pays out at least ten percent."

12   Q    And was this added at a separate time to the rest of the

13   handwritten document?

14   A    I'll tell you when this was added.  This was, I believe,

15   the very last thing we did that night.  And that's why that

16   part:

17             "-- but it will support any plan not inconsistent

18             with this agreement, as long as it pays out at

19             least ten percent."

20        The Judge wrote that in at the very ends.  I barely

21   remember it.  And I barely remember it, honestly.  It was

22   very late, and it was kind of thrown in there, and that's why

23   it's smaller and it's in the margins.

24   Q    And is there any reference in the other -- in the rest

25   of this two-page handwritten document, to anything regarding

1    the bankruptcy?

2    A    I would have to read through the whole thing.  I don't

3    think so.  He --

4             THE COURT:  Why don't you save that point for

5    closing?

6             THE WITNESS:  Okay.

7    BY MR. KIZNER:

8    Q    So what's your understanding of that language that's in

9    the handwritten agreement, that you just read?

10   A    This part again.  This was so -- my understanding is

11   that, if Lancaster can only afford to pay the creditors ten

12   percent, I will not object to that.

13   Q    So your understanding was to all creditors.

14   A    Creditors.

15   Q    Unsecured creditors.

16   A    Unsecured.  I guess there's a class distinction with

17   secured and unsecured, so I am an unsecured, but yes.

18   Q    Okay.  Was there even any -- was there -- you said this

19   was added at the end.  Was there a discussion about

20   bankruptcy during the settlement conference?

21   A    If there was, I cannot recall it, and I really don't

22   think there was.  This was it.  So, basically, the main point

23   here was that:

24             "Dalmatia shall have the ability to pursue its

25             current claim in Bankruptcy Court."

1          And probably -- you know, I think maybe somewhere -- I

2     really don't remember this, but maybe at the very end,

3     someone said, well, what if Lancaster --

4               MR. MASCHMEYER:  Objection.

5     A    -- can't afford --

6               MR. GEORGE:  Your Honor --

7     A    -- to pay more --

8               MR. GEORGE:  -- objection.

9     A    -- than ten or --

10              THE COURT:  Sustained.  You can't speculate.

11              THE WITNESS:  Okay.

12              THE COURT:  If you remember, you remember, you can

13    tell us.

14              THE WITNESS:  Okay.

15              THE COURT:  If you just don't remember, don't try

16    to guess.

17              THE WITNESS:  Okay.  So then I don't -- I think

18    that's it, what I said stands, and that's all --

19    BY MR. KIZNER:

20    Q    Okay.  What --

21    A    Very little discussion happened around this.

22    Q    What about --

23    A    And it was late.

24    Q    What were the -- can you explain to the Court the key --

25    other than the bankruptcy, what were the key terms of the

1   settlement?

2   A    I mean, basically, we were being asked to give up our

3   right to a new trial, from my perspective, giving up pretty

4   much all our rights:  A right to a new trial with potential

5   punitive damages and our right to see a permanent forever

6   injunction.  So we were looking to, basically, say he

7   couldn't make fig spread because we're the ones who taught

8   him how to make it, so -- and he had proven that he would

9   steal it.  So, from our perspective at that time, we were

10  just like, he can't make it because he's going to steal it.

11      So we were looking for -- an even at the settlement

12  conference, I said, I need one of two things, I either need

13  some kind of injunction or a boatload of cash.  And I think

14  that that was my quote.  And I said, I have to leave with one

15  of these things, we need -- either we need to recover some

16  money, or we need to stop you from making product because you

17  shouldn't be making it anyway, and using our -- our stock.

18  I -- I'm kind of rambling.  Did I answer the question?

19  Q    Yeah.

20  A    All right.

21  Q    In terms of the -- in terms of the -- was there any

22  money that was supposed to be paid to you under the

23  settlement agreement?

24  A    Yes, I --

25  Q    Outside of the bankruptcy.

1    A    So, basically, there were two pieces to the money:  A

2    large sum, which Thompson and I -- Thomson and I, actually,

3    at one point in the night, left the room.  I invited him to

4    leave the room.  It was very contentious at the beginning.

5    We were all tense.  We weren't prepared to have a settlement

6    conference when we showed up, and it was very tense.  And at

7    one point, I said, you know, would you like to leave the --

8    let's leave the room.  And he and I went out, and I thought,

9    you know, maybe we can connect, maybe --

10            MR. MASCHMEYER:  Your Honor, I'm going to object,

11   Judge.  Anything they discussed would be hearsay and --

12            MR. GEORGE:  No, it might be an admission.  But

13   it's parol, I think, isn't it?

14            THE COURT:  It's a little late for a parol evidence

15   objection.  Overruled.

16            THE WITNESS:  So --

17            THE COURT:  Go ahead.

18            THE WITNESS:  Thank you.

19            So we left the room.  And I thought that was very -

20   - it was very -- kind of powerful, it was -- it meant

21   something.  We stepped out.  We hadn't talked in years.  You

22   know, we had gone through a terrible litigation.  They're

23   very emotionally draining, they're -- it's very hard.  And

24   you know, I was -- I felt like, for a year, I had been

25   fighting for my -- my survival.  And we stepped out and it

1    was -- it was kind of like, wow, we connected, we came to

2    something.  And he agreed to pay me a large sum of money,

3    which I won't -- I won't say how much because it's -- I'm not

4    -- I shouldn't, so that, and then also the bankruptcy claim.

5    So the money was basically going to be the offset for me,

6    since I was about to give up, basically, all of my rights.

7            You know, he -- Mr. Thompson even gave me a hug.

8    Like we were out there, and he gave me a hug.  It was like we

9    -- we had -- I felt like it was meaningful, and I believed

10   him.  I --

11   BY MR. KIZNER:

12   Q    Okay.  Well, let's just focus on the money for a second.

13   A    Okay.  Sorry.

14   Q    Did you ever get any money that was promised to you,

15   that was part of this settlement agreement?

16   A    I did not.

17           MR. GEORGE:  Your Honor, I object.  She's not going

18   to let them -- she's not going to talk about how much it is,

19   or anything like that, but she's going to talk about those

20   details?

21           THE COURT:  What's the relevance?

22           MR. KIZNER:  Because, Your Honor, they've already

23   talked about how they believe we've received benefits that

24   are going to cause a business justification for different

25   treatment.  If he -- it's critical whether or not she

1    received any benefit under --

2              THE COURT:  I'm not sure --

3              MR. KIZNER:  -- the settlement agreement.

4              THE COURT:  -- performance of those benefits is the

5    same thing as negotiating to get the benefits, so I will

6    sustain the objection.

7              MR. KIZNER:  Okay.

8    BY MR. KIZNER:

9    Q    What about the -- what about the other -- was there

10   anything else that was received, other than money, or that --

11   other than the promise of money?

12             THE COURT:  Actually, let me stop for a second.

13   I'm rethinking that.  I need to ask a question of the debtor

14   and the committee then.

15             To the extent you want to argue -- and I thought I

16   heard this in the opening statement -- that I should factor

17   in as to whether the deal is fair and equitable the other

18   benefits, why isn't it relevant whether -- at least by the

19   time we got to confirmation, whether Dalmatia had actually

20   received any promise for other benefits that were due at that

21   time?  Wouldn't that be relevant?

22             MR. GEORGE:  Yes.

23             MR. MASCHMEYER:  Well --

24             THE COURT:  Okay.  All right.  So, with that in

25   mind, maybe --

1          MR. MASCHMEYER:  Via the confirmation.

2          THE COURT:  -- you can --

3          MR. GEORGE:  Wait, Your Honor.

4          THE COURT:  -- rephrase --

5          MR. GEORGE:  He --

6          THE COURT:  -- your question.

7          MR. MASCHMEYER:  Your Honor, my -- if we're going

8     to talk about what benefits Dalmatia received, I, per se,

9     have no problem if she wants to point to the settlement

10    agreement to the benefits that they were going to get under

11    that.  But it seems like we're going off into some mysterious

12    benefits that weren't incorporated into this settlement

13    agreement, and that's just not right.  I mean, if there was -

14    -

15          MR. MASCHMEYER:  -- settlement --

16          THE COURT:  I have to --

17          MR. MASCHMEYER:  -- discussions between --

18          THE COURT:  -- decide whether the fourth amended

19    plan was fair and equitable.  And by the time we get to the

20    fourth amended plan, some time had passed from this

21    negotiation.  It might affect whether it's fair and equitable

22    at that point.

23          MR. MASCHMEYER:  So -- well, let's go through the

24    time limit then.  You're limiting the questions to after this

25    settlement agreement was entered into?

1          MR. GEORGE:  And at the confirmation hearing.

2          THE COURT:  And the confirmation -- yes, that's why

3     --

4          MR. MASCHMEYER:  And if --

5          THE COURT:  And that's --

6          MR. MASCHMEYER:  -- there were --

7          THE COURT:  -- why Mr. George --

8          MR. MASCHMEYER:  -- discussions --

9          THE COURT:  -- agreed with me.

10          MR. MASCHMEYER:  -- between them?

11          MR. KIZNER:  The question was just focused on

12     whether or not there was monetary performance on this.

13          THE COURT:  And what I'm saying is you need to --

14     you may need to focus the question a little more --

15          MR. KIZNER:  All right.

16          THE COURT:  -- for it to be relevant.  I think

17     there is some relevance to it.  So I'm sustaining the

18     objection as to form, and party as to substance.

19         (Participants confer)

20     BY MR. KIZNER:

21     Q    What was supposed to -- well, can you explain what was

22     supposed to be paid monetarily, without saying the number?

23     A    I was --

24          MR. GEORGE:  Objection, Your Honor.  By whom?

25          THE COURT:  So objection to the form of the

Magee - Direct                                                 60

1    question.

2              MR. GEORGE:  Yes, Judge.

3              THE COURT:  Sustained.  Rephrase it.

4    BY MR. KIZNER:

5    Q    Okay.  If you could explain, other than Earth Pride and

6    Lancaster -- so Mike Thompson and other companies that were

7    part of the litigation.

8    A    Correct.

9    Q    By Mike Thompson and his other companies, not Earth

10   Pride or Lancaster --

11   A    Correct.

12   Q    -- was any money paid to you under the settlement

13   agreement?

14   A    Zero.

15   Q    Okay.  And that was -- you just -- I think you testified

16   earlier, that was a fair -- that was one of the reasons you

17   agreed to settle, right?

18   A    That was -- I needed one or the other.  I needed -- you

19   know, basically, the thing we walked away with of any meaning

20   was supposed to be the claim -- the unsecured claim in

21   Bankruptcy Court and a sum that I was supposed to be paid.

22             MR. MASCHMEYER:  Objection.  Judge, that's not what

23   the agreement says.

24             MR. KIZNER:  Your Honor, let's -- I think we're

25   moving ahead.  Let's move into the written agreement because

                              Magee - Direct                          61

 1    the --

 2              THE COURT:  Well, before you move into the written

 3    agreement, there's an objection.

 4              MR. MASCHMEYER:  Your Honor, she's --

 5              THE COURT:  (indiscernible)

 6              MR. MASCHMEYER:  I'm just saying, Judge, that the

 7    settlement agreement does not -- there's no requirement in

 8    the settlement agreement for sums to be paid.  I mean, she's

 9    mischaracterizing what this document says, which is what

10    incorporates the terms of the settlement.

11              THE COURT:  All right.  Let's -- we'll leave that

12    for cross-examination.

13              MR. MASCHMEYER:  Okay.

14    BY MR. KIZNER:

15    Q    Let's flip back to the beginning of the exhibit, which

16    is the typed agreement.

17    A    Okay.

18    Q    What -- can you explain what this agreement is?

19    A    So this is the -- basically, just the typed version of

20    what the Judge did.

21    Q    Okay.

22    A    Yeah.

23    Q    So this was done to memorialize the handwritten

24    agreement?

25    A    Right.

1    Q    All right.  And is there any other -- is there any

2    reference to payment being made on Page 3?

3    A    (Witness reviews exhibit)

4         There is, Clause 7, clause -- actually, 5.  I haven't

5    looked at this full agreement in a while.

6    Q    And that's what you were referring to when you said

7    payment wasn't made?

8    A    The -- again, it doesn't -- it's blacked out, so I'm

9    assuming that's the one.

10   Q    Uh-huh.

11   A    But yes.

12   Q    And you notice on the first page, the first -- where the

13   language is indented, there's a sentence that says, "Dalmatia

14   shall have the ability."  Do you see that?

15   A    Yes.

16   Q    Okay.

17   A    That's --

18   Q    And that's --

19   A    Okay.  Sorry.

20   Q    No, I'm sorry.  That's the same as the other language

21   that was in the handwritten agreement?

22   A    That looks to be verbatim, yes.

23   Q    And if you go over to Page -- the next page, Paragraph

24   3.

25   A    (Witness reviews exhibit)

Magee - Direct                                    63

1          Which page, please?

2     Q    Page -- it's -- on the top, it says "Page 3 of 15."

3     A    Okay.

4     Q    And then Paragraph 3, it starts, "Dalmatia will amend

5     its claims."

6     A    Yes.

7     Q    Okay.  So this wasn't in the first -- the handwritten

8     document, right?

9     A    I don't think this was.

10    Q    Okay.  What's your understanding of this paragraph?

11    A    Can I read it?

12    Q    Yes.

13    A    So "Dalmatia will amend" --

14              THE COURT:  Read it -- you don't need to --

15              MR. GEORGE:  Your Honor --

16              THE COURT:  -- read it out loud.

17              THE WITNESS:  Oh, okay.  Okay.

18              THE COURT:  We all have it.

19              THE WITNESS:  So my understanding of this is we

20    have -- we can pursue our claim, our -- as an unsecured

21    creditor, that that claim is fixed, valid, and a, quote,

22    "allowed unsecured claim" in the bankruptcy case.  So it's an

23    allowed, secured, valid claim.  And it says which will not be

24    challenged by Lancaster or his sister companies or -- or him.

25    BY MR. KIZNER:

1    Q    And you testified earlier that you received a verdict

2    for around like 2.1 million --

3    A    Right.

4    Q    -- plus legal fees.

5    A    Plus fees and things.

6    Q    And the amount that's agreed upon here is what?

7    A    It's less.

8    Q    Okay.

9    A    That's -- you know, we made some concessions.

10   Q    So you made a concession -- as part of the settlement,

11   you made about a million-dollar -- or eight-hundred-thousand-

12   dollar concession --

13   A    Yes, lower.

14   Q    -- as to the amount of the claim.

15        (Participants confer)

16   A    We made concessions, we made a lot of concessions.  I --

17   I wasn't happy.  I wasn't really happy with the agreement,

18   but you know, that's what it's about.  You -- you both give

19   up some things.  And I justified within my own mind I'm

20   walking away with an unsecured claim and cash, which he's

21   going to pay me.  And that was justifiable in my mind.

22   Q    Okay.  And you also mentioned -- it's been mentioned in

23   openings, and there was some injunctive relief that was

24   provided.  Can you explain what the injunctive relief was to

25   the Court?

1    A     So -- do you mean what was agreed to?

2    Q     What was agreed to, yeah.

3    A     So the injunctive relief was not what we were looking

4    for.  Again, compromises have to be made with -- with these

5    things, but it was basically meaningless because of the

6    timing of it and the duration.  So we are -- we are a holiday

7    business.  We sell at the holidays, Thanksgiving, Christmas,

8    you know, all those holidays.  And that's like 70 percent of

9    our business.  So an injunction that goes from October to the

10   following October basically is useless because Lancaster

11   stocked -- they can stock up FOODMatch right before that

12   injunction because they knew what was coming.

13            MR. MASCHMEYER:  Objection, Judge.

14            MR. GEORGE:  Your Honor --

15            MR. MASCHMEYER:  This is speculation.

16            THE WITNESS:  It's a --

17            MR. GEORGE:  And it's running pretty far afield

18   from --

19            THE COURT:  Sustained.  You need to just describe

20   the injunction, not the efficacy of the injunction.  That was

21   -- the question was for you to describe the injunction.

22            THE WITNESS:  Okay.

23   BY MR. KIZNER:

24   Q     Just describe how long the injunction was, was it -- I

25   think it --

1         THE COURT:  Well, she's doing more than that --

2         MR. KIZNER:  Yeah.

3         THE COURT:  -- and I'm sustaining the objection.

4         THE WITNESS:  Maybe I said it then.  It was October

5    to October.

6         THE COURT:  And what did it enjoin from October to

7    October; what was --

8         THE WITNESS:  What was --

9         THE COURT:  -- restrained?

10        THE WITNESS:  Okay.  So Lancaster was -- was not

11   supposed to make fig spread for FOODMatch or fig spread

12   during that time in mid-October to the following mid-October;

13   however, there were carveouts.  So they asked me, you know,

14   is it okay if Lancaster keeps -- you know, makes fig spread

15   for -- or fig something for this customer; okay, yes, it's

16   fine, it's small -- they promised it was a small customer.

17   Okay, fine.  And is it okay if Lancaster delivers another

18   container load -- which is another 40,000 jars -- to

19   FOODMatch, even though we have this agreement now.  It's

20   like, okay, fine, yes, okay, fine.

21        So they supplied -- we basically allowed them to --

22   some leeway there, they were allowed to keep supplying --

23   supplying a very large amount of product.  They had already

24   delivered a lot.  It's -- it was useless to me.  That wasn't

25   -- that's not what meant anything to me.  What meant

1    something to me was the money.  That's the -- kind of the

2    bottom line of it.

3    BY MR. KIZNER:

4    Q    And they mentioned a five-year injunction where -- was

5    this the only injunctive relief you received?  Just so that

6    it's clear what the injunctive relief was?

7    A    I -- I don't -- I don't even want to call it injunctive

8    -- it was no "relief."  I know that's technically the term.

9    What we were going for was a permanent forever injunction.

10   We wanted to stop him from ever using -- doing fig spread

11   because he had no connection with fig spread before we taught

12   him everything we knew.  That was our perspective.  So this

13   was useless.

14       So, to touch upon your five-year one -- I'm going to

15   just answer you.  So the five-year one, it's a non-clause.

16   And I spoke with the Judge about it when he was wanting to

17   put in.  He wanted to give us a little extra protection.  But

18   it's kind of a non-clause.  I'm not going to argue with the

19   Judge.  What am I going to say, don't put it in there?  I'm

20   not going to tell the Judge not to put something in a

21   settlement agreement.

22       But basically, it's -- it says they can't use our trade

23   secrets for five years.  Okay.  Well, they can't use our

24   trade secrets ever.  It's against the law --

25                   MR. MASCHMEYER:  Objection, Judge.

Magee - Direct                                                68

 1   A     -- to use trade secrets, so --

 2              MR. GEORGE:  Your Honor, I --

 3   A     That's a nonissue.  I'm just answering the question.

 4   It's a nonissue.

 5              MR. GEORGE:  Your Honor, objection.  She's not

 6   answering the question.  She's giving her narrative.  It's

 7   not even responsive to the question that was asked.

 8              THE COURT:  All right.  Well --

 9              MR. GEORGE:  I mean, it --

10              THE COURT:  -- I'll allow it.  The next question

11   was going to be about her perception of the value of the

12   injunction to the company.  She has jumped ahead and answered

13   that, so let's just move on to another question.

14              MR. KIZNER:  Your Honor, they --

15              THE COURT:  I'll overrule --

16              MR. KIZNER:  They've raised all --

17              THE COURT:  -- the objection.

18              MR. KIZNER:  They've raised all these issues in

19   their opening, so --

20              THE COURT:  I --

21              MR. KIZNER:  Which --

22              THE COURT:  You won.

23              MR. KIZNER:  Yeah, I know.  Okay.

24              THE COURT:  Move on to the next question.

25   BY MR. KIZNER:

1  Q    So is it fair to say that -- you didn't receive any

2  money from Thompson, right?

3  A    Correct, nothing.

4  Q    Okay.  And you received just this one year that he

5  couldn't make the fig spread?

6  A    Which was meaningless to me.

7  Q    Okay.

8  A    I told you why, the timing of it meant nothing.

9  Q    What else did you receive?

10  A    I -- I didn't receive anything.

11  Q    Okay.

12        THE COURT:  Can I interject a question --

13        MR. KIZNER:  Sure.

14        THE COURT:  -- just so we can keep it moving?

15        MR. KIZNER:  Yeah.

16        THE COURT:  There was some discussion during the

17  opening statements about some kind of a five-year injunction.

18  Is there some kind of a five-year injunction as part of the

19  deal?

20        THE WITNESS:  That's what I was just -- yes, but

21  no.  So I was just answering, they objected to that.

22        THE COURT:  So that October to October was the five

23  years?

24        THE WITNESS:  The -- the October to October was

25  some -- that injunction that, because of timing, meant

1       nothing, because of the holidays.  The five-year -- let me --

2                      THE COURT:  Isn't October to October a whole year?

3       So, if it's for five years --

4                      THE WITNESS:  Because of the holiday, because 70

5       percent of the business of fig spread is in the holidays,

6       it's meaningless.

7                      THE COURT:  So which months are not subject to the

8       injunction?

9                      THE WITNESS:  So what that means is they supplied

10      their -- when you're in supply, you're not actually producing

11      during those months of October -- it gave him time,

12      basically, to -- I'm in production, I've been in it for

13      years.  When you are supplying for the holiday, you make

14      product before October and you give it to your customers, or

15      you make it in October and you give it to your customers.

16      You're not delivering it November, December.  So, basically,

17      it gave him --

18                      THE COURT:  I guess what I'm not understanding --

19                      THE WITNESS:  Yes.

20                      THE COURT:  -- is, if you say that the duration of

21      an injunction is from October to the next October --

22                      THE WITNESS:  Right.

23                      THE COURT:  -- that seems to include the holiday

24      season.

25                      THE WITNESS:  It --

1          THE COURT:  So how does it not include the holiday

2     season?

3          THE WITNESS:  I know, I get it.  It -- you have to

4     know the business.  Basically, when you're stocking up your

5     customers for the holiday, you stock them at different times

6     than they're selling.  So you can stock them at any window

7     between September to mid-November, and they're still going to

8     be stocked, there's a big window, but you got to stock them.

9     So he had plenty of time to do that both years.  He did not

10    miss his holiday season, which is 70 percent of his business.

11         And that's -- that's what I'm trying to say.

12    That's why it's meaningless.  The point of an injunction is

13    so I don't have competition because that's what he promised

14    me in my contract, he wasn't supposed to have --

15         THE COURT:  So your perception of the effect of the

16    injunction is that it --

17         THE WITNESS:  Yeah.

18         THE COURT:  -- left open a number of months close

19    enough in time to the holiday season --

20         THE WITNESS:  Right.

21         THE COURT:  -- so that the debtor could supply the

22    suppliers.

23         THE WITNESS:  Correct.  And I knew that at the

24    time, and so did he.  That's not -- it was a non-thing.  But

25    again --

Magee - Direct                                              72

1          THE COURT:  But you accepted that.

2          THE WITNESS:  I did --

3          THE COURT:  Okay.

4          THE WITNESS:  -- because the money was everything

5    to me.

6          THE COURT:  Okay.

7          THE WITNESS:  Yes, that's correct.

8          THE COURT:  Okay.

9          THE WITNESS:  And then to the five-year question,

10   would you like me to just say -- explain that quickly?

11         THE COURT:  Yes.

12         THE WITNESS:  So the five-year, that's a non-thing,

13   too.  That's something Judge Smith really wanted to put in

14   there.

15         THE COURT:  That's something different than the

16   injunction you were just telling me about.

17         THE WITNESS:  Correct, correct.

18         THE COURT:  So tell me about the five-year

19   injunction.

20         THE WITNESS:  So they're calling it an

21   "injunction;" I'm calling it a "nothing" because it basically

22   says they can't use my trade secrets for five years.  Okay.

23   Well, they can never use my trade secrets, it's against the

24   law.  If they do, I'm going to sue them again.  So here we

25   are.

1           THE COURT:  Okay.

2           THE WITNESS:  It's a non-thing.

3           THE COURT:  Got it.

4           THE WITNESS:  Okay.  Great.

5           THE COURT:  Thank you.

6           THE WITNESS:  You're welcome.

7      BY MR. KIZNER:

8      Q    Okay.  You said a second ago it's all about the money,

9      but you never received any of that money.

10     A    Correct.

11     Q    When this was entered into, the typed agreement and the

12     handwritten agreement, was there ever -- did you ever believe

13     that you'd be treated differently?

14     A    Differently than other -- the other unsecured creditors?

15     Q    What was your belief how you'd be treated?

16          MR. GEORGE:  Your Honor, I object.

17     A    Like everyone.

18          MR. GEORGE:  I object.

19     A    Like --

20          MR. GEORGE:  What her -- what she believed was

21     irrelevant.  We're focusing on what was happening at that

22     settlement agreement and what the discussions were at that

23     time.  What she thought or didn't think doesn't matter at

24     all.  It's what was expressed in there at the mediation or in

25     this agreement, as to what the intentions were.

1          THE COURT:  Do you have a response to that?

2          MR. KIZNER:  Yeah, Your Honor.  There is no -- one

3     of the ways you can speak about -- get parol evidence in,

4     extrinsic evidence, is when there's just a lack of terms.

5     There's a material term missing in this, which is dealing

6     with any kind of classification into separate plans treating

7     -- there's -- one, we're an unsecured creditor.  So I think

8     it's important to focus on that.  It says "unsecured

9     creditor," that's the only time there's a creditor mentioned,

10    in terms of a creditor class or a potential class for the

11    plan.  So I think what was not in there is important to point

12    out.

13         THE COURT:  But what -- isn't the timing important?

14    Doesn't it matter what the negotiating parties' state of mind

15    and actual conduct during the negotiations, isn't that really

16    what --

17         MR. KIZNER:  Well --

18         THE COURT:  -- I need to hear about?  Not a general

19    question about --

20         MR. KIZNER:  Sure.

21         THE COURT:  -- she now understands these things to

22    mean?

23    BY MR. KIZNER:

24    Q    Okay.  So did you --

25         THE COURT:  So let me --

1          MR. KIZNER:  Let me rephrase it to --

2          THE COURT:  -- sustain -- I'll sustain the

3    objection to that question.  You can try again.

4          THE WITNESS:  Uh-huh.

5          MR. KIZNER:  Okay.

6    BY MR. KIZNER:

7    Q    Did you have any belief during the settlement

8    discussions, when these documents were drafted during the

9    conference, about how you'd be treated compared to other

10   unsecured creditors?

11   A    Well, let me just say I did not really know much about

12   bankruptcy.  I understood basic terms.  You had secured

13   creditors like banks, and then you had unsecured creditors

14   like me.  I knew I was the largest unsecured creditor.

15   That's pretty much it.  I was in a group of unsecured people.

16         THE COURT:  The way you're phrasing that, I'm

17   taking that as the answer to his question is no.

18         THE WITNESS:  Okay.  Sorry.  I digressed and --

19   sorry.  What --

20         THE COURT:  And I don't want to put words in your

21   mouth, but that's what I -- I'm hearing you, so I want to

22   give you the chance to explain that.

23         THE WITNESS:  Can I ask him -- I need the question

24   again.

25         THE COURT:  Do you want to -- ask the question

1    again.

2              THE WITNESS:  Can you just repeat that?  I'm sorry.

3              MR. KIZNER:  Sure.

4    BY MR. KIZNER:

5    Q    At the time the settlement discussions were taking place

6    --

7    A    Yeah.

8    Q    -- and during the settlement agreement -- when the

9    settlement agreements were drafted --

10   A    Right.

11   Q    Did you believe you'd be paid different or treated

12   differently than other unsecured creditors?

13             MR. MASCHMEYER:  That wasn't the question --

14   A    No, the same.

15             MR. MASCHMEYER:  -- he asked the first time.

16             THE COURT:  I think the -- let me rephrase it.  I

17   think the point of the question was:  Did you have any

18   expectations that your treatment would be the same as other

19   unsecured creditors in the bankruptcy case?

20             MR. GEORGE:  And Your Honor --

21             THE COURT:  Basically, what you're saying is you

22   weren't thinking about bankruptcy, so, to me, the short

23   answer is no.  But if you think that's not a fair

24   characterization, tell me.

25             THE WITNESS:  I'm so sorry, I'm just not

1    understanding.  So I saw myself as --

2                    THE COURT:  Were you --

3                    THE WITNESS:  -- an unsecured creditor.

4                    THE COURT:  Were you even thinking about the other

5    creditors?

6                    THE WITNESS:  I was.  I was very aware of

7    creditors, that there were secured and unsecured, and that's

8    it.

9                    THE COURT:  But that's it.

10                   THE WITNESS:  Pretty much, secured and unsecured,

11   and that's what I understood.  Secured were bank; unsecured

12   were people like me.

13                   THE COURT:  Okay.

14                   THE WITNESS:  I was an unsecured.

15   BY MR. KIZNER:

16   Q    So there was no thought about different classes of

17   unsecured creditors or even --

18   A    Those two classes were different in my mind, from

19   secured --

20   Q    Okay.

21   A    -- to unsecured.

22   Q    Okay.

23   A    I didn't think I'd be a third-class --

24                   MR. GEORGE:  Your Honor --

25   A    -- citizen.

1          MR. GEORGE:  -- object.

2     Q    Did you agree --

3     A    Overruled.

4     Q    Did you agree to simply accept ten percent -- only ten

5     percent?

6     A    Absolutely not.

7     Q    Okay.  And what does the settlement agreement say?

8          MR. GEORGE:  Your Honor I'm going to move to strike

9     that.

10         THE COURT:  So what are you moving to strike,

11    exactly?

12         MR. GEORGE:  Because it's not responsive.  Did she

13    agree to accept ten percent?  There's a document that says --

14         THE COURT:  Well, she didn't answer yet.  Are you

15    striking --

16         MR. GEORGE:  Well, she did.

17         THE COURT:  -- the question?

18         MR. GEORGE:  She --

19         THE COURT:  Well, she said absolutely not.

20         MR. GEORGE:  Yeah, and there's a document that says

21    that they'll accept ten percent, if they get at least ten

22    percent --

23         THE WITNESS:  No.

24         MR. GEORGE:  -- they'll accept.  So she's saying,

25    even though I signed the agreement that says --

1          THE COURT:  All right.

2          MR. GEORGE:  -- I'll take --

3          THE COURT:  I'm not --

4          MR. GEORGE:  -- ten percent --

5          THE COURT:  I'm not --

6          MR. GEORGE:  -- and even though money was

7     everything --

8          THE COURT:  I understand.  I'm not going to strike

9     it.  You can deal with it in other ways.

10    BY MR. KIZNER:

11    Q    Okay.  So is it fair to say you agreed to receive at

12    least ten percent?

13    A    I agreed to receive what other unsecured creditors would

14    agree to receive.  And in the worst-case scenario -- this was

15    written in at the end.  It was like if this is all Lancaster

16    can pay out to you guys and to the creditors -- and that's

17    what I mean, "you guys," to the creditors, pay out -- that's

18    what "pay out" means, paying out to the -- to the creditors.

19    If this is all Lancaster can afford, I'm not going to cause

20    any trouble, I'm not going to object, I'm not going to stop a

21    plan if that's all he can afford.  And that's what I --

22    that's what I did.  I wasn't agreeing to only take ten

23    percent.  Why would I do that?

24    Q    And --

25    A    I needed the money.

1    Q    And also, it doesn't say only ten percent, right?  It's

2    a floor of ten percent, not a ceiling.

3    A    It's worst-case scenario, it's a worst-case scenario.

4    It was written in at the very end.  It's very vague.  The

5    real -- I'm surprised we're even here discussing this.  I'm

6    so like insulted about this.  I can't even believe we're

7    wasting time on this.  This is insulting, really.

8    Q    Okay.  Just, consistent with your belief as to how you

9    would be treated, which was fairly with other unsecured

10   creditor --

11   A    Yes, just like --

12   Q    -- what happened --

13   A    -- the other ones.

14   Q    -- what happened in the first -- are you familiar with

15   the first three versions of the plan that were filed?

16   A    I am familiar; I am, somewhat.  I know that I was

17   treated the same, I was just treated fairly like --

18             THE COURT:  Do we need --

19   A    -- everyone else.

20             THE COURT:  -- to go through that with this

21   witness?  Aren't those facts that are just not dispute?

22             MR. KIZNER:  I think it supports --

23             THE COURT:  What are --

24             MR. KIZNER:  We can --

25             THE COURT:  What are you going to do with this?

1              MR. KIZNER:  I --

2              THE COURT:  Where's it going to go?

3              MR. KIZNER:  I think it shows -- it's

4      circumstantial evidence of what the beliefs of the parties

5      were.

6              THE COURT:  Who cares what anybody thought about

7      two, three months later, right?

8              MR. KIZNER:  Well --

9              THE COURT:  If the question is, objectively, is it

10     fair and equitable, and to the extent that that determination

11     requires some assessment of the settlement agreement --

12             MR. KIZNER:  Okay.

13             THE COURT:  -- you have now moved beyond the

14     settlement agreement.

15             MR. KIZNER:  I can deal with that on cross-

16     examination, Your Honor, of Thompson.

17             THE COURT:  Well, all I'm saying is that, to walk

18     this witness through the scenario of how there were multiple

19     plans and what each plan did is unnecessary.  Those facts are

20     already established.

21             THE WITNESS:  Uh-huh.

22             THE COURT:  Unless you want to do something else

23     with it.

24             MR. KIZNER:  No, no, that's fine.  I can deal with

25     it at closing, Your Honor, too.

1          (Pause in proceedings)

2                THE COURT:  Do you need some water?  There's some

3     water up there, if you want.

4                THE WITNESS:  Thank you.  I'll wait.  Thank you.

5                THE COURT:  Okay.

6          (Pause in proceedings)

7     BY MR. KIZNER:

8     Q    What do you feel like you're entitled to from the Court?

9                MR. GEORGE:  Objection, Your Honor.

10               THE COURT:  Sustained.

11               MR. GEORGE:  What's the relevance of that?

12               THE COURT:  Sustained.

13    BY MR. KIZNER:

14    Q    You just want to be treated fairly.  Isn't that

15    accurate?

16    A    That's it.

17               MR. GEORGE:  Leading.

18    A    Just like everyone else.

19    Q    You tried to become a member of the unsecured creditors'

20    committee, correct?

21    A    I did.  I was --

22               MR. GEORGE:  Objection.

23    A    I was blocked.

24    Q    Okay.

25    A    And it's kind of confusing to me how --

1      MR. GEORGE:  Your Honor --

2    A    -- counsel -- counsel is sitting --

3      MR. GEORGE:  -- she's going to start a narrative

4    that's really unnecessary.

5      THE COURT:  I agree.

6      THE WITNESS:  Okay.

7      THE COURT:  Why don't you wait for the next

8    question.

9      MR. KIZNER:  Okay.  That's all I have at this time,

10   Your Honor.

11     THE COURT:  Okay.  Thank you.

12     THE WITNESS:  Okay.

13     THE COURT:  You were up there a while.  Do you want

14   a break before cross-examination, or are you able to keep

15   going?

16     THE WITNESS:  I'm okay, unless somebody else wants

17   a break.

18     THE COURT:  Okay.  Anybody else need a break?

19     MR. GEORGE:  Your Honor, I could use five minutes.

20     THE WITNESS:  Okay.

21     THE COURT:  That sometimes happens.  All right.

22   We'll take a five-minute break.  During the break, you can't

23   discuss your testimony with your counsel.

24     THE WITNESS:  Understood.

25     THE COURT:  Okay.

1          THE WITNESS:  Thank you.

2          (Recess taken at 10:53 a.m.)

3          (Proceedings resume at 11:10 a.m.)

4          (Call to order of the Court)

5          (Witness resumes stand)

6          THE COURT:  Okay.  We're ready to resume with

7    cross-examination of Ms. Magee.  Who would like to go first?

8          MR. GEORGE:  I'll go first, Your Honor.

9                    CROSS-EXAMINATION

10   BY MR. GEORGE:

11   Q    Ms. Maia, my name is Ed George, I'm the attorney for the

12   creditors' committee, and I have some questions for you about

13   this document and your relationship with Dalmatia.

14        You said your partner is named Dev [sic]?

15   A    He's from Croatia; his name is Neb.

16   Q    Oh, Neb.

17   A    Yes.

18   Q    Is he your ex-husband?

19   A    He is.

20   Q    Are you aware that he was communicating with the debtor

21   by emails, indicating that there was nothing wrong with the

22   fig spread that was produced by the debtor?

23        MR. KIZNER:  Objection, Your Honor.  What's the

24   relevancy of any of this?

25        THE COURT:  Let me --

1          MR. GEORGE:  Well, that these claims were --

2          THE COURT:  Wait, wait, wait, wait.  I didn't hear

3     the objection.

4          MR. KIZNER:  What's the relevancy of communications

5     with -- about the fig spread product that -- they objected to

6     anything about the trial coming in.  I just -- that's even

7     more unrelated.

8          THE COURT:  Yeah, except you got it in, right?

9          MR. GEORGE:  Right.

10         THE COURT:  So I'll allow it.  I'm not sure.  Yours

11    was relevant.  But if yours got in, I'm going to let him get

12    his in.

13    BY MR. GEORGE:

14    Q    Are you aware of that, ma'am?

15    A    No.

16    Q    Okay.

17    A    But I'm -- I am aware that he -- he thought that.  We

18    had disagreements, and that's why I'm the president because I

19    make the final call on that.

20    Q    So there wasn't agreement between you and your husband

21    that the product was even defective.

22    A    We're friends now, we're -- we're very good friends, but

23    --

24    Q    But that wasn't the question.

25    A    -- but we're not married.  But you said "husband," and

1    I'm just correcting you.

2    Q    So can you answer the question?

3    A    I'm sorry.  What's the question.

4    Q    The question was:  There was not an agreement between

5    you and your partners -- which I think is actually your co-

6    shareholders in your corporation -- as to whether the product

7    was defective.

8    A    So you're asking whether there was a question as to

9    whether it was defective?  There was a question, a big

10   question.  It was defective.

11   Q    No, you're not listening, ma'am.  I want you to listen

12   to the question.

13   A    I'm sorry.

14   Q    Is it --

15   A    Please rephrase it.

16   Q    Well, I'll ask it again.  Isn't it true that there

17   wasn't an agreement between you and Neb as to whether the

18   product that the debtor produced was, in fact, defective?

19   A    I would phrase it differently than that.  I would say

20   that's not accurate, what you said.

21   Q    How would you phrase it?

22   A    He thought that, even though it had problems, we

23   shouldn't risk shorting customers.  He was -- he thought that

24   we should compromise our quality a little bit, and I

25   disagreed.

Magee - Cross

1    Q    I see.

2         So who owns the company?

3    A    We are joint shareholders.

4    Q    Fifty/fifty.

5    A    Correct.

6    Q    Now you had counsel during this settlement negotiation,

7    right?  The one that happened in District Court.

8    A    Yes.

9    Q    And do you feel that your lawyers did a bad job for you

10   in negotiating that agreement in District Court?

11            MR. KIZNER:  Objection.  What -- Your Honor, what's

12   the relevancy of how she felt --

13            MR. GEORGE:  Well --

14            MR. KIZNER:  -- without her lawyers.

15            MR. GEORGE:  Judge, all she's done is grouse about

16   what a terrible deal this was, and I'm asking her does she

17   think her lawyers did a good a job.  I think that's a fair

18   question.

19            THE COURT:  Overruled.  I'll let her answer it.

20            THE WITNESS:  So what's the question, did I --

21   BY MR. GEORGE:

22   Q    Do you feel like your lawyers did a bad job in cutting

23   this deal for you in District Court?

24   A    That is not what I was saying.

25   Q    Okay.  And you said that you felt that the deal you made

1    in District Court was a terrible deal, right?

2    A     That is not what I said, sir.

3    Q     You said that you thought it wasn't a good deal for you.

4    A     That is not what I said, either.

5    Q     You said --

6    A     There were many things said, and you're sort of changing

7    it a little, sir.

8    Q     Okay.  So was that settlement in District Court good for

9    Dalmatia?

10   A     If I had been paid the money, and if I was treated

11   fairly, yes.

12   Q     Well, when you say "paid the money," what money are you

13   talking about the, ten percent dividend or the money you were

14   supposed to get from Mr. Thompson?

15          MR. KIZNER:  Objection to form.  It's a compound

16   question.

17          THE COURT:  Overruled.

18          MR. GEORGE:  No, it's not a compound question.

19          THE COURT:  Overruled.

20          THE WITNESS:  So you're mischaracterizing the cause

21   and you have been all morning, so I'm going to correct you.

22   I didn't agree to take ten percent, that's false.

23   BY MR. GEORGE:

24   Q     Okay.  So I'm not --

25   A     What is the --

1    Q    -- asking --

2    A    -- second part --

3    Q    -- about --

4    A    -- of the question, please?

5    Q    Ma'am, I'm not asking about whether you agreed to take

6    the ten percent, I'm talking about what's in the agreement.

7    What money are you saying that you were expecting to receive,

8    the dividend, whatever percentage that was, or the money from

9    Mr. Thompson?

10   A    I'm sorry.  You know, I really feel like -- I feel very

11   kind of attacked her.  I'd like just -- can you just sort of

12   --

13          THE COURT:  All right.  Let's all take a deep

14   breath.  It's natural to feel attacked when you're being

15   cross-examined.  So I think the way we should handle this is

16   everybody slow down.  Mr. George, ask your questions a little

17   more slowly.  Listen to them --

18          THE WITNESS:  Okay.

19          THE COURT:  -- and then try to answer very

20   specifically what he's asking for --

21          THE WITNESS:  Okay.

22          THE COURT:  -- in whatever way you think is

23   accurate.

24          THE WITNESS:  Okay.

25          THE COURT:  And let's just sort of reboot and start

1    again.

2                    THE WITNESS:  Okay.

3                    THE COURT:  So, Mr. George, why don't you ask her

4    your question.

5                    THE WITNESS:  Okay.

6    BY MR. GEORGE:

7    Q    I think your testimony was that you thought it would

8    have been a good deal if you would have gotten your money.

9    And I'm -- if I'm misquoting you --

10   A    Yes.

11   Q    -- in saying that, I apologize.  But my followup --

12   A    Okay.

13   Q    -- question was:  When you say "the money" or your

14   money, do you mean the dividend or the money that was

15   promised by Mr. Thompson to be paid to liquidate that

16   injunction that was granted?

17   A    So you're -- you're putting so many things in the

18   question that are just -- I'm going to tell you what I was

19   referring to when I said "the money" because what you said is

20   not right.  What I -- what I refer to when I say "the money"

21   is what I was supposed to get:  My unsecured claim in

22   bankruptcy --

23   Q    Okay.

24   A    -- and my -- what I said then, my boatload of cash,

25   which I never got.  So those -- that's "the money."

Magee - Cross

1   Q    But that boatload of cash was not supposed to come from

2   the debtor, it was supposed to come from Mr. Thompson, right?

3   A    I -- I don't think it was ever specified --

4   Q    Well, does --

5   A    -- how he was --

6   Q    -- it say that --

7   A    -- going to give to me, honestly.  He has many

8   companies.  I don't know.  They're all sister companies, he

9   reworks things.  I don't know.

10  Q    I'm talking about the agreement, ma'am.  It says:

11              "Upon payment of the sum of" blank "to plaintiffs,

12              the injunctions will be terminated, the claim in

13              bankruptcy will be assigned to Mr. Thompson or his

14              designee, and the judgment against CO Nolt will be

15              stricken, and judgment against Mr. Thompson shall

16              be stricken or vacated."

17       My question to you is:  When you negotiated that

18  provision, your understanding was that Mr. Thompson was going

19  to pay $700,000 to get out from under that injunction and get

20  that judgment released against him, isn't it?

21  A    My understanding to the first part of that was that Mr.

22  Thompson -- or somehow he would come up with the money.  I

23  think he said he was going to borrow it from his mom.  I

24  don't know.

25  Q    And if he didn't come up with that money, what happened

1   to the injunctions, based on your understanding of this

2   agreement?

3   A    Again, the injunction was for a year.  He wouldn't go

4   longer.  We all know why.  I think I explained it because it

5   -- it would have held him up at -- during holiday sales, so

6   that's a non-thing that I -- that was in there.  What was the

7   other part of that?

8   Q    Did you ever object to the provision allowing for him to

9   provide a truckload of fig spread to FOODMatch?

10  A    That was one of the things he asked us for, that's what

11  -- that's one of the carveouts that I was trying to explain -

12  -

13  Q    And --

14  A    -- which I think I did explain, where he wanted to

15  deliver 40,000 jars to my biggest competitor, the one who

16  stole the recipe with him, and we agreed.

17  Q    Did you feel you didn't have a choice to accept this

18  settlement agreement that the Judge was proposing or

19  mediating?

20  A    I wouldn't put it that way.

21  Q    Okay.

22  A    I -- I wouldn't put it exactly that way.  I wanted to

23  cooperate with Judge Smith.

24  Q    Right.

25       There was a judgment against you entered, wasn't there?

Magee - Cross                                          93

1    A    I hired a private investigator who hired another --

2              MR. GEORGE:  Your Honor --

3    A    -- private investigator.

4              MR. GEORGE:  -- can we have her answer the

5    question?

6              THE COURT:  Yeah, he --

7              THE WITNESS:  Oh, I'm sorry.

8              THE COURT:  -- didn't ask you what the background

9    was; he just asked a very simple question.

10             THE WITNESS:  Was --

11             THE COURT:  Was there a judgment entered against

12   you?

13             THE WITNESS:  Personally, yeah, for the

14   investigations.

15   BY MR. GEORGE:

16   Q    Well, it wasn't an investigation; it was commercial

17   espionage.  You went into the debtor's property without

18   permission --

19   A    No, that's --

20   Q    -- and started --

21   A    -- false.

22   Q    -- surveilling --

23             MR. KIZNER:  Objection, Your Honor.

24   Q    -- didn't you?

25   A    No, that's false.  That's false.

1   Q    So that judgment that was entered against you, that was

2   for something you didn't do.

3   A    That's correct.

4   Q    Oh, okay.

5        And how much was the amount of that judgment?

6   A    Zero.

7   Q    So a judgment was entered against you in the amount of

8   zero.

9   A    Correct.

10  Q    Now you also sued FOODMatch, didn't you?

11  A    Correct.

12  Q    And isn't it true you got several million dollars from

13  FOODMatch?

14  A    There was a settlement with FOODMatch that I'm actually

15  not allowed to discuss.

16  Q    Well, why is that?

17  A    I'm under an obligation, a legal obligation, not to

18  discuss any of the provisions.

19           MR. GEORGE:  Well, Your Honor, can we seal this

20  part of the record, if this is a confidential issue.  I mean,

21  this goes to -- she's raised what's the consideration and the

22  benefits that she got by virtue of this settlement.  I think

23  the fact that she received several million dollars --

24           THE COURT:  From a --

25           MR. GEORGE:  -- from the --

1          THE COURT:  From a collateral --

2          MR. GEORGE:  -- other defendant is --

3          THE COURT:  -- source, in a separate piece of

4    litigation?  No, I'm not going to seal this, and I'm not

5    going to make her tell you the number.

6          MR. GEORGE:  No, but Your Honor, what it does is it

7    goes to what the actual claims were that were remaining at

8    the time that they entered into the settlement.  She's making

9    this assertion that there were all these monies that were

10   owed, and she didn't get anything out of it.  And the fact of

11   the matter is there were a number of defendants who were

12   jointly and severally liable for a number of these claims,

13   and she got millions of dollars for it.

14         THE COURT:  Was FOODMatch --

15         MR. KIZNER:  Objection --

16         THE COURT:  -- a defendant --

17         MR. KIZNER:  -- Your Honor.

18         THE COURT:  -- in the District Court action that is

19   the subject of the settlement?  Oh, so -- you're saying yes.

20         MR. GEORGE:  Yes, Judge.

21         THE COURT:  Oh, so it wasn't separate litigation;

22   it was part of this litigation.

23         MR. GEORGE:  Yes, Judge.

24         THE COURT:  It was a separate settlement.

25         MR. GEORGE:  Yes, Judge.

1          MR. MASCHMEYER:  Just -- Your Honor, if you look at

2     the settlement agreement, they're on there as a defendant,

3     FOODMatch.

4               THE COURT:  Where is -- oh, yes, I see it's --

5               MR. MASCHMEYER:  See it in --

6               THE COURT:  -- in the caption.

7               MR. MASCHMEYER:  -- a whereas paragraph.

8               THE COURT:  Yes.

9               THE WITNESS:  Your Honor, I actually --

10              THE COURT:  Wait.

11              THE WITNESS:  Okay.

12              THE COURT:  Wait a second.

13              THE WITNESS:  Sorry.

14              THE COURT:  Well, I need to understand a couple of

15    things about the litigation then.  At the time of the -- was

16    the settlement with Foot Match before or after the jury

17    verdict?  Anybody know?  I'm asking counsel.

18              MR. KIZNER:  Oh, I'm sorry, Judge.

19              MR. GEORGE:  I wouldn't --

20              MR. KIZNER:  I thought you --

21              MR. GEORGE:  -- know, Judge.

22              MR. KIZNER:  -- were asking the witness.

23              MR. GEORGE:  I wouldn't know.

24              MR. MASCHMEYER:  It was after, I believe, Judge.

25         (Participants confer)

1          THE COURT:  Was the judgment that was entered, that

2     was described as being -- at one point, I heard 2.1 million,

3     another point, I heard 2.5 million.  Was that a judgment that

4     was joint and several against FOODMatch and the debtor

5     entities?

6          MR. GEORGE:  As we understand, on many of the

7     claims, it was, not on the claims against her individually,

8     obviously.  And there may have been some other ones, but I

9     haven't studied it that closely.  But from the --

10          THE COURT:  Mr. Kizner --

11          MR. GEORGE:  -- debtor we --

12          THE COURT:  -- do you know?

13          MR. GEORGE:  -- understand that?

14          MR. KIZNER:  I was not counsel, but -- at that

15     time, but I believe there was a separate judgment, right?

16     That was entered against FOODMatch and the debtor.  Ms. Magee

17     should know, and maybe I -- maybe she knows.

18          MR. GEORGE:  Well, it may be a --

19          THE COURT:  All right.  So there's no firm

20     agreement about that.  Fine.

21          Implicit in your request, Mr. George, is your

22     assumption that a party that may be under a confidentiality

23     obligation from a settlement does not breach that if the

24     disclosure is made in a core proceeding, at least if the core

25     proceeding is sealed.  Are you sure that that's the law?  Is

1    that correct?

2              MR. GEORGE:  I don't -- I'm not going to say that I

3    have researched that issue, Judge.

4              THE COURT:  Yeah.

5              MR. GEORGE:  But I think that -- I think that that

6    makes sense, and particularly if you seal it.  I mean, if she

7    were served with a subpoena, I would imagine that there's a

8    provision that says that she'd have to testify about it.

9              THE WITNESS:  I have a solution.

10             MR. GEORGE:  And I haven't seen --

11             THE COURT:  Am I correct that the --

12             THE WITNESS:  I have a solution.

13             THE COURT:  -- that the -- I'll hear that in one

14   second, but let me just ask this question, first.

15             THE WITNESS:  Sure.

16             THE COURT:  The aspect of the settlement with

17   FOODMatch that you're concerned is confidential is not that

18   there was a settlement --

19             THE WITNESS:  Correct.

20             THE COURT:  -- but the dollar amount.  That's the

21   key --

22             THE WITNESS:  That's correct.

23             THE COURT:  -- fact.

24             THE WITNESS:  That's correct.  I still have a

25   solution.

1          THE COURT:  What is your suggested solution?

2          THE WITNESS:  I could actually -- I can -- what is

3     my exact solution?  I can't divulge that number, but I can

4     answer to his question, I can address that.  I can just say -

5     - can I -- I'll just tell you.  This number, this 1.7 has

6     nothing to do with FOODMatch.  Basically, this is only

7     Lancaster.  That's what left after things with FOODMatch got

8     dealt with.

9          THE COURT:  That's a round about way of getting to

10    the issue.

11         THE WITNESS:  Yeah.

12         THE COURT:  It wasn't your exact question, but that

13    would be her testimony.

14    BY MR. GEORGE:

15    Q    How much was the total judgment against the debtor and

16    FOODMatch?

17    A    You know, they were trebling things, and I don't think I

18    can do the math like -- I don't know exactly --

19    Q    Well, was it --

20    A    -- the exact --

21    Q    -- more than --

22    A    -- dollar amount.

23    Q    -- 5 million?

24    A    But --

25    Q    Ma'am, was it more than 5 million?

1    A    I think it might have been kind of close to that.

2    Q    Okay.

3    A    But this amount, the 1.7 in the bankruptcy, is only

4    Lancaster.

5    Q    Okay.  So it's net of the amounts that you received from

6    FOODMatch.

7            MR. KIZNER:  Objection.  That's --

8    A    I don't --

9            MR. KIZNER:  -- not what --

10   A    -- understand --

11           MR. KIZNER:  -- she said.

12   A    -- that question.  But I -- I think I answered, right?

13   The --

14           THE COURT:  Yeah, I think, given the

15   confidentiality --

16           MR. GEORGE:  I think so.

17           THE COURT:  -- concerns, I think we've gone as far

18   with this as we can.

19   BY MR. GEORGE:

20   Q    Now, Ms. Maia, you never mentioned to the Judge the

21   ongoing five-year injunction --

22           THE COURT:  She mentioned it.

23   Q    -- that's still in place with respect to the debtor.

24   There is a five-year injunction, isn't there?

25   A    No.

1    Q    So the language that says:

2              "Commencing at 5:01 p.m. on October 13, 2018, and

3              continuing for a period of five years, Lancaster

4              Fine Foods shall be enjoined from selling fig

5              spread containing" --

6         I assume your --

7    A    Trade secrets.

8    Q    -- formula.

9              "-- or using the same percentage of sugar and fig

10             as used by Dalmatia."

11        You don't consider that an injunction?

12   A    No, that's -- that's law.  He can't use my trade

13   secrets, period.

14   Q    Oh.  So what --

15   A    The Judge --

16   Q    -- happens --

17   A    -- wanted to --

18   Q    -- after --

19   A    -- reinforce it.

20   Q    So, under your understanding, what happens after five

21   years?  He still can't use those ingredients.

22   A    Correct.

23   Q    So that's  --

24   A    I brought this up --

25   Q    -- a permanent --

1    A    -- with the Judge.

2    Q    So that's -- so your view is that there's either an

3    agreement or the law that means that there's a permanent bar

4    from them ever producing your product?

5    A    Sir, in trade secret law, you cannot use someone's --

6    you cannot use someone's trade secrets, legally.  You are not

7    allowed to.

8            MR. MASCHMEYER:  Objection, Judge, only that --

9    A    We just --

10           MR. MASCHMEYER:  She's giving a legal opinion now

11   as to what trademark law is.

12           THE COURT:  Sustained.

13           THE WITNESS:  It's not trademark.  It's --

14           THE COURT:  Sustained.

15           MR. MASCHMEYER:  Or -- I'm sorry.

16           THE WITNESS:  It's trade secret.

17           MR. MASCHMEYER:  (Indiscernible)

18           THE COURT:  Let's stop at this point.  Let's move

19   on to another subject.

20           MR. GEORGE:  Understood, Judge.

21   BY MR. GEORGE:

22   Q    So you mentioned that this ten percent came up at the

23   very end of the negotiations.  Who asked for those

24   negotiations to start?

25   A    It wasn't even a negotiation; it was an afterthought and

1    it was put in there.  That's why it's in the margins, in

2    tiny, little writing.

3    Q    Understood.  I'm asking who raised it?

4    A    It was either the Judge himself, Judge Smith, or -- you

5    know, wanting to maybe be fair in a worst-case scenario with

6    Lancaster.

7                MR. GEORGE:  Your Honor, I don't need the narrative

8    about what the Judge may have been thinking.

9    BY MR. GEORGE:

10   Q    I'm asking:  Do you remember, during the settlement

11   provisions, who raised the issue of paying ten percent to

12   Dalmatia?

13   A    It was the -- that wasn't -- that's not what's in there.

14   It doesn't say to pay ten percent to Dalmatia.

15   Q    Who mentioned --

16   A    You keep doing --

17               MR. KIZNER:  Objection --

18   A    You keep --

19               MR. KIZNER:  -- Your Honor.

20   A    -- saying it wrong.

21               MR. KIZNER:  She already said --

22               MR. GEORGE:  I'm going to -- I'm trying to

23   rephrase.

24               MR. KIZNER:  She already said she doesn't know, she

25   said that already.

1        MR. GEORGE:  No, that's not what she said.

2        MR. KIZNER:  She's not sure who it was.

3        MR. GEORGE:  That's not --

4        MR. KIZNER:  I mean that's --

5        MR. GEORGE:  Judge --

6        MR. KIZNER:  That's the answer.

7        MR. GEORGE:  -- is this cross-examination or not?

8        THE COURT:  I'm going to let him see if he can

9    refresh the witness' recollection by the way he asks the

10   questions.  So go ahead, try again.

11       THE WITNESS:  Yeah, try again, please.

12   BY MR. GEORGE:

13   Q    During the settlement negotiations, who began the

14   discussion of a potential dividend to Dalmatia out of the

15   bankruptcy case.

16   A    Dividends.  I don't know the implications of the words

17   you're using, but --

18   Q    The amount that you would be distributed out of the

19   bankruptcy case.  We call it a "dividend" in a lot of

20   circumstances.

21   A    That's not what this is.  That's not -- that was never

22   discussed.  This was a worst-case scenario.  If the plan

23   could only pay out ten percent --

24       THE COURT:  And you're fighting the wrong issue.

25   All he wants to know is --

1           THE WITNESS:  Yes.

2           THE COURT:  -- who initiated the discussion --

3           THE WITNESS:  Yes.

4           THE COURT:  -- that led to this handwritten

5     interlineation at the very end that you put in?  Who started

6     the discussion that resulted in that.

7           THE WITNESS:  Right.

8           THE COURT:  That's all he wants to know.

9           THE WITNESS:  I can't remember.

10          THE COURT:  She --

11          THE WITNESS:  I can't remember.

12          THE COURT:  Okay.

13    BY MR. GEORGE:

14    Q    Did you ever, during the discussions, ask the debtor

15    about what their ability to produce revenue would be, not

16    using any of your formulas to create fig spread?

17    A    I'm sorry.  Can you repeat the question, please?

18    Q    Did you, during the negotiation, get any documents or

19    any kind of projections on what the debtor's ability were --

20    was to produce revenue?

21    A    Did I ask to see his -- his figures on what he was doing

22    if he wasn't using my recipe?

23    Q    Yes.

24    A    No.

25    Q    So, under this agreement, you also have the right to

1    continue monitoring of the debtor's operations, right?

2    A    Not me, personally.

3    Q    Well, it says -- so not you, personally.  So when it

4    says "The payment is to be made to Dalmatia or Maia Magee,"

5    who is really supposed to receive the payments?

6    A    Well, I footed -- I basically spent -- emptied my bank

7    account and my life savings to pay for the litigation.

8    Q    So --

9    A    So --

10   Q    So, if you get a payment, instead of paying it to the

11   entity that has the claim, you're going to take it,

12   personally.

13   A    I'm going to make sure the first thing you do is you pay

14   back your loan.  And if I personally make a loan to the

15   company, I'm going to pay my loan back to myself first, so

16   that's pretty logical.

17   Q    So did you make a loan to the company to finance --

18           MR. KIZNER:  Objection, Your Honor.  What is the

19   relevancy of any of this?

20           MR. GEORGE:  Well --

21           THE COURT:  There's an objection.  What's the

22   relevance, Mr. George?

23           MR. GEORGE:  Well, Your Honor, I think that there

24   is a question about whether she has the claim or she owns the

25   claim or whether she's posturing herself to receive the

1    payment herself, instead of Dalmatia.  I mean, we're talking

2    about -- she's raised the good faith of the parties to these

3    negotiations.  And I'm saying this is a party who committed

4    an act of corporate espionage, is misdirecting the revenue to

5    herself.  Her own partner didn't agree that there was

6    anything wrong with the product.  She's already testified

7    that there was no injunction, but the very language states

8    that there's a five-year injunction.  There are plenty of

9    inconsistencies in her testimony --

10             THE COURT:  All right.

11             THE WITNESS:  Uh-uh.

12             MR. GEORGE:  -- and I'm cross --

13             THE COURT:  But as to that last question, I'm going

14   to sustain the objection.

15             THE WITNESS:  And you're --

16             THE COURT:  That --

17             THE WITNESS:  -- misstating things, sir.

18             THE COURT:  You -- there's nothing for you to

19   respond to yet --

20             THE WITNESS:  Okay.

21             THE COURT:  -- Ms. Magee.

22   BY MR. GEORGE:

23   Q    Do you know whether Stark & Stark are bankruptcy

24   lawyers?

25   A    Yes, that's why I hired them.

1    Q    So did you recall ever having had a discussion with your

2    lawyers --

3              MR. KIZNER:  Objection --

4    Q    -- during these --

5              MR. KIZNER:  -- Your Honor.

6    Q    -- negotiations?

7              MR. KIZNER:  This is attorney/client privilege.

8              THE COURT:  He -- let him finish -- first of all,

9    let him finish the question.  All right?  Let me hear what it

10   is that he's asking.

11             Go ahead.  Try again, Mr. George.

12   BY MR. GEORGE:

13   Q    Did you have any discussions with your attorneys during

14   the settlement agreement in front of the Judge about what

15   this classification claim -- this classification issue --

16   whether there might be a classification issue in any

17   prospective plan filed by the debtor?

18   A    Okay.  So -- I'm sorry.  Repeat that.  The --

19   Q    Yes.  Did you, in the presence of the Judge, discuss

20   with your attorneys at Stark & Stark whether there was any

21   kind of ability of the debtor to classify claims separately?

22   A    I did not reach out to Stark & Stark; I did reach out to

23   someone else who's familiar with bankruptcy and --

24   Q    What did they tell you?

25             MR. KIZNER:  Objection, Your Honor.  This is

1      attorney/client privilege.

2              MR. GEORGE:  Who says it was an attorney?  She

3      didn't say it was an attorney.

4              THE WITNESS:  It was an attorney.

5              THE COURT:  There's an objection to -- that doesn't

6      mean there was an attorney/client relationship.

7              MR. GEORGE:  That's true, too.

8              THE COURT:  You --

9              MR. GEORGE:  Well, that's what I was going to get

10     to next.

11             THE COURT:  So why don't you lay a foundation and

12     I'll --

13     BY MR. GEORGE:

14     Q    Did you hire them formally?

15     A    Yes.

16     Q    Did you have a retention letter?

17     A    Yes.

18     Q    Did you pay them a retainer?

19     A    Yes.

20     Q    And they reviewed this from a bankruptcy standpoint?

21     A    That's the specialty, yes.

22     Q    And can you tell us the name of that firm?

23     A    It's Jerry Berkowitz.

24     Q    And what's his firm?

25     A    Berkowitz Klein, LLP.

1    Q     And are they a Pennsylvania firm?

2    A     Yes.

3    Q     And so you did consult bankruptcy counsel about the

4    individual undertakings in the settlement agreement?

5    A     I -- I --

6              THE COURT:  Mr. George, can I ask for a time frame

7    for this, to see what --

8    BY MR. GEORGE:

9    Q     During the time that you were --

10             THE COURT:  Is this --

11   Q     -- negotiating --

12             THE COURT:  -- happening --

13   Q     -- for the resolution.

14             THE COURT:  This is happening on the day of the

15   negotiations?

16             MR. GEORGE:  I'm --

17             THE COURT:  Is that what you're saying?

18             THE WITNESS:  Yes, I called him.

19             MR. GEORGE:  Okay.

20             THE COURT:  Okay.

21   BY MR. GEORGE:

22   Q     So what happens under this agreement that you made if

23   the debtor doesn't pay you ten cents?

24   A     I never agreed to take ten cents.

25   Q     If they don't pay at least ten cents, what happens?

Magee - Cross                                           111

1    A    I --

2    Q    What are your obligations?

3    A    I'm sorry.  I don't understand the question.

4    Q    The document says that:

5              "Dalmatia shall have the ability to pursue its

6              current claim in Bankruptcy Court, but will support

7              any plan not inconsistent with this agreement, as

8              long as it pays out at least ten percent."

9    Q    So my question is:  What happens under this agreement to

10   the Dalmatia obligations if the debtor doesn't pay at least

11   ten percent?

12   A    So, if -- my understanding is, if the debtor doesn't pay

13   out to the creditors at least ten percent, I would then have

14   a right to say something.

15   Q    Well, it says you -- it says that you don't have to

16   support the plan then, right?

17   A    Right.

18   Q    And did you vote in favor of the plan?

19   A    How did we -- this particular plan we're objecting to

20   because -- the other plans we supported because --

21   Q    Are you --

22   A    -- we were treated fairly --

23   Q    Are you --

24   A    -- in those --

25   Q    -- aware that your company filed a ballot rejecting the

1    plan?

2    A    Because that --

3    Q    Ma'am, I'm asking a yes-or-no question.  Are you aware

4    of whether your --

5    A    I am.  I am.  Because that's not what I agreed to.

6    Q    You testified that you went into the settlement

7    agreement saying you were going to either get an injunction

8    or you were going to get money.  But you got both, didn't

9    you?

10   A    No.

11   Q    Okay.

12   A    Not in effect.

13   Q    And so your complaint isn't that you didn't get what you

14   wanted under the agreement with respect to the injunction, it

15   was that the agreement that you reached with respect to the

16   injunction didn't really serve any benefit to Dalmatia.

17   A    The Judge wanted to put some things in there, and I'm

18   not going to tell a judge not to put things in an agreement.

19            MR. GEORGE:  Your Honor, can you ask her to answer

20   --

21            THE WITNESS:  I --

22            MR. GEORGE:  -- the question I asked?

23            THE COURT:  Yeah, I think that was non-responsive.

24   Why don't you try again?

25            THE WITNESS:  Okay.  Thank you.  Please, could you

1    please rephrase the question, sir?

2    BY MR. GEORGE:

3    Q    Your real complaint about the settlement agreement with

4    respect to the injunction was not that you didn't get it;

5    it's that, once you got it, the terms weren't acceptable to

6    you.

7    A    That's -- I have no objection to the settlement

8    agreement.

9    Q    Oh, okay.

10   A    My objection is -- is that you're misinterpreting it and

11   trying to throw me under the bus.

12   Q    Well, ma'am, you spent a lot of time telling the Court

13   that the injunctions didn't mean anything.  Did you know that

14   at the time you agreed to them?

15   A    Sure.  It was a nonissue, it's a non-clause.  It was in

16   there --

17   Q    It's a non-clause?

18   A    Yeah, it's a non-clause.  The Judge wanted it in there.

19   I'm not going to tell the Judge not to.  The -- the monies --

20   as I've been very consistent saying, the monies are what

21   meant something.

22   Q    Now wait a minute, ma'am.  You said that, when you went

23   into that meeting, your intention was to get an injunction

24   and money.  You didn't say the Judge put that in your head;

25   you said you went into the meeting with that intention.  Was

Magee - Cross                                     114

1    that not what you intended to say?

2    A    I believe what I said was I needed one or the other, and

3    that's what I said on the spot, too.  I really need a real

4    injunction, or I need money.

5    Q    And you got an injunction that wasn't real, but you

6    agreed to it anyway.

7    A    I let -- allowed it to be in there.  It's meaningless.

8    Q    And so back to my other question.  Did you feel that you

9    couldn't say to the Judge, I'm not accepting this, I'm not

10   settling?

11   A    That's correct.  I'm not going to argue with a judge.

12   Q    Oh, so you felt like you had no choice but to agree with

13   what the Judge was suggesting.

14   A    That's not what I said.  I'm very respectful.  He was

15   there to do a good thing.

16   Q    Well --

17   A    I wanted to support him.  I don't appreciate your

18   attitude.

19   Q    Well, it's not about respect, ma'am.  It's about someone

20   imposing something on you that you don't feel is appropriate

21   or acceptable to you.  And I'm asking you:  Did you feel put

22   upon that that settlement was forced upon you by the Judge?

23   A    I wouldn't put it that way, no.

24   Q    Okay.  Who negotiated for the Dalmatia claim to be

25   assigned to Mr. Thompson, who first raised that issue?

1    A    At the settlement conference?

2    Q    Yes.

3    A    That part is kind of hazy.  I -- I think that was Mr.

4    Thompson.

5    Q    Did he ever tell you why he wanted to do that?

6    A    Honestly, I'll tell you straight out, I don't even

7    understand that part, and no.

8    Q    Well, but you had a bankruptcy lawyer that you were

9    talking to during that day.  Did you ask him about what that

10   meant?

11   A    I don't think I did.

12          MR. KIZNER:  Objection.

13   A    I don't think I ran that by him.

14          MR. KIZNER:  Attorney/client --

15          THE WITNESS:  Oh.

16          MR. KIZNER:  -- privilege.

17          THE WITNESS:  Should I not answer that?  Okay.

18   BY MR. GEORGE:

19   Q    Now you mentioned Dalmatia.  Where are its offices?

20   A    Technically, we started in Florida, and we technically

21   still have an office there.

22   Q    Where are Dalmatia's offices?

23   A    Technically, they're still in Florida, though we're, you

24   know, traveling nowadays, but ...

25   Q    Well, when you say "still in Florida," do you have an

1    office that says "Dalmatia" on the outside, or is this a home

2    business?

3    A    No, no.  It's a -- it's in an office building.

4    Q    And you don't produce any of this product yourself, do

5    you?  In other words, does Dalmatia have its own fig spread

6    production facility that it owns?

7    A    We have a sister company, which we owned before hiring

8    Lancaster.

9    Q    Well, that's not what I asked you, ma'am.  I asked you

10   whether Dalmatia has its own production company.

11   A    Dalmatia technically does not.

12   Q    And if you had a production company that was a sister

13   company, why did you need Mr. Thompson's company?

14   A    I wanted to make product in America, I wanted to stop

15   paying high tariffs, I wanted -- for many reasons.  I wanted

16   more turn -- a faster turnaround time.

17   Q    So is --

18   A    There were --

19   Q    Is the sister company in Croatia?

20   A    It is.

21   Q    Where your ex-husband is from?

22   A    He is from there, and I studied there, so ...

23   Q    And you what?

24   A    I studied music there.

25   Q    Oh.

1    A    I studied there.

2    Q    Wonderful.

3         Prior to running this business, did you have any kind of

4    training or education in the operation of a business?

5    A    A little.

6    Q    And what kind of business did you operate before

7    Dalmatia?

8              MR. KIZNER:  Your Honor, I object.  This is --

9    we're so far in left field at this point.  I mean, what does

10   this have to do with anything?

11             MR. GEORGE:  Well, we're really not, Judge.  I --

12   you know, this is a strange discussion, where you have

13   someone sitting on the stand and saying, I agreed to this, I

14   agreed to this, I agreed to this, it was all lousy.  And it

15   sounds to me like that's the complaint here, not that the

16   bankruptcy is treating her poorly, that she did a bad deal in

17   Bankruptcy Court.  So I've just been trying to understand

18   what's her business background and what's her understanding

19   of how business works.  Is this the first business she ever

20   operated?  I think that's a relevant question.

21             THE COURT:  All right.  If you limit it to that,

22   I'll allow it.

23             THE WITNESS:  I can clarify more than that.  My

24   issue isn't with --

25   BY MR. GEORGE:

Magee - Cross                                    118

1   Q    I'm just asking you what you ran before Dalmatia, ma'am.

2   A    So I didn't run, I worked for people.  I had jobs since

3   --

4   Q    Oh.

5   A    -- I was like five.

6   Q    Okay.  So who negotiated for the payment to be made

7   directly to you, Maia Magee?

8   A    Well., this is when Mr. Thompson and I walked out of the

9   room and -- and -- well, I thought we -- I thought we had

10  something.  We -- we made an agreement out there.

11  Q    So you and your husband are 50/50 in this company.  Did

12  you both agree to this document?

13  A    We're -- I don't know if he actually agreed, but he's

14  fine with me doing it.

15  Q    Well, but you're 50/50.

16       MR. KIZNER:  Objection, Your Honor.  What does this

17  have to do with anything?  There's no -- now are they saying

18  that it's not validly signed.  I mean, I'm confused.  What is

19  it; is it an agency issue --

20       MR. GEORGE:  I'm trying --

21       MR. KIZNER:  -- he's raising?

22       MR. GEORGE:  -- to understand --

23       MR. KIZNER:  I don't --

24       MR. GEORGE:  -- whether it was validly signed.

25       MR. KIZNER:  Well --

1          THE COURT:  Is that -- nobody has raised the issue

2     that anybody is seeking to invalidate the agreement as ultra

3     vires in some way.  So why are you bringing it up?  I'm going

4     to sustain the objection.

5          (Participants confer)

6     BY MR. GEORGE:

7     Q    And you said you had pending a motion for a new trial at

8     the time of the settlement, right?

9     A    Yes.

10    Q    You understand that there's no guarantees in litigation,

11    that you'd have actually won that request for a new trial or

12    the new trial itself, right?

13    A    Yes, I understand that.

14    Q    Now, at the time that you negotiated this agreement,

15    were you aware that the committee was negotiating with the

16    debtor for a plan of reorganization?

17    A    So someone is going to have to refresh my memory of the

18    time line of when that creditor's counsel -- did you -- I'm

19    sorry.  Can you rephrase the question, so I'm --

20    Q    At the time that you executed this settlement agreement

21    --

22    A    Uh-huh.

23    Q    -- were you aware that the unsecured creditors'

24    committee had not agreed with the debtor on a plan of

25    reorganization?

1              MR. KIZNER:  Objection, Your Honor.  It assumes

2     facts that are not in the record.  He hasn't laid a

3     foundation for the time even in his --

4              THE COURT:  He's asking a question.  Nothing you

5     ask in the question is in the record yet.  Overruled.

6              MR. GEORGE:  Well, it's cross-examination, Your

7     Honor.

8              MR. GEORGE:  That's the point, it's cross-

9     examination.

10             THE WITNESS:  I don't remember.  I don't remember,

11     really.

12     BY MR. GEORGE:

13     Q    Well, was that of any interest to you, whether the

14     debtor and the committee had made --

15     A    Oh.

16     Q    -- its final deal?

17     A    I remember this now.  Okay.  So this was something we

18     discussed, and we -- it was brought up with the Judge, and it

19     was a concern that we -- something like, well, if we even

20     make an agreement here, will it be okay.  That was a topic.

21     And I can't remember the resolution to that.  Obviously, the

22     Judge felt like it could -- we could still make a settlement

23     agreement.

24     Q    Well, did you --

25     A    I'm not a legal professional.

1    Q    That's fine.

2         Did you consider putting something in the document, or

3    did the lawyers at the meeting suggest something being put in

4    a document, in the event that this was something that either

5    didn't get approved or wasn't accepted?

6              MR. KIZNER:  Objection --

7    A    I don't know --

8              MR. KIZNER:  -- to the extent --

9    A    -- what they --

10             MR. KIZNER:  -- it seeks --

11   A    -- thought about.

12             MR. KIZNER:  -- attorney/client privilege.  He's

13   asking about --

14             THE COURT:  It's not an --

15             MR. GEORGE:  I didn't --

16             THE COURT:  -- attorney/client privilege if he's

17   asking a question about the discussions --

18             MR. GEORGE:  At the meeting.

19             THE COURT:  -- that were taking place at this

20   meeting --

21             MR. GEORGE:  With her -- between her and her

22   lawyer.

23             THE COURT:  -- about the formation of the contract,

24   so it's overruled.  It's -- she's not asking about a direct

25   attorney/client communication between her and her own lawyer.

1    He's asking about the discussions among the parties; that's

2    the focus of the questions.

3         So, with that in mind, did anybody bring up the

4    subject of what might happen if the agreement was not

5    approved by the Bankruptcy Court?  Do you recall that?

6              THE WITNESS:  That came up.

7              THE COURT:  Okay.

8              THE WITNESS:  And I don't know how it resolved.  It

9    came up.

10   BY MR. GEORGE:

11   Q    Okay.  Now at -- did CO Nolt have a judgment entered

12   against it when the verdict came down in the trial that was

13   conducted in front of Judge Smith?

14   A    I think we have judgments against CO Nolt, Lancaster

15   Fine Foods, that little group of his companies.  CO Nolt was

16   one of them.

17   Q    And how much was CO Nolt liable for?

18   A    I would have to look, and I don't know off the top of my

19   head.

20   Q    Have you settled with C and L -- CO Nolt?

21   A    No, that's -- that's Thompson, Mr. Thompson's company.

22   Q    Are you aware of whether --

23   A    I mean --

24   Q    -- Mr. Thompson still --

25   A    Wait.  Let me rephrase.  If it's -- if it's included in

Magee - Cross

1    this grouping here -- I'm not sure I understand your

2    question.  Do you mean outside of this did I settle?

3    Q    Well, I just -- if you look at this document, it says:

4            "Dalmatia shall have judgment entered against CO

5            Nolt as requested in its filings."

6        So that seems to mean, to me, that maybe a judgment

7    wasn't entered, and maybe it was judgment was entered as a

8    consequence of entering into this agreement.  I'm asking you

9    if you have a recollection.

10   A    Not about that.  Sorry.  Maybe it will come to me.

11   Q    Has the judgment against you been satisfied or marked

12   satisfied?

13   A    Where I hired the investigator, that one?  That -- yeah,

14   that was no money, though.  That was not a --

15   Q    Has the debtor, to your knowledge, done anything in

16   violation of the injunction between October 12th, 2017, and

17   October 13th, 2018?

18   A    I would have no way of knowledge, really.  We checked

19   towards the -- the end of this so-called "injunction."

20   Again, it was a non-injunction.  I'm happy to elaborate.

21       (Participants confer)

22   Q    Ma'am, if you wanted the same treatments of -- as other

23   unsecured creditors, couldn't you have simply said that you'd

24   support the plan if you were treated the same as all of the

25   other unsecured creditors?

Magee - Cross                                           124

1    A    Doesn't it go without saying?

2    Q    I'm asking --

3    A    This is very --

4    Q    -- the questions --

5    A    -- generalized.

6    Q    -- today, ma'am, unfortunately.

7    A    I believe this goes without saying.  This was made in

8    good faith, especially --

9    Q    Okay.

10   A    -- after we came back in the room.  You know, Thompson

11   gave me a hug, we were in such -- all a good mood.  It went

12   from feeling so tense to feeling kind of peaceful.  I mean,

13   it was sort of miraculous.  I -- and I remember being very

14   grateful to Judge Smith for seeing it through because he was

15   -- he felt like it could happen, and it did.  And I was -- it

16   was a very good feeling.  I was -- this was written in good

17   faith.

18   Q    So --

19   A    We weren't thinking like you are now, so like devious.

20          MR. GEORGE:  Your Honor --

21   A    It's not -- I'm sorry, but --

22          THE COURT:  Well --

23   A    -- that's how I --

24          THE COURT:  -- I'll let her finish her answer.  Go

25   ahead.

1              THE WITNESS:  You know, you're trying to twist it

2      and change it, and I don't appreciate it, it's very bad

3      faith.  I really don't appreciate this.  We drafted this in

4      good faith.  We were all in a good mode, we were all trying

5      to make peace.  Respect it.  I'm asking for fair treatment,

6      nothing else.  This is very -- very mean, what you're doing.

7      BY MR. GEORGE:

8      Q    So my question to you, ma'am:  Is there anything that

9      would have prevented you from including in this document

10     language that insisted you be treated like all other

11     unsecured creditors?

12             MR. KIZNER:  Objection, Your Honor.  It's totally

13     speculative.  It's --

14             THE COURT:  Overruled.

15             THE WITNESS:  I'm going to need the question

16     rephrased, please, and slower --

17             MR. GEORGE:  Can we read --

18             THE WITNESS:  -- if you --

19             MR. GEORGE:  -- it back?

20             THE WITNESS:  -- don't mind.

21             THE COURT:  No, because it's not --

22             THE WITNESS:  Slower.

23             THE COURT:  -- easy to do it.  And it would help --

24     Mr. George, I know everybody has their own cadence and pace.

25     Try to slow it down a little bit.

Magee - Cross                                    126

1    BY MR. GEORGE:

2    Q    Ma'am, did you consider including in this document a

3    provision that said, for example, that if you weren't treated

4    identically with other unsecured creditors, that you didn't

5    have to settle?

6    A    Did I consider putting something else -- again, it was

7    never considered that I wouldn't be treated fairly.

8    Q    Okay.  But --

9    A    This --

10   Q    -- I think --

11   A    This --

12   Q    -- initially, your attorney said it wasn't even

13   discussed, the classification issue inside of the settlement

14   discussions with Judge Smith.  Would you agree with that

15   statement that your lawyer said in opening, that the

16   classification issue was never discussed in front of Judge

17   Smith?

18   A    I would agree.  The only class was secured and

19   unsecured.  And of course I'm an unsecured creditor, I'm the

20   biggest unsecured creditor.  Why would I be treated

21   differently?  I'm asking for fair treatment.  I -- I don't

22   understand any of this.

23   Q    Did you say you don't understand any of this?

24   A    I don't understand why we're here today and why you're

25   doing this to me.

1    Q    Well, we're here today on your action, ma'am.

2    A    No, we're here because of --

3              THE COURT:  All right.

4    A    -- your actions, sir.

5              THE COURT:  Let's not debate why we're here.  We

6    all know why we're here.  Let's move to something that

7    relates to --

8    BY MR. GEORGE:

9    Q    Has Dalmatia --

10             THE COURT:  -- historical evidence.

11   Q    -- made any efforts to collect against CO Nolt?

12   A    I -- I don't remember the CO Nolt piece, any --

13   Q    Has Dalmatia made any effort to collect against Mr.

14   Thompson on the million-two-hundred-thousand-dollar judgment

15   that was entered against him?

16   A    I think I wanted -- when I saw that he wasn't going to

17   pay the money, again, I think I called mister -- my lawyer,

18   and we said, why don't we just proceed, he's giving us no

19   choice, and apparently doesn't -- we have no choice.  And I

20   was told that all of Thompson's assets are in his wife's name

21   and a joint -- there's some Pennsylvania law --

22             MR. MASCHMEYER:  Objection.

23   A    -- that protects him.

24             MR. GEORGE:  Your Honor --

25             MR. MASCHMEYER:  Judge, this is hearsay.

1              MR. KIZNER:  They asked --

2              THE WITNESS:  No, I mean --

3              MR. KIZNER:  -- the question, Your Honor.

4              THE WITNESS:  -- it's the law.  It --

5              MR. MASCHMEYER:  A third party making comments on

6      what Mr. Thompson --

7              THE COURT:  You asked what she did; she's telling

8      you what she did and what --

9              MR. GEORGE:  Yeah, but that --

10             THE COURT:  -- the result of what she --

11             MR. GEORGE:  That doesn't --

12             THE COURT:  It doesn't --

13             MR. GEORGE:  -- allow her to --

14             THE COURT:  -- mean it's true.

15             MR. GEORGE:  -- say what somebody else said.

16             THE WITNESS:  You don't like my answers, I'm sorry.

17             MR. GEORGE:  Your Honor --

18             THE WITNESS:  His assets --

19             MR. GEORGE:  This is an --

20             THE WITNESS:  -- are protected.

21             MR. GEORGE:  -- evidentiary issue.  I don't want to

22     argue with the witness.

23             THE COURT:  It's not -- I am not taking it for the

24     truth.  I'm taking it for this is what she learned --

25             MR. GEORGE:  But she --

1          THE COURT:  -- from her --

2          MR. GEORGE:  -- didn't say --

3          THE COURT:  -- discussion --

4          MR. GEORGE:  -- that, Judge.

5          THE COURT:  -- and she hasn't taken any action

6     because of that.  That's all.

7          THE WITNESS:  That's it.

8     BY MR. GEORGE:

9     Q    And where did you learn that, ma'am?

10    A    Actually, I was told from very many sources the same

11    thing.  Pennsylvania has protection laws when you're married,

12    so you can't actually -- all of Thompson's assets are

13    protected because of his wife, so he has a shield.  So,

14    basically, he can legally --

15         MR. MASCHMEYER:  Objection --

16    A    -- get out of --

17         MR. MASCHMEYER:  -- Judge.

18    A    -- paying me.

19         MR. MASCHMEYER:  Now she's giving a legal opinion -

20    -

21         THE COURT:  All right.

22         MR. MASCHMEYER:  -- as to what --

23         THE WITNESS:  Okay.

24         THE COURT:  You can --

25         MR. MASCHMEYER:  -- Pennsylvania --

1              THE WITNESS:  Sorry.

2              THE COURT:  You can --

3              MR. MASCHMEYER:  -- law is?

4              THE WITNESS:  My understanding, that's what I'm

5      saying.

6      BY MR. GEORGE:

7      Q    Did you do any investigation of how he held his assets?

8      A    I did not, personally, no.

9      Q    All right.

10             (Pause in proceedings)

11     Q    Did you consider negotiating a provision that said that,

12     if you didn't get at least ten percent, that the settlement

13     agreement could be vitiated?

14     A    I felt that, if I got what every, you know, other

15     unsecured creditors were getting, I'd be okay with that.

16     Q    Okay.  So is the answer to my question no?

17     A    We could say no.  It's not in here, I don't think.  It's

18     not in here.

19     Q    Have you begun taking actions to verify what the debtor

20     is doing through operations?

21     A    We did do one visit, I think.  I can't personally go,

22     but my lawyers went, Mr. Berkowitz and Ms. Handel visited the

23     factory to see -- is that what you mean?

24     Q    Yes.

25     A    Yeah, they visited once, later than I would have liked,

Magee - Cross                                    131

1    but they went.

2    Q    Did you ever understand that, during the first three

3    iterations of the plan, that the creditors' committee was in

4    support of that plan?

5    A    I understood that I was in support of that plan, even

6    though it was low.

7    Q    Okay.  But I'm asking you about whether you understood

8    whether the creditors' committee were -- was in support of

9    it.

10   A    I don't remember hearing about -- actually, I don't

11   know.  I know that I was --

12   Q    Do you -- did you have your attorneys reach out to the

13   committee to find out what the status of the negotiations

14   were with the debtor?

15   A    I'm sure they did.

16           MR. KIZNER:  Objection.  It calls for --

17   Q    I didn't ask --

18           MR. KIZNER:  -- hearsay, Your Honor.

19   Q    -- you that, ma'am.

20   A    There was a lot going on.

21   Q    Okay.

22   A    I'm trying to remember.

23   Q    All right.

24   A    Ultimately, I was treated fairly, so we were sort of

25   just watching what happened.  I was treated fairly, so I

Magee - Cross                                                      132

1    wasn't going to --

2    Q    Okay.

3    A    -- object.

4    Q    So receiving at least ten percent is treating you

5    fairly?

6    A    No.

7    Q    Okay.

8    A    Those are your words, again, twisting the situation,

9    which I --

10   Q    I'm just asking --

11   A    -- don't appreciate.

12   Q    -- your understanding, ma'am.

13   A    Well, that's not my understanding, sir.

14   Q    Okay.

15   A    I was treated fairly.  Fifteen percent was low, but

16   again, we were all getting fifteen percent.  That's fair.

17   Q    Well, it's --

18   A    So I'm not --

19   Q    -- ten percent --

20   A    -- going to say --

21   Q    -- ma'am.

22            MR. KIZNER:  Your Honor --

23   A    In the other plans --

24            MR. KIZNER:  -- is this being argumentative?

25   A    -- it was 15.  And I did not object because I didn't

1    have a right to object because I agreed, right?  We were all

2    getting the same.  That was fine, that was fair.  That's

3    fair.  I'm looking for fairness.  You're looking to throw me

4    under the bus.  Not nice.

5        (Participants confer)

6            MR. GEORGE:  I don't have anything further for this

7    witness, Judge.

8            THE COURT:  All right.

9            MR. MASCHMEYER:  Your Honor --

10           THE COURT:  Mr. Maschmeyer --

11           MR. MASCHMEYER:  -- I have just --

12           THE COURT:  -- do you wish to --

13           MR. MASCHMEYER:  -- a few questions.

14           THE COURT:  -- cross-examine?

15                        CROSS-EXAMINATION

16   BY MR. MASCHMEYER:

17   Q    I'm sorry.  It's Ms. Magee, right?

18   A    It is.

19   Q    Ms. Magee.  Fine.

20   A    Thank you.

21   Q    Ms. Magee, do you have the settlement agreement in front

22   of you?

23   A    I do.

24   Q    Okay.  Can you turn to page -- it says 6 of 15.

25   A    On the top, right?

Magee - Cross                                134

1    Q    Yes I'm going to use those as the numbers, if that's

2    okay.

3    A    I see.

4    Q    Is that your signature there?

5    A    Yes, it is.

6    Q    And what date did you sign this?

7    A    I guess it looks like January 3rd.

8    Q    2018, correct?

9    A    Yes.

10   Q    And the plan of reorganization was confirmed in

11   September of 2018.  Is that correct?

12   A    I don't actually know that off the -- I don't know.

13   Q    Okay.  If I told you, though, it was confirmed in

14   September of 2018, do you have any reason to dispute that?

15   A    Not unless my lawyer says that's incorrect.

16   Q    It was confirmed, though, long after you signed this

17   agreement.  Is that correct?

18   A    That's -- so the September following this.

19   Q    Yes.

20   A    Okay.

21   Q    And can you go back to the first page -- well, it's Page

22   2 of 15.

23   A    Okay.

24   Q    Go to the -- do you see the paragraph where it starts

25   off with "whereas"?

Magee - Cross

1  A    Yes.

2  Q    Okay.  And if you go down to -- it's like the second-to-

3  last sentence, it's right after the words, it says the,

4  quote, "action."  Do you see where I'm at there?

5  A    No, I don't.  I'm sorry.  Is this towards the top of the

6  page, the "whereas"?

7  Q    Yeah, the top page, second paragraph there.

8  A    Okay.  So part of this paragraph?

9  Q    Yeah.  If you go down past where it has all the italics

10  with all the names in the case there?

11  A    Yes.

12  Q    Okay.  It says, "At the end of the settlement

13  conference."  Do you see that?

14  A    Yes, I do.

15  Q        "-- the parties entered into a binding settlement

16           agreement."

17       Do you see that?

18  A    I do.

19  Q    And this is the agreement you signed, correct?

20  A    Yes.

21  Q    Okay.  Now the terms of this agreement -- you've

22  indicated over and over again you want to be treated fairly,

23  like every other unsecured creditor.  Is that correct?

24  A    That's the norm, I would say, yes.

25  Q    Okay.  Now what if the plan -- what if Mr. George,

1   representing the committee and the creditors, accepted a plan

2   of five percent?

3   A    And representing me.  He's supposed to represent me.

4   Q    Excuse me?

5   A    He's also supposed to represent me.

6   Q    Well, put aside that.  But if the plan only said the

7   creditors were going to get five percent on their claim --

8   A    Right.

9   Q    -- would you accept five percent?

10  A    I don't know.  It depends on many circumstances.  That

11  seems very low.  Ten percent was like sort of a bottom-of-

12  the-barrel possibility that we never thought would ever

13  happen.  But if that's all --

14  Q    Well --

15  A    -- they could pay, we --

16  Q    But that's --

17  A    I mean, I don't know how to answer it.  I -- it's very

18  low.

19  Q    But your agreement --

20  A    It was --

21  Q    Your agreement states, though, that you have to get at

22  least ten percent to accept the plan, correct?

23  A    It says that the plan has to pay out at least ten

24  percent.

25  Q    Correct.  So, if it paid out less --

Magee - Cross

1   A    Right.

2   Q    -- you were not bound to accept the plan.

3   A    I would not be bound.

4   Q    Now, under this settlement agreement, the first

5   paragraph is you -- the Debtor Lancaster and you agreed that

6   he would have an injunction against him for a year.  Isn't

7   that correct?

8   A    Where are you?

9   Q    I'm sorry.  The -- this next paragraph --

10  A    Okay.  Yes.

11  Q    -- right after --

12  A    I'm sorry.

13  Q    -- the "whereas."

14  A    Yes.

15  Q    Okay.  So you -- there was an injunction issued for a

16  year, correct?

17  A    Yeah.  You know, yeah.  I -- yeah, technically.

18  Q    Yes.  And the second paragraph there, where it says,

19  "Commencing at 5:01" --

20  A    Uh-huh.

21  Q        "-- and continuing for five years, they shall be

22            enjoined."

23       So there was a second injunction, correct?

24  A    No, that's not -- that's not what this is.

25  Q    That's not an injunction in your mind.

1    A    It's not.  They can't use my trade secrets anyway.

2    Q    Okay.

3    A    And I discussed with the Judge at length.

4    Q    I --

5    A    This was like a --

6    Q    If you don't accept it, let me move on.

7    A    It's not an injunction.

8    Q    You would -- the parties agreed that you would get a

9    judgment against CO Nolt, also.  Isn't that correct?

10   A    You know, I'm trying to -- I don't know why I'm having a

11   blank with that, that one, but --

12   Q    Well, it's right after --

13   A    I see it.

14   Q    -- the paragraph.

15   A    No, I see it.  I'm just not recollecting what -- which

16   company is which, who we have, what judgment -- I got

17   confused by all these different companies he's got, and I --

18   Q    That's not my question, ma'am.  My question is --

19   A    Okay.

20   Q    And I'll read it.  It says:

21            "Dalmatia shall have judgment entered against CO

22            Nolt."

23   A    Right.

24   Q    Isn't that correct?

25   A    It says that, yes.

1    Q    Okay.  Next paragraph:

2              "Dalmatia shall have the right to verify Lancaster

3              Fine Foods and Earth Pride Organics' compliance."

4         Isn't that correct?

5    A    Correct.

6    Q    Correct.

7         You mentioned before that you -- that the debtor has not

8    allowed you to send people in.  Did you say that?

9    A    I did not say that, sir.

10   Q    Oh, okay.  Isn't it a fact, on October 14th of '18, you

11   had individuals checks to make sure that the debtor was in

12   compliance --

13   A    As I said --

14   Q    -- with the injunctions?

15   A    -- I sent two lawyers in.

16   Q    Two lawyers.  Okay.  I'm sorry.  I missed that.

17   A    I think I -- I volunteered that information --

18   Q    Okay.

19   A    -- happily.

20   Q    And I want to skip ahead.  At the very end it says you -

21   - Mr. Thompson also agreed for a judgment of million-two

22   against him, individually.  Isn't that correct?

23   A    Yes.

24   Q    Okay.  Now you talked about -- and I still have to

25   understand.  You talked about your big -- I'm going to use a

1   slang expression -- your big hunk of cash you were looking

2   for.

3                THE COURT:  "Boatload," I think was the word.

4                MR. MASCHMEYER:  "Boatload."  Sorry.

5                THE WITNESS:  That's right.

6                MR. MASCHMEYER:  Thank you, Judge.

7   BY MR. MASCHMEYER:

8   Q    If you look at the third paragraph up, the one with the

9   big black redaction line -- you see that, correct?

10  A    I do, yes.

11  Q    Is that the paragraph you were referring to, where the

12  boatload of cash was supposed to come from?

13  A    I believe, yes.

14  Q    Okay.  Now doesn't that say that, if Mr. Thompson or a

15  designee pays you that boatload of cash, that the injunctions

16  would be terminated?

17  A    Yes.

18  Q    Okay.  It also says the judgment against Nolt would be

19  stricken.

20  A    Actually --

21  Q    Is that correct?

22  A    -- it doesn't say anything about injunctions.  It says -

23  -

24  Q    I'm sorry --

25  A    It says -- I'm sorry.  That's correct -- that's

Magee - Cross                                      141

1    incorrect, what you read --

2    Q    It says --

3    A    -- and it's incorrect --

4    Q    -- right here --

5    A    -- that I answered.

6    Q    It says --

7    A    So ... oh, no.  You're right.  You're right.  My

8    apologies.  So it says the injunctions will be terminated and

9    the claim against him would be vacated or whatever.

10   Q    And the judgment --

11   A    Stricken.

12   Q    -- against Nolt would be stricken.  Isn't that correct?

13   A    Yes.

14   Q    And that the judgment against Thompson would be

15   stricken, also, correct?

16   A    Correct.

17   Q    So, if he doesn't pay you that boatload of cash, you

18   still have all three of those remedies.  Isn't that correct?

19   A    Yes.

20   Q    Okay.  So there's nothing in this agreement that

21   required Mr. Thompson to pay you that money.  Isn't that

22   correct?

23   A    Just good faith and --

24   Q    Good faith.

25   A    -- a deal we had.  Yeah.  It's good faith, which is how

1    this was done, I though.

2    Q    But again, there's nothing that requires him, and if he

3    doesn't, you have other options available, correct?

4    A    I have -- at this point, the only option available to me

5    is my claim in bankruptcy, there is nothing else.

6    Q    You mentioned you thought you were the biggest unsecured

7    creditor in this case?

8    A    Close to it.  I think I was the first, and then I'm not

9    sure if his attorneys who didn't get paid ended up being

10   first or not.

11   Q    Okay.  So --

12   A    I think they turned out to be first, right?  I don't

13   know.  We're right up there at the top.  That's kind of close

14   enough.

15   Q    Okay.  So you're aware that Fox Rothschild --

16   A    Right.

17   Q    -- filed a claim --

18   A    That's it.

19   Q    -- of 2.5 million plus.

20   A    Two five.  Yeah, that sounds right.

21   Q    Okay.  You're also available [sic] that the IRS has a

22   claim of 2.5 million plus, also, correct?

23   A    Oh, interesting.  I remember hearing something about the

24   IRS, but --

25   Q    Okay.

1    A    Okay.

2    Q    So you weren't the biggest creditor, you were one of the

3    creditors.

4    A    Right, a big one.

5    Q    Okay.

6         (Pause in proceedings)

7    Q    Is there anything -- and I think -- I don't want to

8    repeat what Mr. George asked.  Do you have any evidence that

9    the year injunction that was entered into, the first -- I'm

10   looking at the first one there on the settlement agreement --

11   that the debtor wasn't in compliance with that?

12   A    I have evidence that it was meaningless.

13   Q    Forget meaningless.  Do you have any evidence that the

14   debtor did not comply with his requirement under this

15   settlement agreement to obey that injunction?

16   A    No.  To know that, I would have to be there every

17   minute, I'd have to follow them around.  I can't do that, I

18   don't have those resources.

19   Q    Okay.  So you don't -- so you've taken -- so you have no

20   evidence at all that he was not in compliance.

21   A    I have no -- I have no idea, one way or the other.

22   Q    Okay.  Let's look --

23   A    I have a --

24   Q    -- at the second --

25   A    -- a feeling.  A feeling isn't enough.

1     Q     Thank you.

2           Let's look at the second paragraph, the five-year --

3     where he's enjoined for five years from selling fig spread.

4     And it's redacted, I don't know.

5     A     Right.

6     Q     Do you have --

7     A     Because -- because --

8     Q     -- any evidence here today that the debtor is not in

9     compliance with that requirement under this settlement

10    agreement?

11    A     To know that, you would have to go through the recipes.

12    Q     I didn't ask that.

13    A     I'd have to --

14    Q     The question I asked is:  Do you have any evidence that

15    he's not in compliance with that today?

16    A     As of today?  I haven't really looked, honestly.  I

17    haven't looked.  I'd have to go look at jars, I'd have to do

18    some more investigations.

19    Q     But the bottom line is because -- you don't -- you have

20    no evidence that he's not in compliance, right?

21    A     I don't know one way or the other.  He could be using

22    it.  I have no way of knowing.  He could have another

23    facility, for all I know.  I have no way of knowing.

24                THE COURT:  You really need to --

25                THE WITNESS:  I --

1          THE COURT:  -- answer his question.  If don't know,

2     the reason -- you're giving me a lot of reasons why you don't

3     know.

4          THE WITNESS:  Okay.

5          THE COURT:  But the question is:  Do you have the

6     evidence?  And the answer is you don't --

7          THE WITNESS:  No.

8          THE COURT:  -- right?

9          THE WITNESS:  The answer is no.

10         THE COURT:  Okay.

11         THE WITNESS:  Okay.  Sorry.

12         THE COURT:  He's not asking you why, he's just

13    asking you whether.

14         THE WITNESS:  Okay.  No.

15    BY MR. MASCHMEYER:

16    Q    You said, on 10/14/18, two individuals.  I'm not sure if

17    they -- who they were, but you sent them out to see if --

18    didn't you send them out to -- for the purpose of seeing --

19    A    Yes, that's --

20    Q    -- if the debtor was in compliance with these

21    requirements?

22    A    Yes, that's what I said.  I sent -- I sent my lawyers,

23    Jerry --

24    Q    Okay.  Did they --

25    Q    -- Berkowitz and --

Magee - Cross

1   Q    Did they -- and what -- did they come back and

2   communicate with you that he's not in compliance?

3   A    No.  They actually felt that from that -- from that

4   visit, they had no evidence that what -- that he was not

5   compliant.

6        (Participants confer)

7   Q    So that brings me up to my next point.  This paragraph

8   required the debtor to allow you to verify compliance with

9   the injunctions.  Do you see that paragraph --

10  A    Okay.

11  Q    -- right under the CO Nolt statement there?

12  A    Where are we?  Where are we?

13  Q    So the debtor has complied with that portion of this

14  settlement agreement.  Isn't that correct?

15  A    Yes.

16  Q    Okay.

17  A    Well, I mean, I don't have any for that.  We went in, we

18  had the right.

19  Q    Okay.  And the next paragraph we discussed, while Mr.

20  Thompson did not pay you that amount of money --

21  A    Uh-huh.

22  Q    -- the bottom line is you still have your judgment

23  against Mr. Thomas.  Isn't that -- or Thompson.  Isn't that

24  correct?

25  A    Again, meaningless, but yes.

1    Q    Well, you still have the judgment against CO Nolt.

2    Isn't that correct?

3    A    I don't know why I'm blanking out on that, but yes.  I'm

4    going to say yes, because I kind of group them all together

5    in my mind.

6    Q    And that -- and again, that judgment of a million-two is

7    still outstanding, correct?

8    A    Against Thompson?

9    Q    Yes.

10   A    I'm told he's judgment-proof because of his marriage, so

11   I don't know what to say.  It's outstanding, as far as I

12   know.  I guess that's the question, is it outstanding.

13   Technically, it is.

14   Q    Now Mr. George had asked if you had competent bankruptcy

15   attorneys representing you at the settlement of the -- when

16   you signed this agreement, correct?

17   A    No.

18   Q    You didn't have -- you had attorneys representing you

19   when this settlement agreement was signed, correct?

20   A    I had -- do you mean the handwritten one by the Judge?

21   Q    Yes.  Yeah.

22   A    So I had Lauren Handel there, she was my -- not a

23   bankruptcy lawyer.  She's -- she was -- went through the

24   litigation with us.

25   Q    Okay.  And I presume you signed that based on her

1    recommendation, or at least after consulting with her.  Isn't

2    that correct?

3    A    I really signed -- I signed because the Judge wanted

4    this, and I wanted to support it, and I signed it.

5          MR. MASCHMEYER:  I have no other questions.

6                          EXAMINATION

7    BY THE COURT:

8    Q    I only have one question before I allow redirect, and it

9    follows up on this last point that Mr. Maschmeyer was

10   raising.  At the settlement conference with Judge Smith and

11   the other attorneys --

12   A    Uh-huh.

13   Q    -- you were represented by Mr. Handel, who you just said

14   is not a bankruptcy specialist.

15   A    Correct.

16   Q    Do I -- am I correct that I heard you tell us earlier,

17   though, that, during the course of that long day --

18   A    Yes.

19   Q    -- you had the opportunity by telephone to consult with

20   other attorneys about the settlement, who you feel are

21   bankruptcy specialists?  Is that accurate?

22   A    I did.  I reached out to Mr. Berkowitz.

23   Q    Okay.  I'm just trying to understand who you had access

24   to --

25   A    I did.

1   Q    -- during the settlement negotiations.

2   A    I called him.

3   Q    So you had Ms. Handel.  But outside of the room, by

4   phone, you had access to the bankruptcy attorneys.

5   A    Yes, I called him.

6   Q    Okay.

7   A    I mean, I think he's a bankruptcy attorney.  I don't

8   know the technical --

9   Q    Well, there's no --

10  A    But he knows more about it than Lauren, for sure.

11  Q    Okay.

12  A    And -- yeah.

13  Q    All right.  Thank you.

14  A    Thank you.

15         THE COURT:  Redirect.

16                    REDIRECT EXAMINATION

17  BY MR. KIZNER:

18  Q    Just while we're on that topic with Mr. Berkowitz.  He

19  would -- did he have access to -- I mean, you said that you

20  called him.  Like is that what happened during the settlement

21  conference?  What was your communication with him?

22  A    I just ran things by him --

23  Q    Okay.

24  A    -- as best I could.

25  Q    Was it a phone call?

Magee - Redirect                                    150

1   A     It was a phone call.

2   Q     Okay.  I mean, would he have had --

3   A     As it -- towards the end of the night.

4   Q     Okay.  And there was no -- it was just -- was it maybe

5   under -- how long was the call?

6   A     I don't know.

7   Q     Was the --

8   A     A few minutes.

9   Q     Was the agreement even written?  Was the agreement even

10  written by that point --

11  A     I don't think --

12  Q     -- you spoke to him?

13  A     -- it was written.

14  Q     Do you know?

15  A     No.

16  Q     Okay.  Do you know --

17  A     It was (indiscernible)

18  Q     -- if that language --

19  A     This is the direction --

20  Q     -- was squeezed in --

21  A     -- we're going in.  This is -- you know, what do you

22  think, this is -- this is -- it was that kind --

23  Q     It was like --

24  A     -- of a call.

25  Q     -- general discussion?

1   A     It was general.  I mean, I -- I have to think about it.

2   I'm thinking about it --

3   Q     Well --

4   A     -- as you ask me.

5   Q     -- what about the handwritten edition that -- on the --

6   that dealt with the ten percent?

7   A     The payout --

8   Q     I mean -- yeah.

9   A     -- to the creditors?

10  Q     Did you even remember if you had a chance to talk to him

11  --

12          MR. GEORGE:  Your Honor --

13  A     -- about that specific --

14  A     I did not.

15          MR. GEORGE:  -- he -- this is supposed to be

16  redirect.  He's leading her.

17          THE WITNESS:  No, I mean, I can answer it.  I think

18  I've said it.

19          THE COURT:  I don't think that was --

20          THE WITNESS:  That was --

21          THE COURT:  I don't think that was a leading

22  question.  The question was:  At or around the time that the

23  handwritten words were put in about the ten percent

24  requirement, did you have the opportunity to talk to Mr.

25  Berkowitz, or did you talk t Mr. Berkowitz?

1    BY MR. KIZNER:

2    Q    Or do you recall?

3    A    I do recall.  It was like so late at night, I would

4    never think to call him at -- I did not call him at home at

5    eleven o'clock at night, no way.  And this was the last thing

6    put in there, so -- that particular thing.  A few things.  I

7    mean, we -- basically, I called him halfway through.  I said,

8    this is where we're going, this is the feel, this is what the

9    Judge wants, I'd like to support it, do you -- what do you

10   think.  It was that kind of a call.  And it was quick.

11   Q    So he never had access to the written agreement then,

12   the handwritten agreement.

13   A    He -- after the fact, after we had already signed.  I

14   think I asked him to help Lauren.

15   Q    Okay.  That day, he didn't have access to it.

16   A    No.

17   Q    Okay.

18   A    Not at that time.  It was late, again.

19   Q    That's all I asked about that.

20        We talked about they -- they mentioned briefly that a

21   judgment was entered against you, and it wasn't really -- it

22   was kind of taken out of context.  Can you explain to the

23   Court what that was all about?

24   A    Sure.  So, before --

25                THE COURT:  Do I really --

1          MR. GEORGE:  Your Honor, this has to be within the

2     --

3          THE COURT:  Do I really need to hear that?  Why

4     does that matter?

5          MR. KIZNER:  I just think because it's disparaging

6     and I wanted to rebut it, but --

7          THE COURT:  It's not a good enough reason.

8          MR. KIZNER:  Okay.  We'll move on.

9     BY MR. KIZNER:

10    Q    Do you have the -- you mentioned that -- Mr. Maschmeyer,

11    debtor's counsel and his co-counsel for the unsecured

12    creditors' committee, they kind of walked through, you know,

13    these benefits you received, and there was two discussions,

14    monetary and then these injunctions, so kind of two buckets.

15         Just so the record is clear, did you ever receive any

16    actual money --

17    A    No.

18    Q    -- from anything --

19    A    No.

20    Q    -- out of this settlement at all?

21    A    No.

22    Q    Okay.

23    A    Nothing.

24    Q    And was your understanding, when you entered into this

25    settlement agreement, that you would be paid money?

1    A    Of course.

2    Q    Okay.

3    A    I wouldn't have settled.  It was about the money.  Since

4    I was giving up the injunction, it was about the money.

5    Q    And --

6    A    Otherwise, why did I go through a month-long trial and -

7    - for him stealing from me.  I mean, I'm not going to --

8              THE COURT:  All right.

9    A    What am I --

10             THE COURT:  You know what?

11   A    -- supposed to --

12             THE COURT:  It's not a controversial point that you

13   wouldn't have entered into the settlement --

14             THE WITNESS:  All right.

15             THE COURT:  -- unless you thought you were going to

16   get paid.

17             THE WITNESS:  Right.

18             MR. KIZNER:  Just --

19             THE COURT:  We don't have --

20             THE WITNESS:  Sorry.  I'm --

21             THE COURT:  You don't have to --

22             THE WITNESS:  I'm getting --

23             THE COURT:  -- belabor that.

24             THE WITNESS:  I'm sorry.  It's really kind of

25   emotional to think about some of this.

1              MR. KIZNER:  Sure.

2              THE COURT:  I understand.

3              THE WITNESS:  So --

4              THE COURT:  And I know you're doing your best.

5              THE WITNESS:  I am.

6              THE COURT:  Just trying to --

7              THE WITNESS:  I am.

8              THE COURT:  -- keep it under control here.

9              THE WITNESS:  Okay.

10    BY MR. KIZNER:

11    Q    You were -- you mentioned that you were seeking a new

12    trial at the time the settlement conference took place --

13    A    Yes.

14    Q    -- that's why you went back to --

15    A    Yes, that was one of the things.

16    Q    Well, you already had judgments, though, at that point,

17    right?

18    A    We did.

19    Q    All right.  So --

20    A    We wanted some -- there were potentially punitive

21    damages.  I don't know, something with -- again, I'm not a

22    lawyer, but something relating to jury instructions and

23    things like that where things -- they didn't understand some

24    things, and we wanted -- we wanted a retrial on a couple of

25    things.  And it felt strong to me, at the time.

1    Q    So you made a monetary concession by not -- potentially

2    --

3    A    By not --

4    Q    -- not trying --

5    A    -- going forward with that.  Also, we wanted -- we were

6    seeking judgment as a matter of law on the contract claim

7    because we had a two-year -- two-year non-compete, and we

8    wanted the Judge to make a ruling because it really wasn't

9    for the jury, they didn't know the law.  I think that was

10   mainly it.  And then the forever injunction we were seeking.

11            MR. KIZNER:  Okay.  That's all I have, Your Honor.

12            THE COURT:  Any recross?

13            MR. GEORGE:  Just a couple.

14                      RECROSS-EXAMINATION

15   BY MR. GEORGE:

16   Q    Earlier, you testified about your bankruptcy lawyer,

17   that you retained him and you had a retainer agreement.

18   A    Yes.

19   Q    Do you remember testifying that way?

20   A    Yes.

21   Q    And did you enter into that retention agreement before

22   the settlement agreement was negotiated, on the day of?

23   A    No, no, before.  He was hired -- he wasn't Stark &

24   Stark.  Stark & Stark is -- he was --

25   Q    I didn't say he was Stark & Stark, ma'am.

1   A    Yeah, he's --

2   Q    I'm asking --

3   A    -- a different --

4   Q    -- a question.

5   A    -- function.

6   Q    You said that you engaged an attorney.

7          THE COURT:  Berkowitz.

8   Q    Mr. Berkowitz.

9   A    Correct.

10  Q    And asked you did you hire him, and you said yes, and I

11  asked you was there a retainer agreement, and you said yes.

12  A    Yes.

13  Q    And I'm asking you:  Did you enter into that on the day

14  of the settlement agreement, before the settlement agreement?

15  A    Well before.

16  Q    Okay.  So, at the time that you negotiated the

17  settlement agreement, you had retained a bankruptcy lawyer.

18  A    I don't know if he's technically a bankruptcy lawyer.

19  He sure knows more about it than Lauren.

20  Q    Okay.

21  A    I would say they -- I'd say --

22  Q    Well, do you --

23  A    -- Stark & Stark is a bankruptcy firm.  I -- I don't

24  know if Jerry is -- I don't know.  I don't know these terms.

25  Q    Okay.

1    A    He certainly knows much more than Lauren.

2    Q    But you specifically felt that he was someone you should

3    talk to about the bankruptcy issues.

4    A    I actually just think he's a smart guy and I like

5    running things by him.  I didn't think in terms of

6    bankruptcy, to tell you the truth.  He's a smart guy.

7           MR. GEORGE:  Nothing further, Judge.

8    A    I like him, he's nice.  He's helpful.

9           THE COURT:  Mr. Maschmeyer?

10          MR. MASCHMEYER:  I just had one question.

11          THE WITNESS:  Sure.

12                        RECROSS-EXAMINATION

13   BY MR. MASCHMEYER:

14   Q    Ms. Magee, isn't it true that you had numerous other

15   mediations dealing with the settlement of this matter?

16   A    We sure did.  Judge Smith was really intent on having us

17   settle.  We tried many times.

18          MR. MASCHMEYER:  Okay.  I have no other questions,

19   Judge.

20          THE COURT:  Thank you.

21          THE WITNESS:  Thank you.

22          THE COURT:  You are done.

23          THE WITNESS:  Thank you.

24          THE COURT:  You can step down.

25          THE WITNESS:  Okay.

1      (Witness excused)

2      (Participants confer)

3            THE COURT:  Mr. Kizner, are you intending to call

4      any other witnesses?

5            MR. KIZNER:  Your Honor, just for the -- no.  But

6      for the record, I just want to make sure that D-1 is -- well,

7      if there's no objection, we move it into evidence.

8            THE COURT:  You want to move D-1 into evidence.

9            MR. GEORGE:  No objection.

10            MR. MASCHMEYER:  No objection.

11            THE COURT:  All right.  D-1 is admitted.

12      (D-1 received in evidence)

13            THE COURT:  All right.  I gather the committee is

14      going to go first when it comes to the --

15            MR. GEORGE:  No, I think the debtor is going --

16            THE COURT:  Oh, the debtor --

17            MR. GEORGE:  -- to go first --

18            THE COURT:  -- going to go first.

19            MR. GEORGE:  -- on this piece, Judge.

20            THE COURT:  So let's do the logistics part.  It's

21      12:10.  I'm very flexible about how you want to go forward.

22      If you want to power through, I'll power through.  If you

23      want to take a break for sustenance, I'll do that.

24            MR. MASCHMEYER:  Only --

25            THE COURT:  Try to reach a consensus about that.

1      MR. MASCHMEYER:  I just would -- a ten- or fifteen-

2   minute break is all I need, Judge, then we can go forward.

3      (Participants confer)

4      MR. MASCHMEYER:  If that's okay.

5      THE COURT:  How does everybody else feel about it?

6   Would you rather try to go through as quickly as we can, or

7   do you want -- otherwise, I'll take a lunch break for

8   everybody, if you want.

9      MR. KIZNER:  Your Honor, it's just my -- the Court

10  is going to stop at 4:30, I assume, no matter what?  I mean,

11  just because I have to be home, I have to leave at 4:30.  So

12  I don't want to run into a problem that we don't have time

13  today if the Court was to go after hours.  That's my concern.

14      THE COURT:  Well --

15      MR. GEORGE:  Let's just push through.

16      MS. MAGEE:  Let's push through.

17      (Participants confer)

18      THE COURT:  I probably will -- if you need to go --

19      MR. MASCHMEYER:  Ten minutes is fine.

20      THE COURT:  -- I'm willing to stop at 4:30.  That's

21  close enough to 5, that's not that --

22      MR. KIZNER:  Oh, okay.

23      THE COURT:  -- significant to me, so --

24      MR. KIZNER:  I mean, I can -- I can leave at, I

25  guess a little bit later, but I will have no one --

1          THE COURT:  So your preference --

2          MR. KIZNER:  -- watching my kids.

3          THE COURT:  -- is to --

4          MR. KIZNER:  My preference is --

5          THE COURT:  -- pretty much --

6          MR. KIZNER:  -- to just --

7          THE COURT:  -- keep going?

8          MR. KIZNER:  -- is just to go because I think

9     everyone wants to ...

10         (Participants confer)

11         THE COURT:  All right.  Nobody is disagreeing, from

12    what I can tell.  All right.  So let's just use the fifteen-

13    minute break that Mr. Maschmeyer suggested.  It's now 12:12.

14    Let's come back by and be really ready to go at 12:30.

15         MR. MASCHMEYER:  Yes, Judge.  Thank you.

16         THE COURT:  Okay.

17         (Participants confer)

18         MR. CIANCIULLI:  Your Honor, just so you know -- I

19    don't know if anyone is going to call me, but I have an

20    appointment at 1, I'm leaving, I have not been subpoenaed.

21    But I can come back later today, but --

22         THE COURT:  Is anybody intending to call him?

23         MR. CIANCIULLI:  Just so the parties need to know?

24         (Participants confer)

25         THE COURT:  Well, I'm asking.  If you would be

1    called, you'd be called by either the committee or the

2    debtor.

3              MR. CIANCIULLI:  Right.

4              THE COURT:  They've now heard the other side's

5    case.

6              MR. GEORGE:  Right.  Let me just talk to --

7              THE COURT:  Do you need a few minutes to make a

8    decision about that?

9              MR. GEORGE:  We'll make it right now, Judge,

10   outside.

11             THE COURT:  All right.  Why don't we all wait until

12   we see what that is because, if you want to call him, we

13   probably should just call him right now.

14        (Participants confer)

15             MS. MAGEE:  Should we stay?

16             THE COURT:  Yeah, why don't you wait for a minute.

17   Let's see what they plan on doing.

18             MS. MAGEE:  Okay.

19        (Participants confer)

20             MR. GEORGE:  Your Honor, can we just go back on the

21   record for a second.

22             THE COURT:  Sure.

23             MR. GEORG0E:  What -- counsel to Dalmatia and the

24   committee and the debtor agreed to this, that we won't need

25   Mr. Cianciulli if the debtor stipulates to the statement that

1    was made by counsel in the opening statements to Your Honor,

2    that there was no discussion about the classification during

3    the settlement discussions.

4              THE COURT:  I think that's vague.  I'd like you to

5    really be concrete about what the stipulation is.  Work on

6    the words for a second.

7              MR. GEORGE:  Okay.

8              THE COURT:  See if there's an agreement.

9         (Participants confer)

10             MR. GEORGE:  All right, Judge.  We're going to take

11   the break.  Mr. Cianciulli will come back at 2:30, if he has

12   to.

13             THE COURT:  Okay.  Are you going to have other

14   witnesses?

15             MR. GEORGE:  Just Mr. Thompson.

16             MR. MASCHMEYER:  Just Mr. Thompson.

17             THE COURT:  All right.  So, if Mr. Cianciulli --

18             MR. GEORGE:  I don't see --

19             THE COURT:  -- is held up --

20             MR. GEORGE:  -- this going --

21             THE COURT:  -- he can --

22             MR. GEORGE:  -- to 4:30 --

23             THE COURT:  -- go last.

24             MR. GEORGE:  -- under any --

25             THE COURT:  That's all.  I mean, it's not critical

1    when he testifies, right?

2              MR. GEORGE:  No.

3              THE COURT:  Okay.  So your preference is to put him

4    on, and you'd rather do that at what time, at 2:30?

5              MR. GEORGE:  Yeah, around 2:30.  So we'll --

6              THE COURT:  So we'll --

7              MR. GEORGE:  -- put Mr. --

8              THE COURT:  -- still take a --

9              MR. GEORGE:  -- Thompson on --

10             THE COURT:  -- short break, and we'll resume --

11             MR. GEORGE:  So --

12             THE COURT:  -- and then we'll work our way up to

13   Mr. Cianciulli.

14             MR. GEORGE:  Thank you.

15             THE COURT:  All right.  That's fine.  The Court

16   will be in recess until 12:30.

17             MR. KIZNER:  12:30?  All right.  Great.

18        (Recess taken at 12:16 p.m.)

19        (Proceedings resume at 12:38 p.m.)

20        (Call to order of the Court)

21             THE COURT:  That was pretty close to staying on

22   schedule.  I'm impressed.

23             All right.  Mr. Maschmeyer, I think you're up,

24   right?

25             MR. MASCHMEYER:  Yes.  Judge, I'd like to call Mr.

1    Thompson to the stand.

2            THE COURT OFFICER:  Mr. Thompson, please place your

3    left hand on the Bible and raise your right hand.

4    MICHAEL THOMPSON, WITNESS FOR THE DEBTOR/RESPONDENT, SWORN.

5            THE COURT OFFICER:  Please be seated.

6        (Participants confer)

7            THE COURT OFFICER:  Please state and spell your

8    name for the record.

9            THE WITNESS:  Michael S. Thompson, T-h-o-m-p-s-o-n.

10            THE COURT OFFICER:  Please state your address for

11    the record.

12            THE WITNESS:  490 Snyder -- with a Y -- road,

13    Lititz, L-i-t-i-t-z --

14            THE COURT OFFICER:  Uh-huh.

15            THE WITNESS:  -- PA, 17543.

16            THE COURT OFFICER:  Thank you.

17                         DIRECT EXAMINATION

18    BY MR. MASCHMEYER:

19    Q    Mr. Thompson, presently, what's your position with

20    Lancaster Fine Foods and Earth Pride Organics?

21    A    I am President or CEO of both.

22    Q    Okay.  And you're familiar with the litigation of

23    Dalmatia against Lancaster Fine Foods and Earth Pride

24    Organics.  Is that correct?

25    A    Painfully.

1    Q    Okay.  When did this litigation start?

2    A    It started in October of 2015.

3    Q    '15.

4         I -- could you give us -- and I don't want to go on and

5    on.  But just give us a brief synopsis of what your

6    understanding of this litigation was.

7    A    Okay.  In 2015, Ms. Magee re -- after a three-year

8    absence, became involved in the business again, and she had

9    an issue with the President of FOODMatch.  He didn't

10   recognize her properly at a food show, at a ceremony at a

11   food show.  And at that time, she decided that she wanted to

12   change distributors.

13        The relationship was a three-party relationship.  We

14   were the manufacturer, Dalmatia was the brand, brand owner,

15   and FOODMatch was the exclusive distributor and had been

16   since the first day that she entered the U.S. market.  And

17   they had grown the business from zero to like $10 million.

18   Q    Okay.

19   A    In --

20   Q    And -- keep going.

21   A    Okay.  In September of 2017 -- or excuse me -- '15, Ms.

22   Magee put in a purchase order for ten truckloads of fig jam,

23   more than a half a million dollars worth of fig jam.

24        MR. KIZNER:  Your Honor, I object to the -- this

25   has nothing to do with the -- with what we're here for today.

1        THE COURT:  Yeah, how much background do we need

2    about the litigation --

3            MR. MASCHMEYER:  I'm just --

4            THE COURT:  -- that ended in a jury verdict and

5    then a settlement --

6            MR. GEORGE:  Well, Your Honor, because --

7            THE WITNESS:  I -- I can do it in five minutes.

8            MR. GEORGE:  -- because she characterized it as the

9    debtor stealing from her, and I don't want the Court --

10           THE COURT:  What difference does it make if the

11   issues are resolved?  Why do I have to go back and hear who's

12   right and who's wrong about -- yes, she characterized it.  If

13   -- I assure you that I don't care how she characterized it,

14   this is all irrelevant.

15           MR. MASCHMEYER:  I understand, Judge.  I'll fast-

16   forward here.  Mister --

17           THE COURT:  And it's not like -- and I say that.

18   I'm the fact-finder, so by letting -- by telling you that,

19   I'm letting you know why you're not prejudiced --

20           MR. MASCHMEYER:  Gotcha.

21           THE COURT:  -- if we just skip over this.

22           MR. MASCHMEYER:  I understand.

23           MR. GEORGE:  Understood, Judge.

24           MR. MASCHMEYER:  Understood.

25   BY MR. MASCHMEYER:

1    Q    Is B-1 [sic] still in front of --

2    A    There's nothing here.

3             UNIDENTIFIED:  Sorry.

4             MR. MASCHMEYER:  Do you have it?  Oh, okay.  Good.

5         (Participants confer)

6             MR. MASCHMEYER:  Thank you.

7             THE WITNESS:  Thanks.

8             MR. MASCHMEYER:  Oh, D-1.  Is it D-1?  D-1.

9             MR. GEORGE:  It's D-1.

10            MR. MASCHMEYER:  Sorry.

11   BY MR. MASCHMEYER:

12   Q    Mr. Thompson, do you recognize that document?

13   A    Yes, I do.

14   Q    And is that the settlement agreement that was entered

15   into between you and Dalmatia concerning the litigation?

16   A    Yes, it is.

17   Q    And this settlement agreement was entered into after a

18   long mediation.  Is that correct?

19   A    After -- yeah, we -- we had tried several times before

20   that, and then we had a court hearing, as -- as she said, and

21   we were there for maybe 10, 11 hours, and so 8 p.m. that

22   evening, we had -- we entered into this agreement.

23   Q    So there were numerous other mediations, other than this

24   one?

25   A    We had tried to mediate with Ms. Magee since the Spring

1    of 2016.  So Judge Smith had brought the parties together and

2    -- and he did, he really wanted to come to a peaceful

3    settlement, but -- and each time, she backed out.

4    Q    Okay.  So let's go to -- you have the -- let's look at

5    Page 2.  Up at the top, it says "Page 2 of 15."  Do you see

6    that?

7    A    Oh, okay.  The first page is --

8    Q    Yes.

9    A    -- actually 2.

10   Q    Yeah.

11   A    Okay.

12   Q    Do you have that in front of you, sir?

13   A    Yeah.

14   Q    Okay.  You agreed, pursuant to this settlement -- both

15   sides agreed to basically give something up and get something

16   in settlement.  Would that be a correct characterization?

17   A    Yes, I would say that that's true.

18   Q    The first paragraph there, where it says "Injunction

19   entered effective October 12, 2017."  Do you see that?

20   A    I do.

21   Q    Okay.  First of all, that injunction was entered after

22   you had filed bankruptcy.  Is that correct?

23   A    That is correct.

24   Q    Okay.

25   A    About five months after.

1    Q    Can you --

2    A    Four and a half months.

3    Q    Explain to us what -- how did this injunction impact

4    your business?

5    A    Well, first of all, this -- this agreement was made on

6    the 10th or the 11th.  And we were, at the time, producing

7    product for FOODMatch.  And we had an order that was about to

8    go out.  And we agreed -- and I think it's in here -- I think

9    it was one or two truckloads of product would be shipped

10   immediately, and then, unfortunately, we would cancel

11   existing orders; even though we had the ingredients for them,

12   we would cancel orders for additional truckloads.

13        And she's right, it is a more seasonable business that -

14   - we canceled a number of truckloads to be shipped out later

15   -- not to be produced and shipped out, later October,

16   November, and December, during the holiday entertaining

17   season.

18   Q    Okay.  And in -- we're talking about shipping fig

19   product.  Isn't that correct?

20   A    Fig jam.

21   Q    Fig jam.

22        You know, there was some testimony earlier about who

23   invented fig jam.  And I don't know if --

24   A    Yeah, fig jam goes --

25   Q    -- Ms. Magee was trying to indicate she did, but --

1   A    Yeah, that -- that's -- that's kind of funny.

2              MR. KIZNER:  Objection, Your Honor.  What's the

3   relevancy of this?

4   A    Fig jam was actually --

5              THE COURT:  Hold on, wait a second.  There's an

6   objection, objection on relevancy.  Well, I'm going to rule

7   the same way I did before.  To the extent that he's going to

8   speak to the subject that Ms. Magee already testified about,

9   I'll let him give his perspective on it, as long as we're

10  brief.

11             MR. MASCHMEYER:  Sure.  Yes.

12  BY MR. MASCHMEYER:

13  Q    Make it short.

14             THE COURT:  So it's overruled.

15  A    Okay.  Fig jam goes back almost to 100 A.D.  It was

16  prepared by Greek and Romans back in there, and that's why

17  Dalmatia has the jar they do.  It looks like a Roman urn.  In

18  fact, before Dalmatia came to our -- us and asked us to

19  produce their particular product, we had produced product for

20  two other brands of fig jam.  One we were still producing and

21  continued to produce for during the time that we produced for

22  Dalmatia.

23  Q    Okay.  So --

24  A    So that it was not 1995.  Fig jam has been around

25  forever.

1    Q    Okay.  Thank you.

2         To go back to this injunction, did the company lose any

3    money?  And how much money did the company lose by having --

4    entering into this injunction?

5    A    Well, it was significantly painful.  We lost total sales

6    of -- during that twelve-month period, of probably 1.3, 1.5

7    million, and the positive cash flow out of that would have

8    been well over half a million.  And I explained that to -- to

9    Ms. Magee in our discussion.  I said, what you're asking me

10   is really painful for my company because, you know, I know

11   you don't want Dalmatia -- don't want FOODMatch to have

12   product, but it's really painful for me.

13        So I really -- I fought her on the injunction because it

14   was -- it was going to hurt our cash flow, our profitability,

15   covering our overhead at a time that it couldn't be worse for

16   us because we were in bankruptcy.

17   Q    In Chapter 11, correct?

18   A    Chapter 11 bankruptcy, yes.

19   Q    Okay.  So you gave up -- the company gave up something

20   of value, great value, in agreeing to this injunction.

21   A    And I was transparent with her that -- with the numbers,

22   too, what it was.  And that's how we came to that blacked-out

23   number that's -- that's on the -- on this.

24   Q    I'll get to that in a second --

25   A    Okay.

1    Q    -- Mr. Thompson.

2         Let's go to the second injunction -- at least I think

3    it's an injunction.  It indicates about a five-year

4    injunction.

5    A    And do you have that, so I can refer to it, what page?

6    Q    Oh, it's the same page, it's the paragraph right under

7    that.

8    A    Okay.

9    Q    It says "Commencing 5:01."  Do you see that?

10   A    Uh-huh.

11   Q    What was that injunction about?

12   A    That injunction is not her recipe.  We've never used her

13   recipe, and that's in the court.  The recipe that we made for

14   FOODMatch was much, much different than hers, but still has

15   figs and sugar, but it was different.

16   Q    Did that affect your business at all, not being able to

17   produce any of that?

18   A    This -- this -- this injunction has to do with using two

19   ████████  and has nothing to do with using her formula.  She's

20   -- she's correct.  We would not be allowed to use her

21   formula, which actually we developed.

22        MR. KIZNER:  Objection, Your Honor.

23   A    But --

24        MR. KIZNER:  This goes into the confidentiality

25   agreement, certain terms that were -- so do we seal this when

1    --

2              THE COURT:  Well, he's not putting in -- he's not

3    stating the precise measurements.  Is that -- should that

4    make it okay?  I'm asking that as a question.

5              MS. MAGEE:  Mr. Thompson's --

6              THE COURT:  Because he mentioned one word that

7    might be problematic.

8              So if you can avoid doing that again, maybe we can

9    just move on.  But your point I'm taking is that it's not

10   designed to enjoin you from using their particular formula,

11   but from using --

12             THE WITNESS:  It's a process.  It's a --

13             THE COURT:  -- a certain kind of process with

14   certain kinds of percentages of certain things --

15             THE WITNESS:  That would be --

16             THE COURT:  -- which may -- which might even be

17   different than their formula.  Is that right?  Is that what

18   you're telling me?

19             THE WITNESS:  It's the same as their formula, they

20   being Dalmatia, but it's different than any of the other

21   formulas that we are producing, and that, too, was held up in

22   Court.

23             THE COURT:  And now you've confused me because --

24   let me see if I can get this clarified, and then I'll give it

25   back to you, Mr. Maschmeyer.

1          MR. MASCHMEYER:  Okay.

2          THE COURT:  Mister --

3          MR. MASCHMEYER:  Mr. Thompson --

4          MR. GEORGE:  Wait, wait.

5          THE COURT:  No, no.

6          MR. GEORGE:  The Judge.

7          THE COURT:  I'm going to try to class --

8          MR. MASCHMEYER:  Oh, I'm sorry.

9          THE COURT:  -- clarify it.

10          Ms. Magee is describing this injunction as simply

11     enjoining the debtors from using her formula.  I thought I

12     heard you saying that it's actually enjoining the company

13     from doing something other than using her formula that you

14     otherwise might have been able to do.

15          THE WITNESS:  That is correct.  It's --

16          THE COURT:  It's the second thing --

17          THE WITNESS:  It's the second thing.

18          THE COURT:  -- that I said.

19          THE WITNESS:  We -- yeah, I agree with her that we

20     should not, could not, never did use her formula for someone

21     else.  But there is a certain item in that formula that could

22     be perceived as making the product better or easier to make

23     that we are enjoined from doing --

24          THE COURT:  Okay.

25          THE WITNESS:  -- for five years.

1           THE COURT:  Okay.  We can stop there.  That

2      satisfies me, anyway.

3           Go ahead, Mr. Maschmeyer.

4      BY MR. MASCHMEYER:

5      Q    And I'm just trying to look at the economics of this.

6      Does that affect you, economically, the business; are you

7      losing business or money because you can't -- you're subject

8      to this?

9      A    Yeah.  Possibly.  It's harder to put the exact number on

10     -- the first year, I know that cost is five hundred,

11     $700,000.

12     Q    Gotcha.

13     A    This cost us some, but I -- you know, that's -- it's

14     kind of putting a number -- I couldn't put a number against

15     something that I don't know what business we're -- we're not

16     turning down.  The other was very immediate, very direct, and

17     very painful.

18     Q    Gotcha.

19     A    And if I could add, very much of interest to her.

20     Q    Okay.  Why was that?

21     A    Well, she was in the marketplace competing against

22     FOODMatch.  And if FOODMatch's supply got interrupted going

23     into the key holiday season, then they would sell more of

24     their product and get more profit and more market share and

25     make FOODMatch look poorly to retailers because they were --

1   they had a gap in supply in the Thanksgiving to Christmas

2   period, which is a key period if you're into figs, fig jam.

3   Q    These injunctions, did they have any effect on your

4   business with FOODMatch?

5   A    Yeah, it hurt a lot, and we're not producing for them to

6   this day.  So it -- it -- it has a continuing effect.  So the

7   -- if you look at 12 months being five hundred to $750,000,

8   we -- we have been injured this holiday season, too, that we

9   thought we would be producing for.  But because we -- we

10  changed -- and this was, I think, part of her strategy --

11  they got started with something else, so ...

12       (Participants confer)

13  Q    Did these injunctions cause any other problems with any

14  of your other customers?

15            MR. KIZNER:  I'm going to object to the relevancy

16  again, Your Honor.  I feel like we just keep going further

17  away from the issue of the settlement agreement, the

18  language.

19            THE COURT:  I'm not sure I heard the question

20  because your voice dropped off.  What was the question again?

21  BY MR. MASCHMEYER:

22  Q    Other than FOODMatch, did this affect any of your other

23  customers of your business?

24  A    It affected --

25            THE COURT:  I'll let it in because it's just going

1    to finish this line of questioning.

2              MR. MASCHMEYER:  Okay.

3              THE WITNESS:  The effect put some uncertainty with

4    other customers and made them concerned about our viability

5    long term, which, again, I think was part of Ms. Magee's

6    strategy.  And also, we were stuck with figs that we couldn't

7    -- we ended up actually throwing them away, so that we were

8    impacted by another 20,000 of buggy figs that we were not

9    able to use.

10   BY MR. MASCHMEYER:

11   Q    Mr. Thompson, in addition to -- in this settlement

12   agreement, in addition to agreeing to these injunctions,

13   which you've now testified was -- caused harm to the company,

14   in the sense it lost -- you lost revenue because of it, you

15   also agreed that the CO Nolt judgment would be allowed to be

16   entered against them.  Isn't that correct?

17   A    That's correct.

18   Q    And that's a subsidiary or related company.  Is that

19   correct?

20   A    Yeah.  CO Nolt was added to the case the day before

21   Christmas of 2016.  They -- they just added it.  We had

22   already decided, in September of 2016, to close Nolt. So Nolt

23   is a nonentity.  It shouldn't have been included in the case

24   to start off with.  She wanted that for -- to show.  And I

25   said, you know, there's nothing there.

1          THE COURT:  Let me stop you.

2     A    I'll give it to you.

3     Q    Okay.

4          THE COURT:  There was actually no -- not even any

5     question.  If you kept it short, I might not have said

6     anything.

7          MR. MASCHMEYER:  Okay.

8          THE COURT:  Why don't you ask a question, Mr.

9     Maschmeyer.

10         MR. MASCHMEYER:  So you didn't have a question --

11         THE COURT:  I'm cutting him off --

12         MR. MASCHMEYER:  Yeah, okay.

13         THE COURT:  -- because it was turning --

14         MR. MASCHMEYER:  Gotcha.

15         THE COURT:  -- into a narrative of -- when there

16    was no question.

17         MR. MASCHMEYER:  Gotcha.

18    BY MR. MASCHMEYER:

19    Q    You also agreed to a judgment against yourself for a

20    million-two.  Isn't that correct?

21    A    That is correct.

22    Q    Okay.  Let's go back to the paragraph where you've

23    agreed -- the company has agreed to pay Dalmatia at least ten

24    percent.  You were present when that was negotiated.  Is that

25    correct?

Thompson - Direct                         180

1   A    That's correct.  Could you -- just to make sure I don't

2   mess up any word, what page is that?

3   Q    It's the same page, Page 2.

4   A    Okay.

5   Q    It's the third paragraph.

6        THE COURT:  The paragraph below the first --

7   A    Okay.

8        THE COURT:  -- the first set of --

9   Q    Set of -- yeah --

10       THE COURT:  -- black -- blacked-out --

11  A    Okay.

12  Q    Black line, yeah.

13       THE COURT:  -- lines.

14  A    Okay.

15  Q    When those discussions were occurring, was there any

16  discussions at all concerning the other unsecured creditors

17  in your case, at that --

18  A    Ms. Magee was certain that we'd be out of business, and

19  she wanted something.  And --

20       THE COURT:  You're actually not answering the

21  question.

22       MR. MASCHMEYER:  Yeah.

23       THE COURT:  Answer his question first.

24       THE WITNESS:  Okay.

25  BY MR. MASCHMEYER:

Thompson - Direct

1    Q    Yeah.  My question was:  Were there any other -- was

2    there any discussions about the unsecured creditors in the

3    case and how that would relate to the ten percent?

4    A    No.

5    Q    No.  Okay.

6         (Participants confer)

7    Q    Okay.  Mr. Thompson, you agreed -- if you'd go now down

8    three more paragraphs, to the paragraph with the big, black

9    redaction line.  Do you see that?

10   A    Uh-huh.

11   Q    The first -- all right.  Okay.

12        You agreed that, if you paid a certain amount of money

13   to Ms. Magee, she would release you from various -- I'm going

14   to call it "claims."  Isn't that correct?

15   A    That is correct.

16   Q    Okay.  And you did not pay that money.  Isn't that

17   correct?

18   A    That is correct.

19   Q    Was there any obligation to pay that money?

20   A    No, it was an either/or.  I could pay that to eliminate

21   the injunction and produce product and -- or let the year go,

22   and fulfill the injunction.

23   Q    Okay.  So that was a choice you had.

24   A    A choice I had.

25   Q    Okay.

1      (Pause in proceedings)

2  Q    Are you aware -- are there -- have you obeyed this

3  settlement agreement, to the best of your ability?

4  A    We have.

5  Q    Okay.  So you're not -- you haven't violated any of the

6  injunctions?

7  A    No.  And they came and they spent the most part of the

8  day, two attorneys, going through all of our records and

9  checking, and they were comfortable we had lived up to the

10  injunction.

11  Q    And this was entered into, and with your free will, this

12  agreement, correct?

13  A    Correct.

14  Q    Okay.

15      MR. MASCHMEYER:  I don't have any other questions,

16  Judge.

17      THE COURT:  Mr. George --

18      MR. GEORGE:  Yes.

19      THE COURT:  Do you wish to --

20      MR. GEORGE:  Just a couple.

21      THE COURT:  -- examine the witness?

22      THE WITNESS:  Excuse me, can I get --

23      MR. GEORGE:  Sure.

24      THE WITNESS:  -- water?

25      THE COURT:  There's water.  Help yourself.

1          THE WITNESS:  Just water, nothing else there?

2          THE COURT:  It's just water, no, it's not seltzer,

3     not juice, it's not fig juice, it's not alcohol.

4          (Participants confer)

5          THE WITNESS:  Okay.  I'm ready.

6                         CROSS-EXAMINATION

7     BY MR. GEORGE:

8     Q    Mr. Thompson, during the negotiation of the provision

9     that we're here on, with respect to what the plan has to pay

10    out, did Ms. Magee ever express to you her view of whether

11    the debtor had viability going forward?

12    A    Often, often.

13    Q    And what did she say to you?

14    A    That she didn't see us going forward or -- and that had

15    -- it wasn't just during that time; it would have been all

16    the way to the beginning of the case.

17    Q    She consistently expressed her view that your company

18    would fail.

19    A    Correct.

20          MR. KIZNER:  Objection, Your Honor.

21          MS. MAGEE:  When did I do that?

22          MR. KIZNER:  It's all hearsay.  Sh.

23          MR. GEORGE:  It's an --

24          THE COURT:  I'm sorry.

25          MR. KIZNER:  It's all hearsay, Your Honor.

1          THE COURT:  What's the objection?  How is it

2    hearsay?

3          MR. GEORGE:  She's a party.

4          MR. KIZNER:  That she testified that -- he's saying

5    what she said.

6          THE COURT:  Yeah.

7          MR. KIZNER:  It's her testimony --

8          THE COURT:  And she's the principal of the party

9    defendant.  So isn't that an exception?  It's not an

10   exception.  It's -- it's defined as not hearsay.

11         MR. KIZNER:  Okay.

12         THE COURT:  A statement of a party opponent.

13   Overruled.

14   BY MR. GEORGE:

15   Q    Did she ever tell you that, if other creditors got more

16   than ten percent, that she wanted more than ten percent?

17   A    No.

18   Q    And was it any secret to the parties that the Official

19   Committee of Unsecured Creditors had not agreed to a deal

20   with the debtor at the time of this negotiation?

21   A    I don't believe there was any belief that there was.

22   There wasn't.

23   Q    Did you ever express in that meeting that the

24   negotiation with the creditors' committee for what unsecured

25   creditors would receive was finalized?

1    A    We didn't discuss the UCC at all.

2    Q    And in fact, the negotiations with the committee went on

3    several months after you concluded this settlement, didn't

4    it?

5    A    Correct.  It hadn't even really started at that point.

6    Q    Did any of the other creditors get injunctions or

7    personal judgments against you or your companies?

8    A    No.  No.

9    Q    And the payment to the unsecured creditors is over a

10   substantial period of time, isn't it?

11   A    It is; it's over eight years.

12   Q    Eight years.

13        And the only reason that there is any possibility of

14   that happening is if the debtor can make certain tax changes

15   with respect to its net operating losses, isn't it?

16   A    Correct, yeah.

17   Q    And so, if those records -- or returns can't be adjusted

18   to take advantage of those tax losses, then those revenues

19   won't be there, will they?

20        MR. KIZNER:  Your Honor --

21   A    I'm not --

22        MR. KIZNER:  -- is all leading.

23        THE COURT:  Hold on.

24        THE WITNESS:  Yeah.

25        MR. KIZNER:  Your Honor, this is all leading.

1          THE COURT:  It would help me if you would --

2          MR. KIZNER:  The objection is --

3          THE COURT:  -- make your objections a little

4     louder, so that --

5          MR. KIZNER:  The objection --

6          THE COURT:  -- I can hear them.

7          MR. KIZNER:  -- is it's leading information --

8     leading questions.  He's testifying for the witness.

9          THE COURT:  He is leading.

10         THE WITNESS:  I --

11         THE COURT:  And I don't know --

12         THE WITNESS:  Sorry.

13         THE COURT:  You're going to have to wait, Mr.

14    Thompson.

15         MR. GEORGE:  Well, Your Honor, he's --

16         THE COURT:  He's not a hostile --

17         MR. GEORGE:  -- the debtor's --

18         THE COURT:  He's not --

19         MR. GEORGE:  -- witness.

20         THE COURT:  Yes, but --

21         MR. GEORGE:  I'm crossing him, really.

22         THE COURT:  You're not -- you're really on the same

23    side of the case.

24         MR. GEORGE:  Well, wouldn't I have my own case, if

25    I wanted to put my own case on, that would be independent of

1    the debtor?

2            THE COURT:  Understood, but I don't think you're

3    adverse to the witness.

4            MR. GEORGE:  Okay.

5            THE COURT:  Don't you think you shouldn't lead him?

6            MR. GEORGE:  Okay, Judge.

7            THE COURT:  So I'll sustain that objection.

8    BY MR. GEORGE:

9    Q    And would it be fair to say that you weren't thrilled

10   with the arrangement that was ultimately reached with the

11   unsecured creditors?

12   A    That would be a fair characterization.

13   Q    And you feel that you overpaid the unsecured creditors

14   under the plan, right?

15   A    Correct.

16   Q    Now Ms. Magee said you were there until eleven o'clock

17   at night.  Were you there until eleven o'clock at night?

18   A    That's not true.  It -- it was a long day, but we were

19   out by 8, 8:30, at the latest.

20   Q    And this document had already been signed up by 8.

21   A    Correct, the last hour it took for everybody to --

22   attorneys to get their last pieces.

23   Q    So the ultimately deal was made some time before 8, an

24   hour or so before?

25   A    Yeah.

1    Q    Not at eleven o'clock at night?

2    A    Definitely not 11, no.

3         (Participants confer)

4    Q    And you mentioned the other financial benefits that

5    Dalmatia got by virtue of the fact that these injunctions

6    were in existence with respect to the debtor.  Do you have

7    any idea or can you quantify in any way the actual amount of

8    the economic benefit to Dalmatia?

9         MR. KIZNER:  Your Honor, I object.  This is totally

10   speculative.

11        THE WITNESS:  No, I --

12        THE COURT:  Well, hold -- you have to wait -- when

13   you hear an objection, Mr. Thompson --

14        THE WITNESS:  Okay.

15        THE COURT:  -- you need to wait.

16        THE WITNESS:  I'm sorry.

17        THE COURT:  I think you need to lay a foundation as

18   to how he would know what the benefits were.  Maybe he could

19   know it, but I think you have to have a preceding question.

20   So I'll --

21   BY MR. GEORGE:

22   Q    So can --

23        THE COURT:  -- sustain --

24   Q    -- you tell us --

25        THE COURT:  -- the objection.

1   Q    -- the Court what you view as the benefits that Dalmatia

2   derived economically from the injunctions?

3   A    It slowed down their competitor FOODMatch, and it --

4   well, there's -- and that's documented in sales tracking

5   data, retail tracking data that's given by independent

6   sources.

7   Q    And I think your testimony was that it would -- that the

8   debtor would have met it or would have had revenue in excess

9   of expenses of about a half a million dollars by virtue of

10  that?

11  A    Yeah, I think it's probably closer to seven hundred, but

12  yeah.

13  Q    Did you take any effort to make yourself judgment-proof

14  after you entered into this settlement agreement?

15  A    No.

16  Q    Now the debtor agreed to $1,758,871 as the claim.  What

17  -- how is that claim quantified?

18  A    They -- that actually I think is why this document took

19  a couple of months to prepare because they had to go back and

20  balance out what they had paid -- FOODMatch had paid of the

21  7.4 million and net things out.  And I don't understand --

22  that's all I know.  I know it had something to do with the

23  total claim and the joint and severable, I think is the term.

24  And so they had to -- they had to cover their base.

25       And yes, at one time, we were in joint and severable of

190

1      -- and this, I think, is public knowledge.  The judgment was

2      well over -- it was 4.4 million.  So I guess the joint would

3      have been 2.7 million because they came back at 1.7, so I --

4      it's math that they did on their side.  I was not a party to

5      it, and there was definitely no concessions there.  It was --

6      it was because of the legal judgment that the number came

7      down to 1.7 from --

8      Q    And do you know whether this number includes her

9      recovery of any of the attorneys' fees that she incurred?

10     A    I don't believe it did because I think that was covered

11     by the other agreement that I do not know anything more

12     about, other than that I believe there was some --

13     Q    So you don't know whether, in the settlement with

14     FOODMatch, attorneys fees were paid as part of that amount?

15     A    I -- I don't know the particulars of that agreement, no.

16     Q    Okay.  Did the debtor then take that number and do an

17     accounting of it and try to get to the bottom of how it was

18     arrived, or did the debtor accept that number without

19     contest?

20     A    We accepted it without contest.

21          (Pause in proceedings)

22     A    If I could just add, we had asked, and both FOODMatch

23     and Dalmatia said no way were we going to get any kind of an

24     accounting or math.  They both -- it's not just Maia's

25     conviction, but it was also FOODMatch's conviction that

Thompson - Cross                                    191

1    nothing wold be disclosed from that agreement.

2    Q    So you don't know the full contents of the FOODMatch

3    settlement?

4    A    I -- I -- you know, and it would be speculation.  I know

5    what Dalmatia did not accept because I was in the room for

6    that, and I know where that was, so I would imagine --

7              THE COURT:  Well let's not --

8    A    -- what the final --

9              THE COURT:  -- go there.

10   A    -- was, north --

11             THE COURT:  You don't --

12             MR. GEORGE:  That's fine, Judge.

13             THE COURT:  You don't know what they actually

14   accepted.

15             MR. GEORGE:  That's all I --

16             THE COURT:  It doesn't matter what they didn't

17   accept.

18             THE WITNESS:  Yeah.

19             MR. GEORGE:  I don't have anything further for this

20   witness.

21             THE COURT:  Cross-examine?

22             MR. KIZNER:  Can we have a three-minute break, Your

23   Honor?

24             THE COURT:  Sure.  Take a three-minute recess.

25        (Recess taken at 1:07 p.m.)

1          (Proceedings resume at 1:16 p.m.)

2          (Call to order of the Court)

3          (Witness resumes stand)

4               THE COURT:  All right.  Mr. Kizner, are you ready

5     to go?

6               MR. KIZNER:  Yes, Your Honor.

7                         CROSS-EXAMINATION

8     BY MR. KIZNER:

9     Q    Mr. Thompson, do you recall earlier today, a few minutes

10    ago, you testified that you never used Dalmatia's recipe?  Do

11    you recall that in your testimony?

12    A    Yes.

13    Q    So that's -- you're saying you never used Dalmatia's

14    test -- recipe.

15    A    We used the recipe that we developed for Dalmatia to

16    produce Dalmatia, but we never used it to produce any other

17    product.

18    Q    You -- for the record, you were found liable, your

19    company was found liable at trial for misappropriation of

20    Dalmatia's trade secrets, right?

21    A    You know, we -- okay.

22    Q    It's a --

23    A    What -- okay.

24    Q    -- yes-or-no question.

25    A    What's your question?  Okay.  To some extent, yes.

1    Q    Okay.  You also testified earlier -- we talked about the

2    one-year injunction.  Do you recall that?

3    A    Yes.

4    Q    October of 2012 to -- I'm sorry.  October 2018 -- '17 to

5    October 2018, right?

6    A    Correct.

7    Q    And you testified that you couldn't supply FOODMatch for

8    the holidays at 2017, 2018 holiday season.

9    A    That's correct.

10   Q    And that's as a result of the injunction.  Is that your

11   testimony?

12   A    That's my testimony.

13   Q    Isn't it true that fig -- that FOODMatch fig spread was

14   in the stores and readily available during the 2017/2018

15   holiday season?

16   A    It was available, but at a limited inventory because of

17   -- they had to switch to a different production.

18           THE COURT:  But is that a different producer, not

19   you?

20           THE WITNESS:  That's correct.

21           THE COURT:  Is that what you mean?

22           THE WITNESS:  That's correct.  It --

23           THE COURT:  All right.

24           THE WITNESS:  On the bottom, it has -- it says

25   Greece as the place of origin.

Thompson - Cross

1  BY MR. KIZNER:

2  Q    So it didn't say USA on it; you're saying it said Greece

3  on it?

4  A    A product of Greece, yes.

5  Q    But that -- so -- but there was product available,

6  correct?

7  A    You know, that's -- that's not -- I -- I did not check

8  all the stores.  I only know what they told me, that they had

9  limited supply.  That's correct.

10  Q    But you said there was a gap in the supply, and now what

11  you're telling me, that they switched to a different

12  supplier, so that's not correct; there was not a gap in the

13  supply.

14  A    No, I --

15  Q    You testified to that earlier.

16  A    I -- I believe I'm being straight when I say that we had

17  orders, we stopped making those orders based on the

18  injunction, and they had to switch to a producer in Greece.

19  And Greece takes a longer lead time, it takes --

20  Q    So --

21  A    Not only was --

22  Q    So --

23  A    Excuse me.  I'm not --

24          THE COURT:  Let him finish his answer.

25  A    Yeah.  So, when they switched to Greece, it took some

1    time to get the jars and the labels.  And yes, they had a

2    limited -- their inventory was limited.  They only said that

3    it hurt them, I don't know to what extent or anything other

4    than that.  I was only told that it hurt.

5    Q    So your testimony earlier about the gap in the supply,

6    that's completely speculative.

7    A    It's not speculative, it's what I was told by the

8    customer.

9             MR. MASCHMEYER:  Your Honor, I'm going to object.

10   What relevance is this on FOODMatch not being able to --

11            THE COURT:  Overruled.  You brought it up.

12            MR. MASCHMEYER:  Well, no --

13            THE COURT:  He's exploring it.

14            MR. MASCHMEYER:  -- I brought it up that it hurt

15   the debtor not being able to produce it.  If FOODMatch --

16            THE COURT:  It all --

17            MR. MASCHMEYER:  -- had to go somewhere else, what

18   relevance is that to this?

19            THE COURT:  Because the subject of hurting

20   FOODMatch has also been brought up at times as part of

21   Dalmatia's interest.

22        (Participants confer)

23            MR. KIZNER:  So --

24            THE COURT:  I'm not saying that it's particularly

25   relevant; I'm just saying that, if one side gets to explore

1   the issue, I'm going to let the other side explore the issue,

2   that's all.

3           MR. MASCHMEYER:  I understand.

4   BY MR. KIZNER:

5   Q    So the recipe, Dalmatia's recipe, FOODMatch just took it

6   to Greece to have it produced there, right?

7           MR. GEORGE:  Objection, Your Honor.

8           THE COURT:  Sustained.  That's as far as he knows.

9      (Participants confer)

10          THE COURT:  I don't know where else you want to go

11  with this.

12          MR. KIZNER:  Sure.

13  BY MR. KIZNER:

14  Q    Do you recall being at the confirmation hearing on

15  September 17th of this year?

16  A    Yes, I do.

17  Q    Okay.

18  A    Some of the -- some of them, I was not physically here,

19  but that one, I was.

20  Q    Okay.

21  A    Yes.

22  Q    And do you remember putting a proffer on the record that

23  day, on September 17th?

24  A    I'm sorry, I don't know what that means.

25  Q    Do you remember putting -- do you remember testifying

Thompson - Cross                          197

1    about your financial -- the financial ability of the debtors

2    that day, on September 17th?

3    A    I -- if you can be more specifics.  I'm not sure what

4    you're asking.

5    Q    Well, you testified on September 17th that, if Dalmatia

6    is successful at today's hearing on its objection, that the

7    debtors would pay Dalmatia the same as all other unsecured

8    creditors.  Do you recall that?

9              MR. GEORGE:  Your Honor, it -- that's beyond the

10   scope of the direct, I believe.  There wasn't any testimony

11   about that.

12             THE COURT:  I'm going to allow it.  We can just

13   call him back on rebuttal, it's not worth it.

14             MR. GEORGE:  Understood.

15             THE WITNESS:  Yeah, all I was stating is that I

16   would abide by what the Court says.  Any additional spending

17   by my company -- I don't have 3 employees or 1 employee; I

18   have 72, so it's -- it's impactful, it's painful.

19   BY MR. KIZNER:

20   Q    Is it fair to say -- just based on your testimony

21   (indiscernible) is it fair to say you don't recall what you

22   said at the confirmation hearing on September --

23   A    No, I -- I -- I do remember.  Now that you brought it

24   up, I -- the question -- I think -- well, I think it

25   pertained more about could this go forward one way or the

1   other, depending on this hearing, and I feel that it can, but

2   most difficultly.  I mean, it's a painful process --

3   Q    So do --

4   A    -- with what I've gone through.

5   Q    Do you recall specifically the testimony you made about

6   Dalmatia's claim at the hearing on September 17th?

7   A    I do not remember --

8   Q    Okay.

9   A    -- what I said specifically about that hearing -- or

10  their claim.

11        MR. MASCHMEYER:  Your Honor, I'm only going to

12  object to clarify the record.  I believe confirmation was

13  September 6th, not the 17th, so ... okay.

14  BY MR. KIZNER:

15  Q    Okay.  Do you have the settlement -- do you have the

16  settlement agreement in front of you?

17  A    Yes.

18  Q    Okay.  I'm going to refer you to the handwritten

19  settlement agreement, which is start -- it starts at Page 8,

20  on the top.  Do you see it?

21  A    (Witness reviews exhibit)

22        Yeah.

23  Q    Okay.  And you testified earlier that you were at the --

24  at this settlement conference on October 12th, 2017, right?

25  A    Yes, I was.

Thompson - Cross                                        199

1    Q    Okay.  You said it was about ten hours?

2    A    Ten, eleven hours.  I know I got home that evening

3    before midnight, and I live two hours away.

4    Q    Okay.  And who put the provision in the third paragraph

5    -- who added the provision in the third paragraph about --

6    that says "at least ten percent"?  Do you see that there,

7    that provision?  Do you recall who actually put that

8    provision into this handwritten agreement?

9    A    I'm not sure whose handwriting that is.

10   Q    You're not sure whose handwriting it is?  Do you even

11   know who wrote this agreement?

12          MR. GEORGE:  Are you talking about the handwritten

13   agreement?

14          MR. KIZNER:  Yeah.

15          THE WITNESS:  I think it was the Judge's

16   handwritten agreement.

17   BY MR. KIZNER:

18   Q    Do you know if it was -- do you know if any of the

19   lawyers wrote the agreement?

20   A    The lawyers were very much involved in it.  They did --

21          THE COURT:  He's asking specifically about the

22   writing, the pen to paper, right?

23          MR. KIZNER:  Yeah.

24          THE COURT:  Is that the question?

25   BY MR. KIZNER:

1    Q    Do you know if any of the lawyers actually -- I only

2    want to find out who wrote this.

3    A    I --

4              MR. GEORGE:  Well, Judge, just -- when he keeps

5    saying who "wrote," I mean, is he asking who the scrivener

6    was?

7              THE COURT:  That's what I'm trying to get to.

8              MR. KIZNER:  Yes.  I'm asking who's the scrivener,

9    exactly.

10             THE COURT:  Whose hand was -- held the pen to put

11   the words on the paper.

12        (Laughter)

13             THE COURT:  If you know.

14             THE WITNESS:  I cannot say with 100 percent

15   accuracy.

16             MR. KIZNER:  Okay.

17             THE WITNESS:  I think it was the Judge, but I don't

18   -- I would not -- you know, it's not something I'd swear to

19   on a Bible.

20   BY MR. KIZNER:

21   Q    Okay.  And is it fair to say you have no recollection of

22   there being any discussion about bankruptcy at this

23   settlement conference?

24   A    No, there was discussion about bankruptcy.

25   Q    Do you know why this handwritten addition at the end of

1    Paragraph 3 was added?

2    A    I -- I know what the intentions were.

3    Q    Okay.  So you were -- so let me get this straight.  You

4    didn't draft this, right?  And you don't know who drafted it,

5    you don't know who wrote it.

6    A    It was a collaborative work between my attorney and

7    Maia's attorney and me and Maia, and I believe the Judge

8    actually handwrote it.

9    Q    Okay.  So somebody added -- it looks like somebody

10   added:

11           "-- but will support a plan, as long as it pays out

12           at least ten percent."

13       I'm just trying to read the handwriting.

14   A    Right.

15   Q    Do you recall even reading that, that day?

16   A    Yeah, yeah.

17   Q    Okay.  You recall --

18           MR. GEORGE:  Your Honor, can we have an offer of

19   proof?  What does it matter who wrote it?  It says it's going

20   to be memorialized in a separate agreement, which is the

21   writing that is typed and then filed with the Court for

22   approval.  So what does it -- who cares who wrote it?  She

23   signed it, he signed it, everybody agreed to it.

24           THE COURT:  Overruled.

25   BY MR. KIZNER:

Thompson - Cross                                          202

1    Q    So is it -- it's your position here today that, as long

2    as Dalmatia receives ten percent, no matter what, it has to

3    agree with the plan, right?  Isn't that your position?

4    A    My position was that this was a multi-prong agreement.

5    Q    I'm asking you what your position today is.

6              MR. GEORGE:  Your Honor, can he answer?

7    A    You asked me --

8              MR. GEORGE:  It's cross.

9    A    -- what my --

10             THE COURT:  I think he -- actually, I think he is

11   trying to answer your question, I hope.  I'll let you finish

12   your thought.  Go ahead.

13             THE WITNESS:  Okay.  Yeah, it was not a financial-

14   only -- I mean, this -- this agreement had several different

15   potential outcomes at the end, but it -- it had to -- it

16   incorporated Ms. Magee's very important to her injunction, so

17   that -- for her competitive reasons, and some financial

18   reparations.  And her concern was that we would go to zero,

19   her -- give unsecured -- only the secured creditors would get

20   money, and unsecured would get zero, and she wanted ten

21   percent.

22   BY MR. KIZNER:

23   Q    Okay.  So your position -- and I think you just answered

24   the question at the end -- is that Dalmatia agreed to accept

25   ten percent.

1    A     And the injunction or --

2    Q     I'm just talking about the --

3    A     No, I -- I'm finishing.

4    Q     -- that one clause.

5    A     The -- this -- no, this clause is not -- you can't pull

6    it out and say that that was that the agreement.  The

7    agreement was:  A, pay a lump sum; or, B, do the injunction

8    and pay this amount of money, pay the ten percent.

9    Q     Okay.

10   A     And at that point, I -- you know, the ten percent I

11   thought was going to be a little over 200,000 because of the

12   number, but they came back and said the number was 1.742,

13   which brought the ten percent down to a hundred and seventy-

14   four.

15   Q     So the handwritten agreement -- so you just testified

16   your understanding was that Dalmatia would accept just ten

17   percent.  That's what you just said, right?

18   A     I think what I said is it's clear and it was multi-

19   pronged.

20          THE COURT:  But as to this issue.  I get that

21   you're saying it's connected to other parts of the agreement,

22   that it's all a unified agreement.

23          THE WITNESS:  Yeah.

24          THE COURT:  But on this provision --

25          THE WITNESS:  Ten per --

Thompson - Cross                    204

1          THE COURT:  -- he's asking you do you -- did you

2     understand this to mean that Dalmatia, if it got ten percent,

3     had to support the plan?

4          THE WITNESS:  That is correct.

5          THE COURT:  Okay.  That's a simple answer.

6     BY MR. KIZNER:

7     Q    So, in the handwritten agreement, the language says at

8     least -- "pays out at least ten percent," in the handwritten

9     agreement.  You can look at it in front of you.  Is that --

10    A    Yeah, I've seen it.

11    Q    Right?

12    A    Yes.

13    Q    And then, a few months later, there's this typed

14    agreement which further memorialized the terms.  And that

15    agreement says -- and you can look at it, that's on Page 1.

16    It says "as long as it pays out at least ten percent."  I

17    mean, you can look at the two -- the language is verbatim,

18    but if you can look at the two, if you want to --

19    A    Okay.

20    Q    -- see them side by side.

21         THE COURT:  Well, there's no dispute that it's the

22    same.

23         MR. KIZNER:  Okay.

24         THE COURT:  It's been faithfully typed into -- onto

25    the first page of the settlement agreement.

1    BY MR. KIZNER:

2    Q    So, if it was supposed to be only ten percent, how come

3    the agreement didn't say only ten percent?  It says "at

4    least."

5    A    But it was at least from the other direction, from zero.

6    She -- the concern in our discussion in that -- in that

7    conference and when Ms. Magee and I went to the other room

8    was that -- she said, we're going to get zero, and I said, it

9    could be, could be zero.

10   Q    You would agree this clause --

11            MR. GEORGE:  Your Honor, can he --

12   Q    -- is on --

13            THE COURT:  Let him --

14            MR. GEORGE:  -- finish his --

15            THE COURT:  Let him --

16            MR. GEORGE:  -- answer?

17            THE COURT:  -- finish his answer.

18            THE WITNESS:  And -- and I said, it could be zero,

19   it could be five percent.  She says, well, I want to make

20   sure I get ten percent.  And -- and -- and I said okay, we'll

21   make sure you get ten percent, and if I give ten percent it,

22   you will approve it.  She said yes.  As -- and she says, and

23   you know, the injunction is very important to me, I need the

24   injunction, and we need to have proof of the injunction.  And

25   I -- and we get an open door, they can come in any time.  So

1    those two pieces together gave her -- you know, that's what -

2    - that's what the agreement was, that's what I agreed to.

3    Q    So you would agree that this language is not clear

4    because it doesn't say just ten percent.  You'd have to agree

5    with that, right?  It says "at least ten percent."

6    A    It's clear to me because I was there, and I know what

7    was being stated and what her intentions were.

8    Q    Just focusing --

9    A    Her intentions --

10   Q    -- on this clause --

11        MR. GEORGE:  Your Honor --

12   Q    -- you would agree --

13   A    (indiscernible)

14        MR. GEORGE:  -- again, he's --

15   Q    -- that's not --

16        MR. GEORGE:  -- interrupting him.

17        MS. MAGEE:  Yes or no.

18        THE COURT:  Let him finish his answer, please.

19        THE WITNESS:  Yeah, my -- her intentions and my

20   intentions were, at the end of the day, she was going to get

21   the equivalent of a number.  That number was either going to

22   be a lump sum or this ten percent, plus what I felt that

23   value of that injunction was to me as a company.

24        MR. KIZNER:  Okay.

25        THE WITNESS:  And I can tell you that, if you pull

1    away the black there, that number is exactly -- it came out

2    to the penny, almost, as to the cost of the injunction to me

3    and the two hundred (indiscernible) to me, it was a wash.

4    BY MR. KIZNER:

5    Q    But you never -- that number was never paid, right?

6    A    It didn't have to be.

7    Q    Would you agree the language is not clear?  That's what

8    I want to ask you.  Would you agree --

9             MR. GEORGE:  Your Honor --

10   Q    -- the language --

11            MR. GEORGE:  -- he just answered.

12   Q    -- is not clear?

13   A    I --

14            MR. GEORGE:  That's been asked and answered.

15            MR. KIZNER:  He's not answering it, he's --

16            MR. GEORGE:  He did.  He said, it's clear to me

17   because I was there.  That was his answer.

18            THE COURT:  I'll sustain the objection.

19   BY MR. KIZNER:

20   Q    Let's move on to the next page.  In Paragraph 3 --

21            MR. GEORGE:  Which document are you on, the written

22   or the --

23            MR. KIZNER:  Document 306, Page 3.

24            MR. MASCHMEYER:  Which number at the top of that

25   document?

1                THE COURT:  Second page of D-1.

2                MR. GEORGE:  Thank you, Judge.

3                MR. MASCHMEYER:  Thank you.

4                THE WITNESS:  But he's going by the page at the

5        top.  Is it 3 of 5 or 4 --

6                MR. KIZNER:  3 of 15.

7                THE WITNESS:  3 of 15.

8                MR. MASCHMEYER:  15.

9                THE WITNESS:  Okay.

10            (Witness reviews exhibit)

11       BY MR. KIZNER:

12       Q    If you look down to the third paragraph, there's a

13       discussion about bankruptcy there.  Do you see that?

14       "Dalmatia will amend its claims."  I just want to direct you

15       to that paragraph.

16       A    Not -- Item 3, not the third paragraph, "Dalmatia."

17            (Witness reviews exhibit)

18            Correct.  That is -- I see it.

19       Q    Okay.  So isn't it true that you agreed in the

20       settlement that the amount of the claim would be fixed at 1.7

21       -- a hundred -- $1,758,871?  That's the number?

22       A    No.  That number was supplied by Dalmatia counsel six

23       weeks later, after they figured what the number really was.

24       It -- we didn't have that number that day.

25       Q    Did you enter into the settlement agreement?

1                THE COURT:  Let's clarify.  He's talking about --

2       we're you're talking about two different points in time, so

3       let's just be clear.  There's the day that the handwritten

4       agreement was made, and then there's the day that the typed-

5       up agreement was executed.  So ask your question in relation

6       to those dates.

7       BY MR. KIZNER:

8       Q    Okay.  The day the -- the day the typed-up agreement was

9       entered into, the parties agreed that the amount of the

10      unsecured claim would be $1,758,871.  Is that correct?

11      A    That is correct.

12      Q    Okay.  And the debtors agreed they would not -- that

13      would be a fixed number, they would not -- it would be valid,

14      they would not challenge that claim, correct?

15      A    Nor have we.

16      Q    And you -- and you said it was an allowed unsecured

17      claim, right?

18      A    Correct.

19      Q    There was never any discussion about different classes

20      of unsecured claims, was there?

21      A    I'm -- well, I'm -- what's your question?  I'm not sure

22      what your question is.

23      Q    Well, the agreement doesn't contain any language about

24      there being different classes of unsecured claims, correct?

25      A    I think it's -- the document stands by itself.

Thompson - Cross                      210

1    Q    Okay.  So, in the confirmed plan, every other unsecured

2    creditor but Dalmatia is receiving somewhere between 39 to 50

3    percent of its claim.  Isn't that right?

4              MR. MASCHMEYER:  Wait.

5              MR. GEORGE:  Objection to form, Judge.  There are

6    at least seven classes in there.  Fox Rothschild is in its

7    own class.

8              MR. KIZNER:  I can prefer -- I can refer to the

9    specific classes.  I'm just trying to speed it up.  But if

10   you want, I can -- I'll --

11             MR. GEORGE:  I mean, Judge --

12             THE COURT:  Well --

13             MR. KIZNER:  I'll mark the --

14             MR. GEORGE:  -- can't we stipulate that the plan

15   says what it says, and if there's an amount being paid --

16             THE COURT:  Well, but he wants to get at the fact

17   that there is a class of unsecured creditors that probably

18   consists of most of the unsecured creditors in the case, who

19   are getting 39 percent and possibly more.  That's what you're

20   trying to establish, right?

21             MR. KIZNER:  Correct.

22             THE COURT:  And I don't think that's in dispute, is

23   it?

24             MR. GEORGE:  That's what I'm saying.

25             THE COURT:  Okay.  So that's --

1        MR. GEORGE:  That's why I don't know why --

2        THE COURT:  That's the foundation to what his next

3    question is.

4        So, if -- and you agree with that, right?  You

5    understand there's a lot of creditors getting 30 -- possibly

6    39 percent or more, and Dalmatia is not one of them, right?

7        THE WITNESS:  That's correct.

8        THE COURT:  Okay.  What's your next question about

9    now?

10   BY MR. KIZNER:

11   Q    So isn't -- you agree that -- to not challenge the claim

12   in the settlement agreement, Dalmatia's claim, right?  As an

13   unsecured creditor.

14   A    That's what I agreed to, yes.

15   Q    By treating it as a totally separate class of unsecured

16   creditors, aren't you just effectively challenging the claim?

17       MR. GEORGE:  Your Honor, I object.

18       THE COURT:  Sustained.

19       MR. GEORGE:  That's a legal --

20       THE COURT:  Sustained.

21       (Participants confer)

22   BY MR. KIZNER:

23   Q    Are you aware of the difference of how much money

24   Dalmatia would receive if it's treated like all the other

25   unsecured creditors?

Thompson - Cross                                        212

1    A    I am.

2    Q    Okay.  Do you know the difference of what it would

3    receive if it's treated in its own class, as in the plan?

4    A    Less than the value of the injunction.

5    Q    Do you know the number?

6    A    I -- I think it's about $450,000.

7    Q    Okay.

8    A    And it's less -- and that's why I think it's -- all the

9    numbers tie together.  It's -- the injunction is what it is.

10   I lived through it, I incurred that cost, and it was painful.

11   It was painful for me and my company.  And so that's already

12   been paid to -- to Dalmatia.  And -- and so Dalmatia's claim

13   on this -- you know, has already paid, and I think you're

14   asking --

15   Q    What's been paid to Dalmatia?  Has a penny gone to

16   Dalmatia?  Yes or no.  Has a penny gone to Dalmatia?

17   A    It has, indirectly, through the -- through living

18   through the injunction.  It gave them commercial benefit in

19   the marketplace, which was important to Ms. Magee, and that's

20   why she -- that was so important to her in our negotiations.

21   Q    That's your belief.

22   A    Oh, it's fact.

23   Q    All right.

24   A    You know, I've been in commercial and retail says for 30

25   some years.  You know, I knew what she was trying to do, and

1    for me, it was kind of a wash.

2              THE COURT:  Can I ask a question on that point?

3              MR. KIZNER:  Sure.

4              THE COURT:  You've quantified in your testimony the

5    effect of the injunction.  At one point, I think you said it

6    cost you 500,000 in sales, and later you said as much as

7    seven hundred.

8              THE WITNESS:  No, in -- not in sales.  In sales, it

9    was --

10             THE COURT:  In -- I'm sorry.  Not in sales.  In

11   basic profit.

12             THE WITNESS:  Profit and --

13             THE COURT:  Net cash flow, net cash flow --

14             THE WITNESS:  Net cash flow.

15             THE COURT:  -- was the word you used.

16             Okay.  I don't -- you have to help me with this.

17   How does that translate into a benefit to Dalmatia, that you

18   lose money?  Why does that mean there's a benefit to

19   Dalmatia?  And if there is one, how do you quantify that and

20   why are you assuming it's dollar-for-dollar?

21             THE WITNESS:  What -- what that did, as far as

22   increasing the purchase price for FOODMatch and, by

23   disrupting their business, it allowed her sales to increase,

24   and that -- and not be --

25             THE COURT:  It was -- which is a business

1    opportunity, correct?

2              THE WITNESS:  A business opportunity was created by

3    impacting the sourcing of their competitor.

4              THE COURT:  But do you have any data to quantify

5    what benefit Dalmatia got from that business opportunity?

6              THE WITNESS:  Yes, there's -- there's Nielsen data

7    that I was shown that showed that their -- that the FOODMatch

8    growth stopped, and actually decreased --

9              MR. KIZNER:  Your Honor --

10             THE WITNESS:  -- during that period.

11             MR. KIZNER:  -- this is all hearsay.

12             THE COURT:  But what -- but that -- but how does

13   that put increased revenue into Dalmatia?

14             THE WITNESS:  Because they were not -- they didn't

15   have --

16             THE COURT:  They had --

17             THE WITNESS:  -- competitors on the shelf.

18             THE COURT:  You're assuming that they can jump into

19   the void and get the entire benefit of the vacuum that's

20   created by FOODMatch's withdrawal from the market.  Why do

21   you assume that?  Why is that -- why should I assume that?

22             THE WITNESS:  Because it's -- it is how this

23   particular market operates in --

24             THE COURT:  There's no --

25             THE WITNESS:  -- in chief.

Thompson - Cross                215

1              THE COURT:  -- other competitors --

2              THE WITNESS:  There are --

3              THE COURT:  -- for Dalmatia?

4              THE WITNESS:  -- other competitors, but the two of

5    them are represented by the two largest cheese distributors

6    and control the deli sets.  It's FOODMatch and the company

7    that Dalmatia left FOODMatch for at Atlanta.  So it's those

8    two companies fighting at retail --

9              THE COURT:  Okay.

10             THE WITNESS:  -- in these key periods of time.

11             THE COURT:  So, whether it's right or wrong, your

12   perception is there's a direct dollar-for-dollar correlation

13   between your -- the losses that you've described in net cash

14   flow --

15             THE WITNESS:  Uh-huh.

16             THE COURT:  -- and what you presume would be an

17   increase in net cash flow in an equivalent amount to

18   Dalmatia.  That's basically your theory.

19             THE WITNESS:  I think it is that or more.

20             THE COURT:  Okay.

21             THE WITNESS:  And it was very important to her

22   because she -- I mean, she repeated it, she wanted those

23   sales during that period of time and she wanted to hurt

24   FOODMatch --

25             THE COURT:  Okay.

1        THE WITNESS:  -- and that's the way she could do

2    it.

3        THE COURT:  I understand.

4        Thank you for letting me clarify.  I hope I didn't

5    interrupt your flow, but go ahead.

6        MR. KIZNER:  That's fine, Your Honor.

7    BY MR. KIZNER:

8    Q    You testified earlier that you -- that due to the

9    injunction, the one-year injunction, that the debtors

10   incurred a loss of somewhere between five hundred to 800,000.

11   Is that what you testified to?

12   A    I think --

13       THE COURT:  It was seven.

14   Q    Seven?

15   A    I think I said seven something, but yeah.

16   Q    So, if you sustained such a large loss like you claimed,

17   why would you not have just paid under the judgment to get

18   rid of the injunction?

19   A    To me, it was like a wash.  I didn't have the free cash

20   flow to pay it up front.  To me, if I would have been -- if I

21   would have paid it, I would have rather maintained that

22   relationship and keep my people working and keep the factory

23   going.  You know, we -- you know, it was painful for us, but

24   -- I had filed bankruptcy.  I didn't have 700,000 sitting

25   there at the time, so I -- so I incurred that five -- you

1    know, forty or 50,000 of pain a month for 12 months.

2    Q    And you just said you filed bankruptcy.  But the

3    settlement agreement was entered into after you filed

4    bankruptcy.

5    A    It -- correct.  I was hoping to raise the money and just

6    keep it going.  I couldn't raise the money, so I incurred the

7    losses.  It was -- it was an either/or, as far as my -- I

8    would have preferred to pay her off and not -- and quite

9    honestly, I -- she's a litigious person.  I wanted to just

10   eliminate having to see her in a courtroom again, that's what

11   this thing did.

12   Q    Sure.

13   A    But I didn't -- didn't have the 700,000, so I had to

14   suck it up the other way.  This contract allowed it to go A

15   or B.

16   Q    So you testified earlier that your understanding was

17   that Dalmatia would take only ten percent, right?

18   A    And be happy to get it.

19   Q    Correct.

20        Do you recall --

21   A    With the injunction.

22   Q    Do you recall what the first three versions of the plan

23   provided for, in terms of Dalmatia's treatment?

24   A    I think I heard today that -- you know, none of those

25   went anywhere, and we were just -- it was just a starting

1    point, but it had nothing to do with this.

2              THE COURT:  That's not what he asked you.

3    A    Fifteen.

4              THE COURT:  Thank you.

5    Q    Do you recall seeing any of these three versions of the

6    plan that had 15 percent in them?

7    A    Correct.  Yes, I did.

8    Q    So you approved it, presumably; you reviewed it and

9    approved it?

10   A    It was preliminary and there was really -- there was no

11   discussions going on at the time.

12   Q    So, at three separate occasions, you agreed to give

13   Dalmatia more than ten percent in this Bankruptcy Court.

14             MR. GEORGE:  Objection, Your Honor.  That calls for

15   a legal conclusion.  Those plans aren't binding until they're

16   confirmed.

17             THE COURT:  Well, the --

18             MR. KIZNER:  I can rephrase it.

19             MR. GEORGE:  There's no agreement --

20             THE COURT:  I'll sustain it, but let's just agree

21   that on -- that it's not a disputed fact that, on three

22   separate occasions, the debtor proposed, through its

23   principal's authorization, proposed a plan that provided for

24   a 15 percent distribution to Dalmatia.

25             MR. GEORGE:  Well, as long as it's stipulated that,

1    during that same time period, they entered into an agreement

2    that had ten percent in it.

3               MR. KIZNER:  I'm not stipulating to that, Your

4    Honor.

5               THE COURT:  If those are the facts, those are the

6    facts.  It's not --

7               MR. GEORGE:  Yeah, I think those --

8               THE COURT:  It's not --

9               MR. GEORGE:  -- are the facts.

10              THE COURT:  What I just said is not conditioned on

11   what you just said.

12              MR. GEORGE:  Understood.

13              THE COURT:  There's -- unless somebody says

14   otherwise, there's no dispute that there were three plans in

15   which the debtor proposed 15 percent that were filed with the

16   Court.  That's all he's asking.

17              MR. GEORGE:  But for everybody, for all unsecureds.

18              THE COURT:  Fifteen percent for everybody, correct.

19              MR. MASCHMEYER:  Some people.

20              THE COURT:  Let's not quibble about things that

21   aren't in dispute.

22              MR. GEORGE:  Understood.

23   BY MR. KIZNER:

24   Q   If Dalmatia was only supposed to receive ten percent, how

25   come it didn't say that in the agreement, only ten percent.

1  A    I'm unsure.

2  Q    Okay.

3         THE COURT:  You know, he's answered that already.

4         (Participants confer)

5         THE COURT:  He said it was from -- it was at least

6  ten percent because it was to go from -- make sure it was

7  above zero; he said that, I think twice already.

8         MR. KIZNER:  Sure.

9         THE COURT:  I don't think we need it a third time.

10 BY MR. KIZNER:

11 Q    Regarding the judgments that were discussed earlier, you

12 never paid any of the judgments, right?  The CO Nolt judgment

13 and the personal judgments, those are outstanding, correct?

14 A    Correct.

15 Q    Okay.  So you've never paid any money to Dalmatia in the

16 Bankruptcy Court or outside the Bankruptcy Court, you or your

17 companies, correct?

18         MS. MAGEE:  Cash.

19         MR. GEORGE:  Your Honor, I'm going to object.  What

20 time -- we're talking during the --

21         THE COURT:  Also, I don't know who "you" is in that

22 question.

23         MR. KIZNER:  Okay.  I'll --

24         THE COURT:  I'll sustain the objection to the form

25 of the question.  Try it again.

1    BY MR. KIZNER:

2    Q    Since October of 2017, CO Nolt has not paid Dalmatia any

3    -- any money, correct?

4    A    CO Nolt was not even in operation.  It has paid no

5    money.

6              THE COURT:  Can you -- like it's a yes or a no

7    question.  Why do you have to fight -- let me just put it in

8    some perspective.  You're doing the same thing that Ms. Magee

9    does, that seven out of every ten witnesses I hear does.

10   Instead of answering the question, you try to explain why the

11   answer to the question is what it is because you think it's

12   unfavorable.  Just answer the question.  Your attorney can

13   ask on --

14             THE WITNESS:  Okay.

15             THE COURT:  -- redirect examination for you to

16   clarify.  Otherwise, we spend all this time quibbling over

17   whether you're answering a question, and it's -- and you can

18   tell I'm getting frustrated by this, at this point.

19   BY MR. KIZNER:

20   Q    Since October 2017, you never paid anything to Dalmatia,

21   personally.

22   A    No.

23   Q    And since October 2017, the debtors never paid anything

24   to Dalmatia, correct?

25   A    Correct.

1    Q    And your position here today is it's fair an equal

2    treatment to pay Dalmatia 10 percent, while other unsecured

3    creditors get up to 50 percent?

4    A    I believe that this agreement was fair to Dalmatia, yes.

5              MR. KIZNER:  Okay.  No further --

6              THE COURT:  That's it?

7              MR. KIZNER:  -- questions, Your Honor.  Yeah.

8              THE COURT:  I just have a couple of questions.

9                          EXAMINATION

10   BY THE COURT:

11   Q    I just want to clarify in my mind the role FOODMatch

12   plays in all of this.  If I understood Ms. Magee's testimony

13   correctly, in the good old day, when everybody was getting

14   along, Dalmatia was the owner of the product, the debtors

15   actually fabricated the product, and FOODMatch was the

16   exclusive distributor of the product for Dalmatia.  That's, I

17   think, what Ms. Magee said.  Does that sound right to you?

18   A    That's correct, except maybe in Canada.  I --

19   Q    All right.  Well, let's just -- we can stay in just the

20   United States for now.  Okay.

21        Once there was a falling out, and then, as a result of

22   the settlement, how did the parties then align?  What role

23   was FOODMatch playing by that time?  That's the part I don't

24   understand entirely.

25   A    We -- we were --

1    Q    They stayed as a distributor for you.  Is that right?

2    A    No, no.  They -- it's not a distributor for us.  They

3    developed their own brand of fig jam, and we produced it for

4    them.

5    Q    Oh, okay.

6    A    They -- they don't distribute our products, they only

7    produce their products.

8    Q    So they changed from being a distributor to actually

9    creating their own product.

10   A    That's correct.  And they -- and they --

11   Q    And that's --

12   A    -- do that for a lot of products.

13   Q    And that was part of the reason that Dalmatia sued them?

14   A    Correct.

15   Q    Because they were doing that.

16   A    Because of the competition.

17   Q    And Dalmatia was claiming that the debtors did the same

18   thing.

19   A    They're saying --

20   Q    I'm not saying it's right.  I'm saying that that was the

21   claim.

22   A    They're claiming that we produced -- there were -- there

23   two issues:  One was the ten truckloads that she canceled and

24   said we did -- I don't want any more --

25   Q    One was a quality issue, right?

Thompson - Examination by the Court                    224

1    A    But there was no quality issue.

2    Q    Okay.

3    A    But we sold those to FOODMatch, who was the distributor,

4    and that's what the original purchase order -- took those and

5    distributed those to the marketplace.  They had put those

6    orders in, in good faith, in August, September, and they had

7    customers asking for it.  It wasn't anything more than just

8    normal business.  So that, under UCC law, is allowed.  Under

9    trademark law, I came to find out it was not allowed, and I

10   had legal advice that said I was good to go, so -- to

11   mitigate the cost.

12        The second issue was Dalmatia claimed that we were using

13   their formula for making the new Divina product.  Now --

14   Q    And that was -- that product is your product or

15   FOODMatch's product?

16   A    It was FOODMatch's product.

17   Q    Okay.  All right.

18   A    And so we made -- they came back with a formula that

19   they had developed in Greece.  It had 50 percent more figs,

20   less sugar, it had one ███████, and it did not have Ms.

21   Magee's secret ingredient.  But this one -- one of the jury

22   found against us and created an issue, and we just wanted it

23   to be over with.

24   Q    All right.  So let me go to the injunction now.  If

25   there had been no injunction -- okay.  Just take that

1    injunction out of the settlement agreement, and you could

2    have done those sales in that calendar year.  Would FOODMatch

3    have played any role in your production or distribution?

4    A    They would have bought -- bought that product and sold a

5    lot, and that business would have grown and --

6    Q    Well, when you say they "buy" the product, they would --

7    they would contract with you to make the product --

8    A    Correct.

9    Q    -- and pay you to make their product.  Is that --

10   A    Correct.  And compete --

11   Q    Is that how it would work?

12   A    And compete against --

13   Q    And compete against --

14   A    -- Dalmatia.

15   Q    -- Dalmatia.  And the injunction stopped you from doing

16   that.

17   A    It interrupted their supply.

18   Q    Okay.

19   A    And it also made their supply more expensive when they

20   started to get it again because --

21   Q    Okay.

22   A    -- from (indiscernible) you don't have to deal with

23   tariffs, so ...

24   Q    Now, at some point -- now exploring the details of the

25   terms -- FOODMatch -- which was part of the same litigation

1   that you were part of -- and by "you," I mean the debtors --

2   settled with Dalmatia.  Everybody seems to agree with --

3   about that, right?

4   A    Right.

5   Q    Did the -- at the settlement discussions on October

6   12th, before Judge Smith, was there anything stated by any of

7   the parties present that would suggest one way or another

8   whether the settlement with FOODMatch had already been

9   reached, or that -- or not?

10  A    It was -- it was reached in like June, early July '17.

11  Q    So FOODMatch had already settled out by the time you got

12  to October.

13  A    Right.  And it was kind of prompted because of our

14  bankruptcy.  It kind of made things start to happen.

15  Q    Whatever the reasons are.  Okay.

16       And so, if I'm following all the testimony, the

17  agreement in October, at that time, was simply that Dalmatia

18  could pursue its bankruptcy claim.  But between October and

19  January, it was able to calculate the benefits it got from

20  the FOODMatch settlement, and then liquidate a number that

21  was still -- it considered still owing, and that was then

22  plugged into the January agreement, and you accepted that.

23  That's the 1.7 number.

24  A    Yes.

25  Q    But in October, you wouldn't have known -- that number

1    was unliquidated, you didn't --

2    A    We knew it was in the range of 2 million, plus or minus.

3    Q    All right.  You had an estimate, but it wasn't firmed

4    up.

5    A    Right.

6    Q    So that -- am I describing the process correctly?

7    That's sort of how this all came about?

8    A    That's --

9    Q    Okay.

10   A    -- that part, correct.

11   Q    All right.

12   A    See, the other part was that they had already reached th

13   agreement that FOODMatch was allowed to compete against them

14   in the marketplace with their own product, the fig jam.  And

15   that's -- that was --

16   Q    And that's why -- that's when the injunction kicks in --

17   A    That's --

18   Q    -- as being --

19   A    That's why --

20   Q    -- significant.

21   A    -- it was so important to her because it was a

22   competitive advantage for her to get that injunction.

23   Q    Okay.  And one last thing.  At one point, you tried to

24   bullet point the essence of the meeting of the minds, of the

25   agreement, and you said that, as you understood how you got

1  to a settlement with Dalmatia, it's because Dalmatia was

2  willing to accept either a lump sum of money or an injunction

3  and a ten percent distribution from the bankruptcy case.

4  A    Yeah.  And I think --

5  Q    Is that --

6  A    -- it would be --

7  Q    Is that what you were trying to say earlier, basically?

8  A    Yeah.  It's clear, if you take that black off that

9  number, it makes it --

10  Q    Okay.  And in your mind, your testimony is that the

11  lump-sum number and the injunction, the value of the

12  injunction have an equivalent economic value.

13  A    Exactly.

14  Q    Okay.  I understand your testimony, that's all I'm

15  trying to do at this point.

16  A    I can give you more words.

17  Q    What's that?

18  A    I can give you more words.

19  Q    No, thank you.

20            THE COURT:  Okay.  Redirect.

21            MR. GEORGE:  I just have a couple, Judge.

22            THE COURT:  Well, Mr. Maschmeyer would go first.

23            MR. MASCHMEYER:  I'll let him go.  I have nothing

24  at this point.

25            THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. GEORGE:

Q    There is a contribution that has to be made by the

principals of the debtor in connection with the confirmation

of the plan, right?

A    Correct.

Q    And can you tell the Judge how much that number is?

A    Six hundred and fifty thousand.

Q    And you had to try to collect that from your friends and

family?

A    Yeah.

Q    And you've gotten --

A    And --

Q    -- that money together to go effective with the plan?

A    Is this for the Court or for you?

Q    Well, let's hope parts for me.

A    Yes.  We --

Q    And by the way, it was due about four weeks, but --

A    Yeah, we've -- we've had it.  There's been some

paperwork snafus, so ...

          MR. GEORGE:  That's all I have, Judge.

          THE COURT:  Okay.  Any further cross-examination?

          MR. KIZNER:  Just -- does Mr. Maschmeyer --

          MR. MASCHMEYER:  I have nothing further.

          THE COURT:  He passed.

1          MR. KIZNER:  Oh, sorry (indiscernible)

2                       RECROSS-EXAMINATION

3     BY MR. KIZNER:

4     Q    You testified a few minute ago that, at the -- that, by

5     the time of the October 2017 settlement conference, that

6     FOODMatch had already settled.

7     A    That's correct.

8     Q    But you don't know any of the terms of those -- of that

9     settlement agreement.  You weren't a party to that, were you?

10    A    I only -- I only know what I could see from outside.

11    They were allowed to continue to produce or -- I was

12    producing for them, so I know that they were allowed to

13    continue to sell their brand.  And I know that was important

14    to them, and they confirmed that.

15    Q    So --

16    A    I don't know the financial arrangement.

17    Q    So you have no personal knowledge of the financial

18    arrangement.  That was my final question.

19    A    Yeah, no financial arrangement.  I don't know.

20         (Participants confer)

21              MR. KIZNER:  That's all I have, Your Honor.

22              THE COURT:  That's all you have?

23              Okay.  Thank you, Mr. Thompson.  Please step down.

24         (Witness excused)

25              MR. MASCHMEYER:  Your Honor, we have no further

1    witnesses.

2            THE COURT:  Okay.  The only other witness who was

3    going to be offered was Mr. Cianciulli?

4            MR. GEORGE:  Yeah, Cianciulli.  And we've decided

5    not to call him.

6            MR. MASCHMEYER:  We're not going to call him.

7            THE COURT:  You've decided not to call him.

8            MR. MASCHMEYER:  Yeah.

9            MR. GEORGE:  So I think we can rest, right?

10            THE COURT:  Okay.  All right.  So the debtor and

11    the committee both rest.

12            MR. MASCHMEYER:  Rest, yeah.  We rest, Judge.

13        (Participants confer)

14            THE COURT:  Mister --

15            MR. KIZNER:  Something, Your Honor, just came up.

16    One of the -- one of the statements Mr. Thompson made was

17    apparently subject to the confidentiality provision; it was

18    actually one of the key terms.  Can my client speak, since

19    she's --

20            THE COURT:  Well, let's not --

21            MR. KIZNER:  Just one statement was made.

22            THE COURT:  Let's do that off the record.

23            MR. KIZNER:  Okay.  At least --

24            THE COURT:  But not --

25            MR. KIZNER:  -- that part.

1            THE COURT:  But not now.  Don't forget about it.

2            MS. MAGEE:  Okay.

3            THE COURT:  We'll come back to it.

4            I guess what I want to ask you is:  Do you want to

5     put on any rebuttal evidence?  Is there anything else you

6     want to cover with any -- with a witness?

7            MR. KIZNER:  Yeah.  Can we have five minutes, Your

8     Honor?

9            THE COURT:  To decide that, do you mean?

10           MR. KIZNER:  Yeah, to discuss it.

11           THE COURT:  Okay.  So -- all right.  So let's go

12    off the record.  But before you go and discuss that, let me

13    hear about the confidentiality.

14           MS. MAGEE:  Oh.

15        (Off the record at 2 p.m.)

16        (Proceedings resume at 2:02 p.m.)

17           THE COURT:  Off the record, Ms. Magee brought up a

18    concern that one particular phrase that came out in the

19    testimony recently revealed at least part of a trade secret

20    and requested it be redacted.  I didn't hear anybody when we

21    were off the record objecting to my suggestion that, if and

22    when this hearing today is transcribed, that I will find a

23    mechanism to just redact that one phrase that created the

24    concern, which we all know about.  But I also said that, if

25    we get to that point, I will expect the parties to do

1    something, file something, notify me in some way that -- to

2    remind me that I need to do that.  So, with that --

3            MR. MASCHMEYER:  On behalf of the debtor, we have

4    no objection.

5            MR. KIZNER:  Your Honor, you also mentioned that

6    you wouldn't allow an electronic version of the record --

7            THE COURT:  That -- right, I'm not -- that's

8    something that's under my control.

9            MR. KIZNER:  Okay.

10           THE COURT:  I'm not going to post the electronic

11   version of the record.  And I don't consider it likely enough

12   to worry about, that some other party-in-interest in the

13   bankruptcy case would request a copy of this transcript,

14   since nobody else has really been participating for some

15   time.  If that happens and anybody gets wind of that, and the

16   Court doesn't bring it to -- and we don't remember it here at

17   the Court, I'll need, again, somebody to take some action and

18   let me know.

19           MR. KIZNER:  Yes, Judge.

20           THE COURT:  All right.  So we'll go off the record

21   for a couple of minutes while Mr. Kinzer decides if he wishes

22   to present --

23        (Recess taken at 2:04 p.m.)

24        (Proceedings resume at 2:20 p.m.)

25        (Call to order of the Court)

1        THE COURT:  All right.  Mr. Kizner, what have you

2    decided to do?

3        MR. KIZNER:  We decided we're going to call Harvey

4    Grossman, the sales -- sales manager?  Is that correct?

5        THE COURT:  Okay.

6        MR. KIZNER:  The sales manager, as a rebuttal

7    witness, Your Honor.

8        THE COURT:  Okay.

9        THE COURT OFFICER:  Please place your left hand on

10   the Bible and raise your right hand.

11   HARVEY GROSSMAN, WITNESS FOR THE MOVANT, SWORN

12       THE COURT OFFICER:  Please be seated.

13      (Participants confer)

14       THE COURT OFFICER:  Please state and spell your

15   name for the record.

16       THE WITNESS:  Harvey Grossman, H-a-r-v-e-y, G-r-o-

17   s-s-m-a-n.

18       THE COURT OFFICER:  May I have your address, Mr.

19   Grossman, for the record?

20       THE WITNESS:  1324 Round Pointe Drive, Haverstraw,

21   New York, 10927.

22       THE COURT OFFICER:  Thank you.

23       MR. GEORGE:  Your Honor, could we have an offer of

24   proof of what this witness?

25       THE COURT:  No, let him just go ahead.

Grossman - Direct                      235

1          MR. GEORGE:  Okay.

2          (Participants confer)

3                      DIRECT EXAMINATION

4     BY MR. KIZNER:

5     Q    Mr. Grossman, can you explain what your role with the

6     company is?

7     A    I do -- I'm in charge of all the sales for Dalmatia.

8     Q    All right.  And earlier, Mr. Thompson testified about

9     Nielsen data.  Are you familiar with that?

10    A    Yes.

11    Q    What is Nielsen data.  Because I don't believe it was

12    clear.

13    A    Nielsen is -- is a -- the Nielsen Company does -- puts

14    together syndicated data, which they get from supermarkets.

15    When you scan something through the supermarket, it

16    registers.  They are able to get all that data.  And so it

17    registers sales through a register, rather than cases sold to

18    the warehouse.  So that's the value of having Nielsen, or IRI

19    is another company.

20    Q    So, during the year of the injunction, which was October

21    2017 to October 2018, were you reviewing Nielsen data around

22    that time frame?

23    A    Yes.  I had the end of year, which is December.  Nielsen

24    is a fifty-two-week, rolling by month.  So you're comparing -

25    - if you did -- if you had December of 2017 and compared it

1   to 2016, December, that's how they measure.  So you could

2   have different months, and someone -- so, you know, you could

3   have different things happening.  But the one that really

4   counts is the end of the year because that pretty much takes

5   the whole year into account.  So I don't know what months he

6   was referring to.  But I know the end of the year is what I

7   use because that's the one that counts.

8   Q    And do you recall what FOODMatch's end of the year for

9   2017, what the Nielsen data showed, their sales?

10  A    I don't know exactly, I don't remember that.  But I do

11  know that they were up about 80 percent, and we were down.

12            THE COURT:  I'm sorry.  I didn't hear the number.

13  How much percent?

14            THE WITNESS:  Eighty.

15            THE COURT:  And which year are we talking about,

16  end of which year?

17            MR. KIZNER:  End of --

18            THE WITNESS:  The end --

19            MR. KIZNER:  -- 2017.

20            THE WITNESS:  -- of 2017.  So our sales --

21            MR. GEORGE:  Objection.  This starts --

22            THE WITNESS:  -- on the other hand --

23            MR. GEORGE:  -- '17 to '18.

24            THE WITNESS:  -- we were down because we had lost

25  distribution to FOODMatch, who had switched a lot of our

1      customers to them.  So there was no way that we could be up,

2      and we weren't up, so it was inaccurate to say that we were

3      up --

4                   THE COURT:  Can I ask --

5                   THE WITNESS:  -- and they --

6                   THE COURT:  -- the obvious question?

7                   THE WITNESS:  -- they -- they weren't.

8                   THE COURT:  The end of 2017 was only two months

9      into the injunction.

10                  MR. GEORGE:  Right.

11                  THE COURT:  So wouldn't the end of 2018 be the more

12     significant --

13                  THE WITNESS:  No, well --

14                  THE COURT:  -- piece of --

15                  THE WITNESS:  -- they had --

16                  THE COURT:  -- information?

17                  THE WITNESS:  -- started to switch with -- from our

18     brand to their brand before that --

19                  THE COURT:  All right.

20                  THE WITNESS:  -- because they knew that we were

21     leaving them, and about six months before, they started to

22     switch to their brand.

23                  Also, they were making product with our label on

24     it, they were using our label.  And they were selling that,

25     of which Dalmatia got -- did not receive any income on that

1    because it was going right to them.  When the injunction was

2    filed, they had to stop selling our label, and then they

3    switched to Divina.

4    BY MR. KIZNER:

5    Q    What's vina [sic]?  Can you explain that?

6    A    Excuse me?

7    Q    Can you explain what vina is?

8    A    Divina is the brand that FOODMatch came out with.

9    FOODMatch also is a distributor of olives, and it's a brand

10   that they've had for a long time, so it's not a new brand,

11   but it's new to fig spread.

12   Q    So, after the injunction was entered, this vina brand

13   started making food spread -- fig spread?  Sorry.

14          MR. GEORGE:  Objection, Your Honor.  He's leading

15   the witness.

16          THE COURT:  Well, I think he's just trying to lay

17   the foundation here.  I'll allow that question.

18          THE WITNESS:  When Divina stopped selling our

19   product with our name, they switched -- when FOODMatch,

20   rather, they switched to Divina brand, using our formula,

21   basically, in a different jar.

22   BY MR. KIZNER:

23   Q    And during the 2017/2018 holiday season, a year ago, I

24   mean, how was -- how was the production for Dalmatia doing at

25   that point?

1    A     Our sales were so -- so down that we actually had to let

2    people go in the plant in Croatia because we had no sales

3    because, for those couple of months, we weren't selling

4    anything, which is really what tipped us off to the fact

5    there was something wrong, which led us to try to find out

6    what was going on.

7              THE COURT:  I'm sorry.  What --

8    A     And then we found out.

9              THE COURT:  What period of time are you talking

10   about now?

11             THE WITNESS:  Yes.

12             THE COURT:  What period of time are you talking

13   about, in this last --

14             THE WITNESS:  It would have been the end of 2016

15   into 2017, I believe.

16   BY MR. KIZNER:

17   Q     And how did you -- what gave rise to the lawsuit --

18   A     What gave --

19   Q     -- the underlying --

20   A     -- rise to --

21   Q     -- lawsuit?

22   A     -- the lawsuit?

23   Q     Yeah.

24   A     Well, we found out that they were counterfeiting our

25   product and --

1          THE COURT:  Do we really --

2     A    -- honestly --

3          THE COURT:  -- have to go into --

4          MR. GEORGE:  Your Honor --

5          THE COURT:  I stopped --

6          MR. GEORGE:  And he's the head --

7          THE COURT:  I stopped --

8          MR. GEORGE:  -- of sales.

9          THE COURT:  I stopped the debtor from going to the

10    beginning of the litigation, and I'm going to stop you, as

11    well, on rebuttal.

12         MR. KIZNER:  Okay.

13         THE COURT:  Let's not do that.

14    BY MR. KIZNER:

15    Q    Mr. Thompson testified earlier about how fig spread was

16    around since like 100 A.D.  Do you recall that testimony?

17    A    Yes.

18    Q    Okay.  How long has -- how long was the debtors actually

19    producing fig spread, though?

20    A    How long was?

21    Q    Were they actually producing it.

22    A    I really don't know that answer.

23    Q    Oh, okay.

24         (Participants confer)

25    Q    Did --

1    A    I mean, he's correct to say that fig spread has been

2    around forever, a long time.  I'm not saying that isn't true.

3    But nobody every really did anything to market fig spread in

4    this market until Dalmatia came along and really started to

5    develop a marketing program, develop sales programs.  So they

6    created a market that never existed.  That's not to say that

7    fig spread wasn't around; it was.  But there was no market

8    for fig spread until Dalmatia got into it.

9    Q    And since the debtors were introduced to Dalmatia and

10   the fig spread, the whole business model of fig spread, even

11   after the lawsuit, they still have their own fig spread,

12   right?

13   A    I can't hear you.

14   Q    They have their own fig spread --

15   A    They have Divina --

16   Q    -- the debtors.

17   A    -- correct.

18   Q    Okay.

19        (Participants confer)

20   Q    Do you know how they, all of a sudden, started creating

21   the fig spread --

22   A    No, I didn't.

23   Q    -- the debtors?

24        Do you believe that they used Dalmatia's recipe?

25            MR. GEORGE:  Objection, Your Honor.

1            THE COURT:  Sustained.

2            MR. GEORGE:  Leading.

3            THE COURT:  Sustained.

4        (Participants confer)

5            THE WITNESS:  I -- I --

6            THE COURT:  You can't answer the question.

7            THE WITNESS:  I can't answer the question.

8            THE COURT:  I sustained the objection.

9            THE WITNESS:  Anyway ...

10           THE COURT:  Please don't answer.

11           MR. KIZNER:  That's all, Your Honor.

12           THE COURT:  Okay.

13           MR. GEORGE:  Just a couple, Judge.

14                       CROSS-EXAMINATION

15   BY MR. GEORGE:

16   Q    You said -- what is your position at the company?

17   A    I'm the Director of Sales.

18   Q    And are you employed by Dalmatia or some other company?

19   A    Dalmatia.

20   Q    And who do you answer to at the company?

21   A    To Maia Magee and to Neb, but mostly to Maia.

22   Q    Now you said someone was using a formula in a different

23   jar.  Who were you talking about?

24   A    I was talking about FOODMatch was using Dalmatia's

25   formula, selling it in the jar with the Dalmatia label on it.

1    Q    Okay.

2    A    The only difference was that it said "Product of USA,"

3    instead of product of Croatia.

4    Q    Were you in -- personally involved in any of the testing

5    of the formula that was used --

6    A    No.

7    Q    -- in those jars?

8    A    No.

9    Q    Have you ever seen any reports from anybody about that -

10   - what was in those jars --

11   A    No.

12   Q    -- used?

13   A    No.

14   Q    Okay.  You don't have any information on what happened

15   between October '17 and October of '18 with respect to the

16   Nielsen sales, right?

17   A    The -- I do not.

18   Q    Okay.

19   A    But the only one that I have for that particular year is

20   December.

21   Q    Up to the end of '17.

22   A    Correct.  So I don't know --

23   Q    Okay.

24   A    -- what October was.  It is possible that, maybe in

25   October, you know, it could have been up.  But like I said --

1   Q    Well, but it's also --

2   A    -- it's the year end that matters.

3   Q    But it's also possible that, through the whole year, it

4   was down because you don't know what the number was.

5   A    No, but I can get it.

6        MR. GEORGE:  Okay.  I don't have anything further,

7   Your Honor.

8        THE WITNESS:  Okay.

9        MR. MASCHMEYER:  Your Honor, I have one question.

10                    CROSS-EXAMINATION

11  BY MR. MASCHMEYER:

12  Q    Mr. Grossman.

13  A    Yes.

14  Q    Grossman, correct?

15  A    Yes.

16  Q    When did you start working for them?

17  A    December of 2017.

18        MS. MAGEE:  No, no.

19        THE WITNESS:  Yeah.

20        THE COURT:  That would be a year ago.

21        THE WITNESS:  Yes.

22        THE COURT:  Yeah.

23        THE WITNESS:  But you know, Nielsen is a very --

24  readily available.  When I took over, the first thing I did -

25  -

1          THE COURT:  No, that wasn't --

2          THE WITNESS:  -- was look at --

3          THE COURT:  That wasn't the --

4          THE WITNESS:  -- the data.

5          THE COURT:  -- question he asked you.  It was how

6    long ago --

7          MR. MASCHMEYER:  No, I asked --

8          THE COURT:  Maybe you didn't --

9          MR. MASCHMEYER:  -- when he was --

10         THE COURT:  -- hear the question.

11         MR. MASCHMEYER:  -- when did he get --

12         THE COURT:  How long ago did you start working for

13   Dalmatia?

14         THE WITNESS:  2017, December.

15         THE COURT:  December.  One year.

16         THE WITNESS:  One year.

17         THE COURT:  You've been with the company one year.

18         THE WITNESS:  Correct.

19         THE COURT:  Okay.

20   BY MR. MASCHMEYER:

21   Q    Yeah.  Next, were you at the settle -- any of these

22   settlement conferences?

23   A    No.

24         MR. MASCHMEYER:  I have no further questions.

25         THE COURT:  Okay.  I don't have any questions.

1    Redirect?

2          (Participants confer)

3          MR. KIZNER:  Your Honor, I have no -- Ms. Magee has

4    one question I'd like to ask her on the stand, if we could

5    bring her up as a second rebuttal witness.

6          THE COURT:  So you don't have any questions for --

7          MR. KIZNER:  No, no more --

8          THE COURT:  -- this witness.

9          MR. KIZNER:  -- questions for --

10         THE COURT:  All right.

11         MR. KIZNER:  -- Mr. Grossman.

12         THE COURT:  Thank you, Mr. Grossman.  You can step

13   down.

14         (Witness excused)

15         THE COURT:  You want to call Ms. Magee?

16         MR. KIZNER:  Ms. Magee back up as a rebuttal --

17         THE COURT:  Yeah.

18         MR. KIZNER:  -- as a rebuttal witness.

19         THE COURT:  She can come back up as a rebuttal

20   witness.

21   MAIA MAGEE, WITNESS FOR THE MOVANT, PREVIOUSLY SWORN, RESUMES

22   STAND

23                    DIRECT EXAMINATION

24   BY MR. KIZNER:

25   Q   Ms. Magee, I just have one question.  What did you prove

1    in court at the Eastern District trial; what was proved?

2    A    In the Federal Court in Easton, Pennsylvania, in a four-

3    week trial, I proved that Lancaster and FOODMatch stole our

4    recipe.  I proved that they counterfeited our product,

5    meaning they made lookalike jars, to look like mine.  And I

6    proved they illegally used my trademarks.

7              MR. KIZNER:  That's the only question I have, Your

8    Honor.

9                         CROSS-EXAMINATION

10   BY MR. GEORGE:

11   Q    And ma'am, isn't it true that both your verdict and the

12   debtor both sought new trials of both of those verdicts?  You

13   sought a new trial, and so did the debtor, right?

14   A    I don't think the debtor sought a new trial on --

15   Q    Okay.

16   A    -- stealing the recipe.

17   Q    You sought a new trial.

18   A    Not on those issues.

19   Q    Okay.

20   A    We won.

21             MR. GEORGE:  Okay.

22             THE COURT:  Mr. Maschmeyer, anything?

23             MR. MASCHMEYER:  I have nothing, Judge.

24             THE COURT:  Okay.  All right.  Thank you.

25             THE WITNESS:  Thank you.

1    (Witness excused)

2              THE COURT:  All right.  So I take it, with that,

3    Dalmatia rests.

4              MR. KIZNER:  Yes, Your Honor.

5              THE COURT:  Okay.  So the record is -- the

6    evidentiary record is complete.

7              MR. MASCHMEYER:  Yes, Judge.

8              THE COURT:  All right.  Before we discuss,

9    procedurally, where we go from here, I would like to see

10   counsel in chambers.

11        (Participants confer)

12        (Recess taken at 2:24 p.m.)

13        (Proceedings resume at 2:52 p.m.)

14        (Call to order of the Court)

15             THE COURT:  Okay.  Both for the sale of the record,

16   and truly for the benefit of the principals of Dalmatia and

17   the debtors, I want to summarize what we talked about in

18   chambers off the record.

19             Essentially, what I did for the lawyers -- and I'm

20   sure the parties' lawyers will give you their versions of

21   this, as well.  But essentially what I did is I shared some

22   impressions about the case, the hearing that I've heard

23   today.  And the main theme that I expressed is that there are

24   difficult issues in the case that I have to resolve, in order

25   to decide who wins and who loses, and there are difficult

1   issues legally.

2         You know, the bankruptcy process, particularly in

3   Chapter 11, is a very technical process, it's very concerned

4   about the procedures that are used.  And some of the

5   standards for deciding the propriety of plan provisions are

6   fairly general, where courts have applied them in many

7   different ways, leaving me without any specific rules that I

8   have to follow or cases that tell me exactly what I need to

9   do in certain situations.

10        The point here is that I expressed that I don't

11  know how I'm ruling on this case.  It will require me to

12  study the record and resolve a number of thorny bankruptcy

13  issues that have been discussed in some cases, but nothing

14  that I think is going to give me any clear guidance.  And as

15  a result, it's a crap shoot, from the perspective of the

16  parties.

17        It's also a case where it's all or nothing, at

18  least as I see it now.  It's not the kind of case that comes

19  to a court, where parties win partially or not partially.

20  The nature of this dispute is, either I'm going to say the

21  plan is fine, in which case Dalmatia gets treated with the

22  ten percent distribution; or the plan isn't fine, in which

23  case Dalmatia has to be treated by the Class 8 and Class 9

24  creditors, and they get a lot -- and Dalmatia gets a lot more

25  money.  There's nothing in between here.

1          And that's a kind of classic situation.  It's

2     almost a red flag for a judge to stop for a second and tell

3     the parties to at least consider settlement and to consider

4     controlling your own destiny about this, cutting off at least

5     some of the bleeding, in terms of paying legal expenses, and

6     determining if there's some kind of a compromise that you can

7     live with that will give you some finality to this.

8          In terms of the time process, given what you'll see

9     in a moment, the need for obtaining a transcript and briefing

10    the issue, and then giving me sufficient time to resolve it,

11    the best you're looking at, probably, from past experience,

12    is a decision in the summer.  And so this will be hanging

13    over your heads for another six months.

14         It could be longer, sometimes I take longer writing

15    opinions, and particularly when they're difficult.  And I see

16    this, at the outset, as being one of those difficult cases,

17    where I'm treading in legal areas that bankruptcy

18    practitioners are very sensitive about, when judges write.

19    And so I will be very careful about what I say on some of

20    these issues.

21         So that's what I told counsel, and I just simply

22    asked them to reach out to their clients and determine if the

23    parties are willing to engage in some settlement discussions

24    on the finite issue -- because it's only a fixed amount of

25    money here that's in dispute.

1        So the process will be this.  I'm going to give

2    everybody a couple -- some time to do this.  I'd say, by the

3    end of next week, I'd like to have the -- somebody -- one or

4    more of the parties report back to my courtroom deputy that,

5    essentially, you're on board with having some time to settle,

6    and that will slow down the rest of the scheduling process

7    for deciding this case.  And assuming that happens, I want to

8    lay out for everyone what the deadlines will be.

9        If you're willing to engage in a -- one more round

10   of trying to settle it, I'm willing to wait -- let's see.

11   Where's the calendar?  I'll give you the whole month of

12   January, to see if you can settle it.  If you haven't -- and

13   let me make one other comment about the settlement process.

14   Unlike Judge Smith, I am reluctant to really roll up my

15   sleeves and be involved in the settlement negotiations, since

16   I have to decide this.  But as long as I can protect my

17   ability to decide the case, if you -- if the parties get to

18   the point where they're really awfully close, and they just

19   might need a little help from me, I'll be willing to

20   participate at that point.

21       So, giving you the whole month of January,

22   essentially what I'm saying is that, if there's no

23   settlement, I want the transcript ordered by February 1st,

24   2019.  Assuming that there's roughly -- you can order it on

25   the least inexpensive fashion, which is a thirty-day

1    turnaround, usually it comes in a little faster than that.

2    And as a reminder to all of us, if we get to that point that

3    you're ordering the transcript, we do -- we'll have to redact

4    that one little portion of it.

5         Essentially, I -- it won't be firm dates, but

6    whenever the transcript hits the docket, I'll give each side

7    -- I'm actually going to ask for simultaneous briefs.  I'll

8    give each side four weeks to file an initial brief, and I'll

9    give two weeks for a reply.  And I'll give two weeks for a

10   reply.  So, realistically, you'll get the transcript in late

11   February, the briefs will be late March, the briefing will be

12   completed in April at -- on this kind of a schedule.

13        If I don't get the confirmation next week, through

14   my courtroom deputy, that there is -- the parties are at

15   least intending to have a serious and meaningful settlement

16   process or effort to try to settle it, I'll just move up the

17   dates, proportionally at that point.

18        So that's how I see it, and that's how I see where

19   we are.  In light of that, as I told counsel in chambers,

20   there's really no need for a closing argument.  A case that

21   has any degree of length and complication, I tend to find

22   that getting post-trial briefs obviates the need for a

23   closing argument.  There is a potential that, once I have the

24   briefs, I might want oral argument, but that's rare, it

25   doesn't happen very often, once I have briefs after a trial.

1          So anything by way of logistics that I need to

2     cover that I haven't talked about?

3          (No verbal response)

4          THE COURT:  Okay.  So let me thank you all.  I

5     appreciate -- while, at times, the hearing was a little

6     testy, overall, I appreciate the hard work that went into it

7     and the relative efficiency of the hearing.  I'm sure we're

8     all glad it's done.  And with that, I'll conclude the hearing

9     and wish everybody a good -- have a good weekend and a good

10    holiday.

11         PARTICIPANTS:  Thank you, Judge.  Thank you, Your

12    Honor.

13         THE COURT:  Court is adjourned.

14         (Proceedings concluded at 3:00 p.m.)

15                         *****

1                         CERTIFICATION

2              I certify that the foregoing is a correct

3      transcript from the electronic sound recording of the

4      proceedings in the above-entitled matter to the best of our

5      knowledge and ability.

6

7

8

9

10      _____        March 6, 2019

11      Coleen Rand, AAERT Cert. No. 341

12      Certified Court Transcriptionist

13      For Reliable